RECEIVED
MAR 13 2020
U.S.D.C.
WP

1    *JANE / JOHN DOE*

2    Email: JWHater@protonmail.com

3

4    *Pro se*

5

6    ### IN THE UNITED STATES DISTRICT COURT FOR THE
     ### SOUTHERN DISTRICT OF NEW YORK

7

8    IN RE: DMCA SUBPOENA TO GOOGLE, LLC | Case No.:  7:20-mc-00119

9

10   | **JANE / JOHN DOE'S OBJECTION AND
11   MOTION TO QUASH DMCA SUBPOENA
     PURSUANT TO THE FIRST AMENDMENT
12   AND BOTH THE CA AND NY REPORTER
     SHIELD LAWS**

13

14

15       *Jane / John Doe* (a pseudonym) wishes to object to a February 28, 2020, DMCA

16   subpoena seeking certain account and subscriber information relating to a YouTube

17

18   account using the name "JW Apostate"

19   (https://www.youtube.com/channel/UC09GQmDAFGLmaffWo16ETPg).  See ECF

20

21   Doc #7.  As of yet, no information has been produced.  *Jane / John Doe* would ask the

22   court to quash this fishing expedition.

23

24

25                           ## A. INTRODUCTION

26

27       *Jane / John Doe* alleges that she / he is a noted author and journalist.

28

Upon review of the documents submitted to the Court, *Jane / John Doe* suspects that this is an illegal attempt by the Jehovah's Witnesses to violate the First Amendment rights of journalists, authors, and citizens by attempting to get information regarding confidential sources in violation of the Reporter Shield Laws of California and New York.

As the Court well knows, the Watch Tower organization is an anti-government, end-of-the-world / doomsday religious cult run by a bunch of god damn pedophiles who think that Jeebus or God or Allah speaks to them personally telling them that it is okay to be raping a bunch of little kids and then trying to cover that shit up.

## B. ARGUMENT

*Jane / John Doe* alleges that she / he is entitled to protection from this subpoena pursuant to the First Amendment and the Reporter Shield Laws of California and New York, and that the Court utterly failed in its duty to balance the interests of news reporters from stupid fishing expeditions by angry pedophile and pedophile enablers in its hurried effort at rubber stamping whatever documents are handed to the Court in an effort by this judge to appease stupid religious cults who live in her neighborhood. The Watchtower Bible and Tract Society is no stranger when it comes to DMCA subpoena applications or indeed Judge Seibel. The religious cult has attempted to obtain several subpoenas in New York courts against Facebook and YouTube users,

JANE / JOHN DOE'S OBJECTION AND MOTION TO QUASH DMCA SUBPOENA- 2

filing around 60 applications overall since June 2017. This is complete **BULLSHIT** (to use a legal term).

## 1. CALIFORNIA REPORTER SHIELD LAW

In California, article I, section 2(b) of the California Constitution and Evidence Code section 1070 provide an immunity from being held in contempt to reporters, editors, publishers, and other people connected with or employed by newspapers, magazines, press associations and wire services, as well as radio or TV news reporters.

The California shield law applies to both the source of information ("confidential sources") and to "unpublished information" such as notes, out-takes, unpublished photographs and tapes. [1]

California's shield law was first adopted in 1935 as Code of Civil Procedure § 1881. *Delaney v. Superior Court*, 50 Cal. 3d 785, 795-96, 789 P.2d 934, 268 Cal. Rptr. 753 (1990). At that time, it provided an immunity from contempt for a newspaper employee's refusal to disclose source information, but it did not explicitly

---

[1] During the 2013-2014 legislative session, California state senator Ted Lieu introduced SB 558 to amend section 1986.1 of the Calif. Code of Civil Procedure. Among the amendments made include the addition of subsection b(2), which mandated that, in the case of a third party subpoena, notice must be given to the journalist and the publisher at least five days prior to issuing the subpoena. According to senator Lieu, his intent was to ensure that parties could not take advantage of gaps or loopholes in the existing law to undermine journalists' rights. He also noted as a cautionary tale the 2013 scandal involving the United States Department of Justice secretly obtaining the records of the Associated Press without the organization's knowledge, which is mentioned above.

SB 558 was enrolled on September 10, 2013 and was approved by the Governor on October 3, 2013, and it applies to both civil and criminal cases.

JANE / JOHN DOE'S OBJECTION AND MOTION TO QUASH DMCA SUBPOENA- 3

protect other unpublished information or other forms of media. *Id.* Amendments

added employees of radio and television stations, press associations, and wire services

to the shield law's protection. *Id.* In 1965, the shield law was transferred to Evidence

Code § 1070.

In 1972, apparently in response to the United States Supreme Court's decision in

*Branzburg v. Hayes*, 408 U.S. 665, 92 S. Ct. 2646, 33 L. Ed. 2d 626 (1972) (which

held that a newsperson did not have a qualified privilege against disclosing source

information to a grand jury), the California Legislature amended Section 1070 to

protect "unpublished information," in addition to protecting the identity of confidential

sources. *Id.*

In 1980, California voters elevated the reporter's privilege to the state

Constitution. "The proposition incorporated language virtually identical to section

1070 into the California Constitution, article I, section 2, subdivision (b)." *Delaney*, 50

Cal. 3d at 796.

The California Supreme Court has held that the First Amendment to the federal

Constitution confers a qualified privilege on reporters even when they are parties to a

lawsuit. *Mitchell v. Superior Court*, 37 Cal. 3d 268, 274, 690 P.2d 625, 208 Cal. Rptr.

152 (1984) (citations omitted). The Supreme Court held that courts should evaluate

five factors in determining whether disclosure by a reporter should be compelled:

(1) whether the reporter is a party to the litigation;

JANE / JOHN DOE'S OBJECTION AND MOTION TO QUASH DMCA SUBPOENA- 4

(2) whether the information sought "goes to the heart of the party's claim";

(3) whether the party seeking the information has exhausted all alternative sources;

(4) the importance of protecting confidentiality, including whether the information "relates to matters of great public importance" and whether the risk of harm to the source is "substantial"; and

(5) whether the party seeking disclosure has made a prima facie showing on its underlying claim.

*Id.* at 279-83.

A number of other cases have applied the qualified privilege, reaching different results regarding the protection afforded. E.g., *Anti-Defamation League of B'nai B'rith v. Superior Court*, 67 Cal. App. 4th 1072, 1095-97, 79 Cal. Rptr. 2d 597 (1998) (compelling disclosure of some unpublished information because it "might lead to admissible evidence" and other Mitchell factors satisfied); *Dalitz v. Penthouse Int'l, Ltd.*, 168 Cal. App. 3d 468, 479, 214 Cal. Rptr. 254 (1985) (compelling disclosure of confidential sources in defamation case because need for disclosure "compelling"); *KSDO v. Superior Court*, 136 Cal. App. 3d 375, 386, 186 Cal. Rptr. 211 (1982) (refusing to compel disclosure of unpublished information because alternative source of information); *Bohl v. Pryke*, 35 Media L. Rep. 2189 (Cal. Ct. App. 2007) (unpub. dec.) (noting that trial court considered *Mitchell* and ordered publisher defendant to respond to discovery); *Star Editorial, Inc. v. United States District Court*, 7 F.3d 856,

859-62, 21 Media L. Rep. 2281 (9th Cir. 1993) (applying California law) (compelling disclosure of confidential sources because it "goes to the heart of the claim").

In the case at hand, it is absolutely none of the Watch Tower's business who is posting this information about it. If they do not like it, they can go suck on a bag of dicks and stop preaching their ridiculous anti-government, *It's the end of the world so let's have sex with children!* nonsense!

## 2. NEW YORK REPORTER SHIELD LAW

Under New York law a professional journalist is defined as one who is engaged in "….gathering, preparing, collecting, writing, editing, filming, taping or photographing of news intended for a newspaper, magazine, news agency, press association or wire service or other professional medium or agency which has as one of its regular functions the processing and researching of news intended for dissemination to the public…"

See *Civil Rights Law*, Art. 7, Section 79-h (a) (6).

The New York Shield Law is an outgrowth of the state's long history of protecting the freedom of the press and of providing "one of the most hospitable climates for the free exchange of ideas." *In re Beach v. Shanley*, 62 N.Y.2d 241, 255, 476 N.Y.S.2d 765, 773 (1984) (Wachtler, J., concurring). According to one judge, the first New York case in which a reporter refused to reveal his sources dates back to

JANE / JOHN DOE'S OBJECTION AND MOTION TO QUASH DMCA SUBPOENA- 6

1735, when John Peter Zenger was prosecuted for publishing articles critical of the New York colonial governor. The case resulted in an acquittal. *Id.* Since that time, and particularly with the growth of the publishing industry in New York in the 19th century, the privilege has been expanded to the point that it provides "broadest possible protection" to the press. *O'Neill v. Oakgrove Const., Inc.,* 71 N.Y.2d 521, 529, 523 N.E.2d 277, 281 (1988).

New York Civil Rights Law § 79-h provides an absolute privilege from forced disclosure of materials obtained or received in confidence by a professional journalist or newscaster, including the identity of source. *Beach,* 62 N.Y.2d 241 (applying absolute privilege against disclosing a confidential source even though the disclosure of the materials to the reporter may itself have been a crime). The privilege applies in both criminal and civil contexts and to information passively received by a reporter.

As a result of a 1981 amendment to the Shield Law, the term "professional journalist" was expanded to include not only those working for traditional news media (newspapers, magazines, and broadcast media), but those working for any "professional medium or agency which has as one of its regular functions the processing and researching of news intended for dissemination to the public," as well. Civil Rights Law § 79-h(a)(6).

In 1988, the New York Court of Appeals, in *O'Neill v. Oakgrove Construction, Inc.,* 71 N.Y.2d 521, 528 N.Y.S.2d 1 (1988), held that both the New York State

Constitution and the First Amendment to the U.S. Constitution provide a qualified

privilege from the forced disclosure of nonconfidential materials.  This privilege may

only be overcome by a clear and specific showing by the party seeking disclosure that

the materials sought are: (a) highly material and relevant to the action; (b) critical or

necessary to the maintenance of a party's claim or defense; and (c) not obtainable from

any alternative source.  In 1990, Civil Rights Law § 79-h was, in the wake of *O'Neill*,

amended to incorporate this three-part test for nonconfidential news.

The Shield Law represents a formidable barrier to those who seek to compel the

disclosure of information obtained by reporters in the course of their newsgathering

activities. The *O'Neill* court, citing to the New York State Constitution and the State's

early recognition of a constitutionally guaranteed free press, noted that this barrier is

deliberately high:

The ability of the press freely to collect and edit news, unhampered by repeated

demands for its resource materials, requires more protection than that afforded by the

[CPLR].  The autonomy of the press would be jeopardized if resort to its resource

materials by litigants seeking to utilize the newsgathering efforts of journalists for their

private purposes were routinely permitted.  Moreover, because journalists typically

gather information about accidents, crimes, and other matters of special interest that

often give rise to litigation, attempts to obtain evidence by subjecting the press to

discovery as a nonparty would be widespread if not restricted.  The practical burdens

on time and resources, as well as the consequent diversion of journalistic effort and disruption of newsgathering activity, would be particularly inimical to the vigor of a free press. *O'Neill*, 71 N.Y.2d at 526-27 (quashing subpoena seeking nonconfidential photographs) (citations omitted). New York courts thus afford the broadest possible protection to those engaged in "'the sensitive role of gathering and disseminating news of public events,'" and they do not hesitate to quash subpoenas issued to reporters in both criminal and civil actions. *Id.* at 529 (*quoting In Re Beach v. Shanley*, 62 N.Y.2d at 256).

Even before the Shield Law was amended in 1990 to incorporate a qualified privilege for nonconfidential news, the Court of Appeals in *O'Neill* recognized a reporter's qualified privilege under the First Amendment and interpreted that privilege as consistent with the three-pronged balancing test articulated by the Second Circuit Court of Appeals in *United States v. Burke*, 700 F.2d 70 (2d Cir.1983), *cert denied*, 464 U.S. 816 (1983). *See O'Neill*, 71 N.Y.2d 521 at 527 (noting that "confidentiality or the lack thereof has little, if anything, to do with the burdens on the time and resources of the press that would inevitably result from discovery without special restrictions.").

In *People v. Korkala*, a 1984 case which rejected the notion that the 1981 amendment to the Shield Law extended the statute to nonconfidential news, the court nevertheless recognized that "there is the qualified privilege accorded to the newsman

which is founded directly upon the free speech, free press guarantees of the First

Amendment," and cautioned that compelling disclosure even of a reporter's

nonconfidential resource material can "have a chilling effect upon his functioning as a

reporter and upon the flow of information to the general public." *Korkala*, 99 A.D.2d

at 166-167 (1st Dep't 1984) (internal citations omitted).

However, in *Gonzales v. NBC*, 194 F.3d 29 (2d Cir. 1999), the Second Circuit

indicated that the issue of whether the privilege is rooted in the First Amendment or

federal common law is unresolved.  The *Gonzales* court limited the holding of *Burke*

and determined that when the materials are nonconfidential, federal law offers less

protection to a journalist than the three-part test articulated in *Burke*, which should

only be applied to confidential materials.  Indeed, the *Gonzales* court held that the

privilege for nonconfidential material is overcome if the litigant can show that the

materials are of likely relevance to a significant issue in the case and are not

reasonably obtainable from another reliable source. *Gonzales,* 194 F.3d at 36.

Interestingly, while citing past second circuit authority suggesting a constitutional

basis for the privilege, the *Gonzales* court declined to rule on whether this privilege

derived from federal common law or the Constitution, indicating that the issue would

have to be resolved in the event that the federal privilege were restricted or abrogated

by Congressional action.  *Id.* at n.6 (*citing von Bulow by Auersperg v. von Bulow*, 811

F.2d 136, 142 (2d Cir. 1987)).  In that event, if the privilege were constitutionally

derived, the restrictions would be struck down; if derived from federal common law,

Congress could modify the privilege.

Subsection (b) of Civil Rights Law § 79-h provides an absolute privilege with

respect to any information, including the identity of a source, conveyed to a reporter in

confidence.  The privilege applies with equal force in criminal and civil actions and in

responding to grand jury subpoenas.  *Knight-Ridder Broadcasting, Inc. v. Greenberg*,

70 N.Y.2d 151, 518 N.Y.S.2d 595 (1987) (criminal investigation); *Beach*, 62 N.Y.2d

241 (grand jury subpoena).  *See Flynn v. NYP Holdings, Inc.*, 235 A.D.2d 907, 652

N.Y.S.2d 833 (3d Dep't 1997) (reporters have unqualified protection from having to

divulge confidential information and qualified privilege for nonconfidential

information).  A reporter may invoke the privilege regardless of whether he or she

receives the information "passively" or receives it as a result of newsgathering efforts.

*See* Civil Rights Law § 79-h(b), (c); *In re WBAI-FM*, 42 A.D.2d 5, 8, 344 N.Y.S.2d

393, 395-396 (3d Dep't 1973) (Cook, J., dissenting).

Subsection (c) of the statute provides a qualified privilege for nonconfidential

news, which can only be overcome by a "clear and specific" showing by the party

seeking disclosure that the material sought (i) is highly material and relevant; (ii) is

critical or necessary to the maintenance of a party's claim, defense or proof of an issue

material thereto; and (iii) is not obtainable from any alternative source.  *See, e.g.*,

*O'Neill v. Oakgrove Const., Inc.*, 71 N.Y.2d 521, 527 (1988).  The privilege applies

1    with equal force to journalists' testimony and the production of materials. *See Guice-*

2    *Mills v. Forbes*, 12 Misc.3d 852, 819 N.Y.S.2d 432 (Sup. Ct. N.Y. Co. 2006).

3
4        In addition to these statutory safeguards, reporters in the Ninth Circuit enjoy a

5    strong First Amendment privilege against third-party discovery of published and non-

6
7    published journalistic work product.  See *Shoen v. Shoen*, 48 F.3d 412 (9th Cir. 1995).

8    The First Amendment privilege applies in civil and criminal proceedings. *Id.*

9
         In *Shoen,* the court held that a litigant seeking unpublished information must
10
11   show that the material is: "(1) unavailable despite exhaustion of all reasonable

12   alternative sources; (2) non-cumulative; and (3) clearly relevant to an important issue

13
14   in the case." *Shoen*, 48 F.3d at 416.  The privilege applies in civil and criminal cases,

15   and evidence satisfying each prong of the test is necessary to compel production. *Id.*

16       The Ninth Circuit has stated that the journalist's privilege cannot easily be

17
18   defeated: "'[I]n the ordinary case the civil litigant's interest in disclosure should yield

19   to the journalist's privilege.  Indeed, if the privilege does not prevail in all but the most

20
21   exceptional cases, its value will be substantially diminished.'"  *Id.* (quoting *Zerilli v.*

22   *Smith*, 656 F.2d 705 (D.C. Cir. 1981)).

23

24
25   **3. ANALYSIS OF SHIELD LAWS**

26
27       In determining whether a statute creates a privilege that bars otherwise lawful

28   discovery, courts have a "duty to avoid a construction that would suppress otherwise

JANE / JOHN DOE'S OBJECTION AND MOTION TO QUASH DMCA SUBPOENA- 12

competent evidence unless the statute, strictly construed, requires such a result." *St. Regis Paper Co. v. United States*, 368 U.S. 208, 218 (1961); see also *In re England*, 375 F.3d 1169, 1177 (D.C. Cir. 2004) ("[T]he terms of a statute should be strictly construed to avoid a construction that would suppress otherwise competent evidence." (internal quotation marks omitted)).  In assessing the reach of state and even federal confidentiality statutes, courts are careful to distinguish "between privilege and protection of documents, the former operating to shield the documents from production in the first instance, with the latter operating to preserve confidentiality when produced." *Virmani v. Novant Health Inc.*, 259 F.3d 284, 287 n.4 (4th Cir. 2001); see also *Pearson v. Miller*, 211 F.3d 57, 68 (3d Cir. 2000) ("Statutory provisions providing for duties of confidentiality do not automatically imply the creation of evidentiary privileges binding on courts."); *Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1344 (D.C. Cir. 1984) (observing, in the FOIA context, that "[i]f information . . . is exempt from disclosure to the general public under FOIA, it does not automatically follow the information is privileged . . . ."); *In re Grand Jury Proceedings*, 832 F.2d 554, 560 (11th Cir. 1987) (concluding that a Florida statute requiring secrecy of grand jury testimony did not establish an evidentiary privilege under Florida law).

New York has "long provided one of the most hospitable climates for the free exchange of ideas … It is consistent with that tradition for New York to provide broad

protections, often broader than those provided elsewhere, to those engaged in
publishing and particularly to those performing the sensitive role of gathering and
disseminating news of public events." *In Re Beach v. Shanley*, 62 N.Y.2d 241 at 255-
256, 476 N.Y.S.2d 765, 773 (1984) (Wachtler, J., concurring).

Here the Reporter Shield Laws of both California and New York, by their plan
terms, provide for the confidentiality of this information.

## 4. IDENTITIES OF ANONYMOUS SPEAKERS IS PROTECTED BY 1ST AMENDMENT

There can be little doubt that the First Amendment protects against compelled
identification of anonymous speakers. *Watchtower Bible and Tract Soc. of New York
v. Village of Stratton*, 536 U.S. 150, 166-67 (2002); *Buckley v. American
Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999).

> [A]n author is generally free to decide whether or not to disclose his or her true
> identity.... [A]n author's decision to remain anonymous, like other decisions
> concerning omissions or additions to the content of a publication, is an aspect of
> the freedom of speech protected by the First Amendment.

*McIntyre v. Ohio Elections Comm.*, 514 U.S. 334, 341-42. (1995). "Under our
Constitution, anonymous pamphleteering is not a pernicious, fraudulent practice, but
an honorable tradition of advocacy and dissent." *Id.* at 356. Thus, this Court's

compelling Google to disclose the identity of the individuals behind this anonymous Google account would irreversibly amputate those authors' First Amendment rights.

It is also well-settled that anonymous speech on the Internet is afforded the same protections as anonymous "pamphleteering." *Reno v. ACLU*, 521 U.S. 844, 853 (1997); see also *ApolloMedia Corp. v. Reno*, 19 F. Supp. 1081 (N.D. Cal. 1998) (protecting anonymous denizens of www.annoy.com, a website "created and designed to annoy" legislators), aff'd by *ApolloMedia Corp. v. Reno*, 526 U.S. 1061 (1999). And since a court order constitutes state action, compelling *Jane / John Doe's* destruction of anonymity (either her/ his own or someone else's) is subject to constitutional limitations. *New York Times v. Sullivan*, 364 U.S. 254, 265 (1964). Compelled identification affects the First Amendment right of anonymous speakers to remain anonymous. Justification for an incursion upon that right requires proof of a compelling interest. *McIntyre*, 514 U.S. at 347. And beyond that, the restriction must also be narrowly tailored to serve that compelling interest. *Id.*

## C.  CONCLUSION

The Watch Tower organization can go fuck itself – seriously. They are all a bunch of damn pedophiles and pedophile enablers.

> ***Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.***

*Jane / John Doe* is going to see to it that each and every member of this pedophile organization gets burned to death in the scorching light of publicity and that this social disease is eliminated from the planet, and she / he asks the Court to quash this subpoena.  Should the Court desire a hearing on the matter, *Jane / John Doe* asks that it be done in such a manner so as to preserve her / his anonymity with the understanding that it would be totally impossible for her / him to physically come to the courthouse to argue this matter (which would then result in the exposure of the very things she / he wishes to keep anonymous and would defeat the purposes of this motion and these fundamental Constitutional protections) (not to mention the fact that she / he is now prohibited from even entering the courthouse there on account of the chrono virus).  Perhaps the Court could appoint counsel for the limited purposes of arguing the motion.

Documents may be served via email.


Respectfully submitted,




Dated: March 11, 2020                                  ____/s/____
                                                       Jane / John Doe
                                                       *Pro se*

JANE / JOHN DOE'S OBJECTION AND MOTION TO QUASH DMCA SUBPOENA- 16

## CERTIFICATE OF SERVICE

1

2

3

4        I certify that on March 11, 2020, a copy of this document was delivered to the

5   US District Court Clerk's office by US Mail, which will automatically serve a Notice

6
    of Electronic Filing on the plaintiff Watch Tower organization.
7

8        I certify that plaintiff is a registered CM/ECF user and that service will be

9   accomplished by the CM/ECF system.

10

11                                          _____/s/_____

12                                          Jane / John Doe
                                            Pro se
13

14

15

16   Cc

17
     Google Legal Investigations Support
18   1600 Amphitheatre Parkway
19   Mountain View, CA 94043
     via email:  Copyright@YouTube.com
20   and usernotice@google.com
21

22

23   Paul D. Polidoro
24   Associate General Counsel
     Legal Department
25   200 Watchtower Drive
26   Patterson, NY 12563-9204
     Email: inboxLGLipg@jw.org
27

28   Attorney for Plaintiff

JANE / JOHN DOE'S OBJECTION AND MOTION TO QUASH DMCA SUBPOENA- 17

Please scan in color

JWHater@protonmail.com
pro se filer

Case # 7:20-mc-00119
in re:  DMCA Subpoena to Google LLC



Clerk's Office
United States Courthouse
300 Quarropas St.
White Plains, NY 10601-4150



**PRIORITY**®
★ **M A I L** ★

**FLAT RATE ENVELOPE**
ONE RATE ★ ANY WEIGHT

APPLY PRIORITY MAIL POSTAGE HERE

EXPECTED DELIVERY DAY: 03/13/20

**USPS TRACKING® NUMBER**

9505 5125 8819 0071 7324 06

9114 ☆ ‥

× For International shipments, the maximum weight is 4 lbs.

U.S. POSTAGE PAID
PM 2-DAY
SUN CITY, AZ
85351
MAR 11 20
AMOUNT
**$7.75**
R2305K131832-03

EP14H July 2013 Outer Dimension: 10 x 5

EP14H © U.S. Postal Service; July 2013; All rights reserved.



**PRIORITY MAIL**

★ PRIORITY ★
★ MAIL ★

📅 DATE OF DELIVERY SPECIFIED*

📶 USPS TRACKING™ INCLUDED*

$ INSURANCE INCLUDED*

🚚 PICKUP AVAILABLE
* Domestic only

**PRIORITY MAIL**
ONE RATE ★ ANY WEIGHT

FLAT RATE ENVELOPE

United States
Postal Service®

no return
address
opened by security
no threat

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

VISIT US AT USPS.COM®
Label 106A, Nov 2018

This product is for use with Priority Mail®
Misuse may be a violation of federal law.
This label is not for resale.

**PRIORITY MAIL**

United States
Postal Service®

TRACKED
INSURED

PRESS FIRMLY TO SEAL

★ Domestic only.

RECEIVED

MAR 13 2020

U.S.D.C.
W P

UNITED STATES POSTAL SERVICE®

SEP14H July 2013
OD: 10 × 5

PS00001000064

This packaging is the property of the U.S. Postal Service® and is
provided solely for use in sending Priority Mail® shipments. Misuse
may be a violation of federal law. This packaging is not for resale.