1  *JANE / JOHN DOE*

2  Email: JWHater@protonmail.com

3

4  *Pro se*

5

6  **IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

7

| | |
|---|---|
| 8  IN RE: DMCA SUBPOENA TO GOOGLE, LLC | Case No.:  7:20-mc-00119 |
| 9 | |
| 10 | **JANE / JOHN DOE'S SUPPLEMENT IN SUPPORT OF THE MOTION TO QUASH DMCA SUBPOENA** |
| 11 | |
| 12 | |

13      Attached is the most recent edition of the Watch Tower pedophile cult's

14  publication *Shephard of the Flock of God*, April 2020, along with a confidential memo

15  outlining some of the recent updates and changes.  This is a book strictly *Elder's Eyes*

16  *Only* and it details the procedures for the concealment of child sex abuse, along with

17

18  their practices of isolation and indoctrination of their members, and their internal

19  "judicial" procedures and financial affairs.  This is super-secret stuff!

20      Of specific relevance to the Court is the Watch Tower's rules with regards to

21

22  contact and association with apostates and other individuals who have been

23  'disfellowshipped' or kicked out of the cult:

24

25

26

27

28

**17.** Though this is not an exhaustive list, brazen conduct may be involved in the following if the wrongdoer has an insolent, contemptuous attitude made evident by a practice of these things:

(1) **Unnecessary Association With Disfellowshipped or Disassociated Individuals**: Willful, continued, unnecessary association with disfellowshipped or disassociated nonrelatives despite repeated counsel would warrant judicial action. —Matt. 18:17b; 1 Cor. 5:11, 13; 2 John 10, 11; *lvs* pp. 39-40.

If a publisher in the congregation is known to have unnecessary association with disfellowshipped or disassociated relatives who are not in the household, elders should use the Scriptures to counsel and reason with him. Review with him information from the Remain in God's Love book, page 241. If it is clear that a Christian is violating the spirit of the disfellowshipping decree in this regard and does not respond to counsel, he would not qualify for congregation privileges, which require one to be exemplary. He would not be dealt with judicially unless there is persistent spiritual association or he persists in openly criticizing the disfellowshipping decision.

See Shephard of the Flock of God, *Determining whether a judicial committee should be formed*, Chapter 12, Section 17 at pg 84.

**39**. Apostasy: Apostasy is a standing away from true worship, a falling away, defection, rebellion, abandonment. It includes the following:

(3) Deliberately Spreading Teachings Contrary to Bible Truth: (2 John 7, 9, 10; *lvs* p. 245; *it*-1 pp. 126-127) Any with sincere doubts regarding the Bible truth taught by Jehovah's Witnesses should be helped. Loving

assistance should be provided. (2 Tim. 2:16-19, 23-26; Jude 22, 23) <mark>If one obstinately is speaking about or deliberately spreading false teachings, this may be or may lead to apostasy.</mark> If there is no response after a first and a second admonition, a judicial committee should be formed.—Titus 3:10, 11; *w86* 4/1 pp. 30-31.

(4) <mark>Causing Divisions</mark>, Promoting Sects: (Rom. 16:17, 18; Titus 3:10, 11) <mark>This would be deliberate action disrupting the unity of the congregation or undermining the confidence of the brothers in Jehovah's arrangement.</mark> It may involve or lead to apostasy.—*it*-2 p. 886.

See Shephard of the Flock of God, *Determining whether a judicial committee should be formed*, Chapter 12, Section 39 at pg 90.

It is my position that these 60 DMCA subpoena legal actions, and the concurrent hundreds of DMCA takedown notices, are all in bad faith and simply being done so as to root out and identify apostates, leakers, and whistle blowers. (Because this *Elder's eyes only* manual is assigned to a specific individual, *Jane / John Doe* has sanitized and redacted the document to remove personally identifying information and any

electronic watermarks, substituting any with spoofed information, so as to not reveal the source of this document.)

This Court's authority and subpoena powers should only be used for legitimate copyright litigation purposes and not for religious persecution and witch-hunts!

Respectfully submitted,

Dated: April 14, 2020

_____/s/_____
Jane / John Doe
*Pro se*

## **CERTIFICATE OF SERVICE**

I certify that on April 14, 2020, a copy of this document was filed electronically with the US District Court Clerk's office via their pro se e-filing system, which will automatically serve a Notice of Electronic Filing on the Watch Tower organization.

I certify that Watch Tower attorney Paul Polidoro is a registered CM/ECF user and that service will be accomplished by the CM/ECF system.


_____/s/_____
Jane / John Doe
Pro se


Cc

Google Legal Investigations Support
1600 Amphitheatre Parkway
Mountain View, CA 94043
via email:  Copyright@YouTube.com
and usernotice@google.com


Paul D. Polidoro
Associate General Counsel
Legal Department
200 Watchtower Drive
Patterson, NY 12563-9204
Email: inboxLGLipg@jw.org

# Announcements and Reminders

April 2020

## FOR THE ATTENTION OF ALL ELDERS

1. **Revised *Shepherd* Book:** We are pleased to inform you that a revised version of the *Shepherd* book will soon be posted on jw.org. Please be aware that revisions to the text in the JWPUB and EPUB versions of *Shepherd* may affect the location of highlights, notes, and bookmarks made by the user in the previous version. For example, in the JWPUB version, where a paragraph has been deleted or a new paragraph has been inserted, any highlighting, notes, or bookmarks on subsequent paragraphs within the associated chapter will appear in the wrong paragraph. The revised version of *Shepherd* contains updated references to the *Organized* book. Listed below is an overview of the significant textual changes along with additional direction:

### Chapter 9

- Pars. 6-7: When a pioneer transfers to another congregation, elders should transfer the congregation person record using the Congregation Persons feature, following the direction in *Instructions for Congregation Use of JW.ORG* (S-135), paragraphs 12-14. By doing this, the pioneer record will be transferred to the new congregation automatically, even if the pioneer transfers to another branch territory. There is no longer a need for the former congregation to delete the pioneer on jw.org. When the new congregation accepts the transfer, the person will be added automatically to the list of pioneers. This direction will be included in a future revision of *Shepherd.*
- Par. 13: Inserted direction on pioneer hour credit received for attendance at a theocratic school or class.

### Chapter 11

- Par. 16 pt. 4: Inserted direction that the circuit overseer should be informed when private baptisms are performed.

### Chapter 12

- Par. 43: Inserted direction that if the elders learn of an accusation of serious wrongdoing against a temporary volunteer at Bethel, a construction volunteer, an occasional commuter, or a temporary special pioneer, two elders with knowledge of the circumstances should contact the Service Department immediately.

### Chapter 20

- Par. 1: Inserted paragraph on qualifications of public speakers.
- Deleted previous paragraph 3 on reading scriptures during public talks since this direction will be included in a revised version of *Reminders for Those Assigned Public Talks* (S-141).
- Par. 24: Inserted updated direction on use of broadcasting systems. Congregations should not use a broadcasting service that stores the audio or video files, that subjects users to commercial advertisements, or that allows users to post comments.
- Par. 24 pt. 1: Congregations should transmit meetings live rather than record them for future distribution.
- Par. 24 pt. 3: Broadcasting systems with video capabilities should show only what transpires on stage, along with any approved media. Those commenting from the audience should have only their voices transmitted.—As an exception to what is stated in *Shepherd,* please note that sign-language broad-

casts may show video of those commenting. Also, those attending meetings held via *Zoom* or other videoconferencing systems in any language may allow their video to be displayed.

**Chapter 21**

- Par. 33: Inserted direction on holding two weekend meetings due to overcrowding.

**Chapter 22**

- Pars. 29-31: Adjusted direction on processing of applications.

**Chapter 23**

- Pars. 2-3: Inserted direction on the congregation's territory assignment.

**Chapter 26**

- Par. 6: Inserted direction regarding the annual part about disaster preparedness that will be included in the schedule for the midweek meeting. As previously announced, it will no longer be necessary to schedule a local needs part on this subject each year.

**Chapter 28**

- Par. 15: Adjusted direction to state that the circuit overseer rather than the Service Department should be informed when baptisms are performed in prisons.

**Chapter 29**

- Par. 9 pt. 5: Inserted direction to indicate that before elders contact the Legal Department on behalf of a publisher involved in a lawsuit over child custody and visitation matters it should be confirmed that the publisher is in good standing in the congregation.

2. **Reduction in the cost of electricity.** You will be pleased to know that we are working to reduce the cost of electricity for Kingdom Halls and Assembly Halls. The state of emergency laws, decreed by the authorities, have simplified the requirements for these arrangements. In most cases we are requesting a decrease in the contracted energy usage. Once the state of alarm has been lifted, and permission to use the Kingdom Halls has been renewed we will request an increase. Since these arrangements are being handled by the Branch Office, nothing will be required of the local elders unless the LDC or any of its representatives specifically request it. We hope that these measures will lighten the financial burden of the congregations for as long as this situation exists.

## FOR FOLLOW-THROUGH BY THE SERVICE OVERSEER

1. *Pure Worship of Jehovah—Restored at Last!:* With the help of the literature servant, please verify the number of requests for printed copies of the *Pure Worship* book that could not be filled from existing congregation stock. This number should then be conveyed to the language-coordinating congregation. Language-coordinating congregations should submit requests for the total quantity needed by the congregations in their language group. A few additional copies may be requested for stock. Requests should be submitted to the branch office **before May 1, 2020.**

# "SHEPHERD THE FLOCK OF GOD"

**1 PETER 5:2**









# "SHEPHERD
# THE FLOCK OF GOD"

## 1 PETER 5:2

## April 2020

THIS BOOK HAS BEEN ISSUED TO

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

**This publication is not for sale. It is provided as part of a worldwide Bible educational work supported by voluntary donations.**

**To make a donation, please visit donate.jw.org.**

Unless otherwise indicated, Scripture quotations are from the modern-language *New World Translation of the Holy Scriptures.*

*"Shepherd the Flock of God"—1 Peter 5:2*
April 2020 Printing

English (*sfl*-E)

© 2020
WATCH TOWER BIBLE AND TRACT SOCIETY OF
REPUBLIC OF KOREA, INCORPORATED ASSOCIATION

Publishers
Christian Congregation of Jehovah's Witnesses
Wallkill, New York, U.S.A.

Made in the U.S.A.

# Table of Contents

TOPIC                                                          CHAPTER

**INTRODUCTION**

**HOW ELDERS WORK TOGETHER AS A BODY** .................................................. **1**

**CONGREGATION SERVICE COMMITTEE** ............................................................ **2**

**COORDINATOR OF THE BODY OF ELDERS** ...................................................... **3**

**SECRETARY** ............................................................................................................ **4**

**SERVICE OVERSEER** ............................................................................................ **5**

***WATCHTOWER* STUDY CONDUCTOR** .................................................................... **6**

**FIELD SERVICE GROUP OVERSEER** ...................................................................... **7**

**APPOINTMENT AND DELETION OF ELDERS
   AND MINISTERIAL SERVANTS** .......................................................................... **8**

**PIONEERS** .............................................................................................................. **9**

**CIRCUIT OVERSEER** ............................................................................................ **10**

**MEDICAL MATTERS** ............................................................................................ **11**

**DETERMINING WHETHER A JUDICIAL COMMITTEE
   SHOULD BE FORMED** ........................................................................................ **12**

**PORNOGRAPHY** .................................................................................................... **13**

**CHILD ABUSE** ...................................................................................................... **14**

**PREPARING FOR JUDICIAL HEARINGS** ............................................................ **15**

# Table of Contents

**TOPIC**                                                               **CHAPTER**

**PROCEDURE FOR JUDICIAL HEARINGS** ........................................................... **16**

**APPEAL HEARINGS** ............................................................................................. **17**

**DISASSOCIATIONS** .............................................................................................. **18**

**REINSTATEMENTS** .............................................................................................. **19**

**MEETINGS** ........................................................................................................... **20**

**KINGDOM HALLS** ................................................................................................ **21**

**CORRESPONDENCE AND RECORDS** ................................................................. **22**

**FIELD MINISTRY** ................................................................................................. **23**

**MULTILANGUAGE FIELDS** ................................................................................. **24**

**SHEPHERDING** ..................................................................................................... **25**

**DISASTERS AND EMERGENCIES** ....................................................................... **26**

**WEDDINGS** ........................................................................................................... **27**

**PRISONS** .............................................................................................................. **28**

**LEGAL MATTERS** ................................................................................................ **29**

**APPENDIX**

  **A. WORK PERFORMED AT KINGDOM HALLS**

**INDEX**

# Introduction

1. As an appointed elder, you have the serious responsibility to "shepherd the flock of God under your care." (1 Pet. 5:2, 3) Providing accurate theocratic direction to our brothers and sisters is a weighty responsibility. It is important that elders locate Scriptural and theocratic direction in a timely manner in order to assist all to be "completely united...in the same line of thought." (1 Cor. 1:10) To that end, we are pleased to make this publication available to you.

2. Although this book covers most aspects of our work as elders, at times you may need to consult other sources of theocratic direction, such as *Organized to Do Jehovah's Will* and forms and letters provided by the branch office. Be alert to adjustments so as to stay up-to-date. Ensure that you are using the latest version of this publication. Supplemental direction that applies specifically in your branch territory can be found in *Addendum to "Shepherd the Flock of God" —1 Peter 5:2.* We encourage each elder to make appropriate notes in his personal copy of this book directing attention to *Shepherd Addendum.*

3. This publication is copyrighted and confidential. It is issued to each appointed elder. If an elder is deleted for reasons other than moving to another congregation with a favorable recommendation, he should turn over this publication to the Congregation Service Committee to be destroyed, and any electronic copies in his possession should be deleted.

4. We pray that this publication will prove to be a valuable resource in assisting you to imitate Jehovah God and Jesus Christ in the way you treat the sheep. (John 10:11; Eph. 5:1; 1 Pet. 2:21, 25; 5:4) Rather than making rigid rules for the congregation, rely on Scriptural principles and direction from Jehovah's organization.—2 Cor. 1:24.

**CHAPTER ONE**

# How Elders Work Together as a Body

| | Paragraphs |
|---|---|
| **Responsibilities** | 2 |
| **Elders' Meetings** | 3-11 |
| When to Hold | 4 |
| What to Discuss | 5-6 |
| Compiling and Distributing the Agenda | 7 |
| During the Meeting | 8-11 |
| **Pursue Peace** | 12-13 |

**1.** Jehovah has appointed Jesus Christ as head of the Christian congregation. (Eph. 1:22, 23; Rev. 1:20) Your accepting Jesus as head of the congregation promotes cooperation and unity on the body. You demonstrate submission to Christ's headship when you do the following:

(1) Seek to understand and apply Bible laws and principles. —John 7:16-18; Eph. 5:17.

(2) Obey direction from "the faithful and discreet slave" and from overseers appointed to take the lead, such as those at the branch office and the circuit overseer. —Matt. 24:45-47; Heb. 13:17.

(3) Listen carefully to the expressions of fellow elders. —Rom. 12:10b; Jas. 1:19.

(4) Deal in a kind and loving manner with each individual in the congregation, including fellow elders. Do not

impose personal viewpoints or arbitrary rules on others.—Matt. 11:28-30; 1 Cor. 4:6; 1 Pet. 5:1-3, 5.

(5) Open and close all meetings of the body of elders with prayer. Pray again if a discussion of the body of elders seems to falter.—Jas. 1:5.

## RESPONSIBILITIES

**2.** The responsibilities of the body of elders include the following:

(1) Making recommendations for the appointment and deletion of elders and ministerial servants.—See Chapter 8.

(2) Deciding the number of field service groups and who will serve as group overseers and assistants.—See Chapter 7.

(3) Deciding the subjects of local needs parts and who should present them.—See 20:14-15.

(4) Deciding who should serve as the secretary, the service overseer, the *Watchtower* Study conductor, and the Life and Ministry Meeting overseer. Deciding who, if anyone, should assist or substitute for these brothers or the coordinator of the body of elders in their assignments. —See Chapters 3-6 and *Instructions for Our Christian Life and Ministry Meeting* (S-38).

(5) Deciding who should serve as the auxiliary counselor and, if needed, the counselors for auxiliary classes. —See *Instructions for Our Christian Life and Ministry Meeting*.

(6) If the Kingdom Hall is used by only one congregation, deciding who should serve as the maintenance coordinator. If the Kingdom Hall is used by multiple

congregations, selecting a brother or brothers to serve on the Kingdom Hall Operating Committee.—See 21:14-20.

(7) Deciding who should serve as the accounts servant, the literature servant, the territory servant, the cleaning coordinator, the public talk coordinator, and any brothers who assist them.

(8) Deciding who will receive additional privileges and responsibilities, such as reading at the *Watchtower* Study, reading at or conducting the Congregation Bible Study, serving as chairman for the midweek meeting or weekend meeting, handling nonstudent assignments at the midweek meeting, serving as an attendant, passing microphones, offering public prayer, conducting meetings for field service, and so forth.

(9) Deciding who is approved to deliver public talks in the local congregation and who is approved to give public talks in other congregations. Deciding whether a ministerial servant should deliver his first public talk by means of a symposium.—See 20:1-2, 4.

(10) Assigning two elders to investigate accusations of serious wrongdoing, determining whether serious wrongdoing requires a judicial committee, and choosing who will serve on the committee, including who will serve as chairman. (See Chapters 12 and 15.) Choosing who will serve on the committee that meets with one who has decided to disassociate himself. (See Chapter 18.) Assigning two elders to meet with a publisher who has deliberately viewed pornography.—See Chapter 13.

(11) Determining whether a warning talk should be given to the congregation and deciding who should present the talk.—See 12:77-80.

(12)   Deciding which elders will handle the annual meeting with the regular pioneers, special pioneers, and field missionaries in December/January.

(13)   Selecting speakers for the special public talk and Memorial, selecting those who will offer prayer over the emblems at the Memorial, and selecting Memorial meeting times.—See 20:6-8.

(14)   Determining whether a publisher is Scripturally free to remarry.—See 12:71-76.

(15)   Reviewing the congregation's resolved donation to Kingdom Hall and Assembly Hall construction worldwide.—See *Instructions for Congregation Accounting* (S-27).

(16)   If the Kingdom Hall is used by multiple congregations, reviewing and approving the monthly amount to be contributed to the Kingdom Hall Operating Committee for the upcoming service year to care for Kingdom Hall operating expenses.—See 21:20 and *Instructions for Kingdom Hall Operating Committee Accounting* (S-42).

(17)   Determining whether to host a pregroup or group and determining which meetings will be held.—See Chapter 24.

(18)   Determining how to extend hospitality to visiting speakers.—See 20:5.

(19)   Deciding who will temporarily serve as the coordinator of the body of elders when an adjustment must be made apart from the visit of the circuit overseer. —See 3:1.

(20)   Determining whether it is necessary for the congregation as a whole to consider providing some form of assistance to certain needy brothers and

> sisters who have a long history of faithful service, particularly if there are no family members or other relatives to assist such ones and no adequate assistance from government agencies is available. —*od* chap. 12 pars. 12-15.

## ELDERS' MEETINGS

**3.** When the body of elders discusses a matter, Christ by means of the holy spirit can influence any elder to make an expression that contributes to a wise decision, one that may not have been reached if the elders had been consulted individually. (Acts 15: 6-21) Meetings should normally not exceed two hours in length.

**4. When to Hold:** In addition to the elders' meeting held during each visit of the circuit overseer, an elders' meeting should be held about three months after each visit. Other meetings can be arranged any time that circumstances necessitate.

**5. What to Discuss:** The body of elders may discuss any matters pertaining to the congregation. Generally, these would involve matters that cannot be handled by individual elders or that are not the responsibility of another entity, such as the Congregation Service Committee or the Kingdom Hall Operating Committee. —See 2:1; 3:3.4.

**6.** Following are some matters that periodically merit the attention of the body of elders:

(1) At the meeting held about three months after the visit of the circuit overseer, review the circuit overseer's report on his previous visit to the congregation. In preparation for the next visit of the circuit overseer, consider any recommendations for the appointment or deletion of elders or ministerial servants. —See Chapter 8.

(2) Consider whether and how the congregation can do more to give a thorough witness in the congregation's assigned territory.—Acts 20:24; see Chapter 23.

(3) Consider the spiritual and physical needs of widows, orphans, the blind, the homebound, those in nursing homes, and other publishers with special circumstances.—Jas. 1:27.

(4) Consider what further training is needed to help brothers care properly for congregation assignments and to help those with potential, including newly baptized and younger brothers, to take on greater responsibility.—2 Tim. 2:2; see 25:4-6.

(5) Review the congregation assignments of all exemplary, baptized brothers. For example, is there a need to balance out the workload of the appointed brothers or to adjust the assignments so as to provide newer brothers with the opportunity to gain additional experience?—Ex. 18:17, 18; Prov. 11:2b; see 1:2.8.

(6) Review published information on disaster preparedness. —See 26:1-6.

**7. Compiling and Distributing the Agenda:** For the meeting that is held about three months after the visit of the circuit overseer, the coordinator of the body of elders should ask the other elders to submit matters that they would like to discuss. The elders should be invited to suggest the names of brothers they would like to consider for recommendation as elders or ministerial servants. (See Chapter 8.) The coordinator of the body of elders should give a copy of the agenda to each elder a few days before the meeting to allow time for research and prayerful consideration. (Prov. 21:5) For the meeting that is held during the visit of the circuit overseer, the circuit overseer compiles the agenda after checking whether the elders have additional points they wish

to discuss. If time permits, the circuit overseer may agree to include one or two significant items on the agenda. Otherwise, he will direct the elders to consider those matters at another time.

**8. During the Meeting:** The coordinator of the body of elders should set the pace of the discussion by sticking to the agenda as much as possible and by keeping the main points to the fore. The secretary or another designated elder should take notes of the decisions, including the names of elders who will follow through and the suggested date for completion. In some cases the coordinator of the body of elders may ask the elder recommending an item for the agenda to take the lead in presenting it for discussion.

**9.** Each elder should freely express himself if he believes he has something meaningful to add. (Prov. 10:19) He should keep his comments succinct and relevant. The coordinator of the body of elders should avoid dominating the discussion, being careful as to when and how he expresses himself. There should be no anger or debates during elders' meetings.—1 Tim. 2:8.

**10.** It should be possible for bodies of elders to be unanimous in most of their decisions. (Acts 15:25) The body of elders should always base their decisions on Bible principles and written direction from "the faithful and discreet slave." (Matt. 24:45) In cases that do not involve specific Bible laws or where there is no direction from the faithful slave, the body of elders must exercise their collective judgment and conscience. If a matter requires assistance from the branch office, it is usually best to write. If the matter is urgent, two elders together should call to explain the situation and to make a note of the direction given.—See 14:6-30; 29:1.

**11.** No one should insist on his personal viewpoint. If a decision is not unanimous, the minority should give willing support to the final decision. If in the opinion of the minority a Bible-based decision still has not been reached, the minority should continue to cooperate with the rest of the body and should bring the matter to the attention of the circuit overseer during his regular visit.

## PURSUE PEACE

**12.** If the imperfections of those serving on the body are allowed to cause strained relations, the flow of Jehovah's spirit can be restricted and the congregation may be adversely affected. Work hard to pursue peace with your fellow elders. (Rom. 14:19) Cultivate and maintain friendships with one another. At the same time, you should not hold back from giving fellow elders loving counsel when needed.—Ps. 141:5.

**13.** Take the lead in showing honor to your fellow elders. (Rom. 12: 10) One way you can do this is by keeping communication open and free, especially if there are differences in background. Younger elders should be respectful of older, more experienced elders on the body and demonstrate patience. (Lev. 19:32) Older elders should not take offense when younger elders give suggestions or respectfully offer counsel. (Eccl. 7:9) Humility will enable you to accept counsel. (Prov. 12:15) Even if you feel the counsel was not entirely justified, try to learn from it. Remember that the peace and well-being of the congregation is more important than personal interests.—1 Cor. 10:23, 24.

# Congregation Service Committee

**1.** The Congregation Service Committee works under the direction of the body of elders and consists of the coordinator of the body of elders, the secretary, and the service overseer. If a member of the service committee is absent, another elder may substitute. Certain responsibilities are delegated to the service committee to handle. These elders seek to make decisions that are in line with Scriptural and theocratic direction and that harmonize with the thinking of the other elders. These brothers do not function apart from the body, and their opinions do not carry more weight than those of the other elders. The service committee uses good judgment in determining when it would be wise to confer with the other elders. For example, if unusual factors are involved or if the service committee is unsure of the thinking of the body, the entire body of elders should discuss the matter and make a decision.—See 1:5; 9:4; 23:5; *od* chap. 5 pars. 35-37.

**2.** In congregations in which there are not enough elders to fulfill the responsibilities of the service committee, qualified ministerial servants may substitute as members of the service committee. For example, they may be authorized to sign applications or letters of introduction as long as the documents do not contain sensitive or confidential information. If sensitive or confidential information needs to be conveyed in writing, the correspondence should be prepared and signed only by the elders. If there are no elders in the congregation, this could be cared for by an elder in a neighboring congregation who is familiar with the situation or by the circuit overseer.

**3.** The responsibilities of the service committee include the following:

    (1)  Determining the locations and meeting times for all meetings for field service and assigning publishers,

including inactive ones, to field service groups after consulting with the group overseers involved. —See 1:2.8; 25:14.

(2) Assigning publishers to conduct Bible studies with inactive publishers who temporarily need spiritual help. —See 25:16.

(3) Determining whether it is advisable for another publisher to conduct a Bible study with the child of a Christian parent. When such approval is given, all elders should be informed.

(4) Approving publishers to report field service in 15-minute increments.—See 22:14.

(5) Approving publishers who have special needs for assembly or convention accommodations.—See *Special Needs Room Request Instructions* (CO-5ai).

(6) Signing correspondence on behalf of the body of elders.—See 22:1-8.

(7) Sending a letter of recommendation to the appropriate branch office when a publisher plans to move and wishes to obtain information regarding congregations having a need for assistance.—*od* chap. 10 par. 9.

(8) Making the final decision on public witnessing locations, determining what public witnessing equipment will be used and where it will be stored, and deciding which publishers are approved to participate in public witnessing.—See 23:5-17.

(9) Approving publishers to participate in prison witnessing as well as witnessing at schools, universities, nursing homes, and retirement homes.—See 23:18-19; 28:1-20.

(10) Approving the appointment and deletion of regular pioneers. (See 9:1-5.) Processing applications for

service privileges such as auxiliary pioneering. (See 22:31.) Reviewing the field service activity of the pioneers who did not meet the yearly hour requirement. —See 9:16-17.

(11) Approving use of the Kingdom Hall for weddings and funerals.—See 27:6.

(12) Determining any additional jw.org roles assigned to elders and ministerial servants.—See *Instructions for Congregation Use of JW.ORG* (S-135).

(13) Assigning elders to determine how to handle material in the confidential file when the brothers who handled the matter are unavailable or no longer qualified.—See 22:26.

(14) Arranging for elders to contact the households that have asked that no further visits be made.—See 23:22.

(15) Developing, along with the field service group overseers, a plan to assist those with special needs in times of disaster or emergency.—See Chapter 26.

(16) Developing a plan to protect congregation records in the event of an impending disaster.—See Chapter 26.

**4.** At times, the service committee or the body of elders is called upon to determine whether a publisher is "in good standing." In such cases, the elders must weigh the factors and circumstances that are unique to each situation. If an individual is not under any judicial or branch-imposed restrictions, if he is not bringing reproach on the congregation, and if his receiving a certain privilege would not raise serious questions in the minds of others or be a cause of stumbling, the elders may determine that he is in good standing. By way of contrast, being "exemplary" involves more than simply being in good standing. An individual whose conduct and worship are considered worthy of imitation

is exemplary. His meeting attendance, share in the ministry, family life, choices of entertainment, dress and grooming, and so forth are good examples for others. An individual must be exemplary to represent the congregation in prayer, to serve as an auxiliary or regular pioneer, or to enjoy other special privileges.

# Coordinator of the Body of Elders

Paragraphs

**Appointment** ................................................................................................ 1

**Qualifications** ............................................................................................ 2

**Responsibilities** ........................................................................................ 3

## APPOINTMENT

**1.** The circuit overseer is responsible for the appointment of the coordinator of the body of elders, taking into consideration the recommendation of the body of elders. If an adjustment is needed, this appointment will be made during his regular visit to the congregation. The body of elders may assign another elder to assist the coordinator of the body of elders. If a temporary adjustment is made by the body of elders apart from the circuit overseer's visit, the Congregation Service Committee should immediately notify the circuit overseer, explaining the reason for the change. Whether the change in the coordinator of the body of elders is permanent or temporary, a *Coordinator of the Body of Elders/Secretary Change of Address* (S-29) form should be submitted to the Service Department. If the coordinator of the body of elders will be away temporarily, the body of elders may select another elder to substitute for him.

## QUALIFICATIONS

**2.** The coordinator of the body of elders must be less than 80 years of age. He should be known as one who is loyal to Jehovah and

to the organization. If possible, he should have served for years as an elder. He should be approachable and respected for his hard work in the ministry and as a shepherd. He should be a good organizer and diligently care for his responsibilities. He is not the coordinator of the congregation but is the coordinator of the body of elders. He should maintain a modest view of his role in the congregation and humbly appreciate his fellow elders and welcome their advice.—Prov. 15:22; Matt. 23:8.

## RESPONSIBILITIES

**3.** The responsibilities of the coordinator of the body of elders include the following:

(1) Along with the secretary, ensuring that all elders have access to correspondence directed to the body of elders.—See Chapter 22.

(2) Approving the items placed on the congregation information board.—See 21:34.

(3) Arranging for elders to review questions with baptism candidates. If there are very few elders, capable ministerial servants may be used to review the questions found in "Part 1: Christian Beliefs" in the appendix of the *Organized* book.

(4) Arranging for meetings of the body of elders or the Congregation Service Committee and serving as chairman during such meetings. He compiles and distributes agendas for scheduled elders' meetings. —See 1:3-11.

(5) Arranging for two elders (one being a member of the service committee) to meet with each person desiring to become an unbaptized publisher.

(*od* chap. 8 pars. 6-12.) In congregations that have very few elders, a capable ministerial servant who has demonstrated good judgment and discernment may accompany a member of the Congregation Service Committee when meeting with Bible students desiring to become unbaptized publishers.

(6) Arranging for two elders, one of them being the individual's group overseer, to meet with each baptized publisher one year after baptism.—See 4:2.7; *od* pp. 211-212.

(7) Arranging for two elders to ask the necessary questions of a brother approved for appointment as an elder or as a ministerial servant when the brother was not present during the visit of the circuit overseer. —See 8:17-18.

(8) Arranging for two elders to inform a brother of his deletion as an elder or as a ministerial servant between visits of the circuit overseer and informing the circuit overseer if the brother appeals the deletion. —See 8:35, 39.

(9) Contacting the circuit overseer when a committee needs to handle wrongdoing involving child sexual abuse.—See 14:19-21.

(10) Distinguishing between items that individual elders can handle and those needing attention by the entire body of elders, in accord with published direction.—See 2:1.

(11) Ensuring appropriate follow-through on direction received from the branch office and on decisions made by the body of elders.

(12) Ensuring that newly appointed elders and elders who move into the congregation are made aware of the

> Service Department's direction regarding individuals under branch-imposed restrictions.—See 14:22-24.

(13) Maintaining communication with the group overseers and the circuit overseer when a disaster occurs.—See Chapter 26.

(14) Reviewing and approving all announcements made to the congregation.

(15) Serving as one of the jw.org local domain administrators, if possible.—See *Instructions for Congregation Use of JW.ORG* (S-135).

(16) Taking the lead in caring for details in preparation for the circuit overseer's visit.—See Chapter 10 and *Information Needed for Visit of Circuit Overseer* (S-61).

(17) Making assignments of all midweek meeting parts other than the student assignments. This includes making the assignment of the meeting chairman for each week from among those approved by the body of elders. In cooperation with the Life and Ministry Meeting overseer, the coordinator of the body of elders should ensure that a copy of the assignment schedule for the entire meeting is posted on the information board.

(18) Overseeing the attendants, the public talk coordinator, and those working with the stage, sound, and video.

(19) Scheduling public talk chairmen and *Watchtower* readers. Another elder or ministerial servant may be used to assist.—See 6:9.

(20) Approving expenses and arranging for audits.—See *Instructions for Congregation Accounting* (S-27).

# Secretary

|  | Paragraphs |
| --- | --- |
| **Qualifications** | 1 |
| **Responsibilities** | 2 |

## QUALIFICATIONS

**1.** The body of elders selects the secretary. The secretary should have good organizational ability and should not be a procrastinator. (Rom. 12:11) He should have the ability to write in a way that is clear and understandable. The body of elders may assign another elder to assist him. If necessary, a qualified ministerial servant may be assigned by the body of elders to assist with tasks such as the compiling, posting, and submitting of the congregation's field service activity to the branch office. The branch office should be notified of a change of the brother serving as secretary by means of the *Coordinator of the Body of Elders/ Secretary Change of Address* (S-29) form.

## RESPONSIBILITIES

**2.** The responsibilities of the secretary include the following:

(1) Along with the coordinator of the body of elders, ensuring that all elders have access to correspondence directed to the body of elders.—See Chapter 22.

(2) Along with the service overseer, reviewing the activity of regular pioneers near the midpoint of the service year.—See 9:15.

(3) Compiling, posting, and submitting the congregation's field service activity to the branch office. Before

submitting the report, informing group overseers of publishers in their group who did not submit a report for the month.—See 22:12-17.

(4)  Ensuring that any legal and financial responsibilities the congregation may have are handled in a timely manner. —See Chapter 21.

(5)  Maintaining an orderly congregation file. This includes filing sealed confidential envelopes and adhering to the retention policy outlined in Chapter 22, paragraphs 8-27.

(6)  Providing durable power of attorney (DPA) cards and related materials to newly baptized publishers. —See 11:1.

(7)  Notifying the coordinator of the body of elders when a publisher has been baptized one year.—See 3:3.6; *od* pp. 211-212.

(8)  Overseeing congregation accounts and convention matters.—See 1:2.7 and *Instructions for Congregation Accounting* (S-27).

(9)  Maintaining a list of all publishers, including inactive ones. The list should show to which field service group the publisher is assigned. It should also contain the contact information and emergency contact information for each publisher.—See 25:14-15; 26:2.

(10)  Preparing and sending correspondence on behalf of the body of elders.—See 22:1-9.

(11)  Updating regular pioneer information on jw.org. —See 9:1-9.

(12)  Serving as one of the jw.org local domain administrators, if possible.—See *Instructions for Congregation Use of JW.ORG* (S-135).

# Service Overseer

|  | Paragraphs |
|---|---|
| **Qualifications** | 1 |
| **Responsibilities** | 2 |

## QUALIFICATIONS

**1.** The body of elders selects the service overseer. He takes a keen interest in the publishers' share in the ministry and their effectiveness. He is enthusiastic about the ministry and motivates others to have a full share. He is skillful in various aspects of the work, capable of training others, and alert to do so. The body of elders may assign another elder to assist him.

## RESPONSIBILITIES

**2.** The responsibilities of the service overseer include the following:

 (1) Arranging for the congregation's territory to be worked thoroughly and overseeing the work of the territory servant.—See 23:1-4.

 (2) Arranging for brothers or sisters to conduct meetings for service, as needed. (See 7:2.2.) He organizes witnessing on holidays and during special campaigns.

 (3) Determining what permits, if any, are required for public witnessing, organizing schedules for public witnessing, providing initial training for public witnessing, and determining what literature should be displayed at public witnessing locations.—See 23:5-17.

(4) Overseeing the work of the literature servant. This includes ensuring that anyone in the congregation who is deaf, blind, or has impaired vision is able to request literature in his preferred format.—See 1:2.7 and *Literature Request and Inventory Guidelines* (S-56).

(5) Visiting a different field service group each month. (In congregations with few groups, he may arrange to visit each one twice during the year.) During the visit, he conducts the meeting for field service and works with the group in the ministry, offering helpful suggestions as needed. He reviews the *Congregation's Publisher Records* (S-21) with the group overseer and his assistant and discusses the effectiveness of existing field service arrangements.

(6) Ensuring that adequate supplies of forms are available for congregation use.

(7) Along with the secretary, reviewing the activity of regular pioneers near the midpoint of the service year. —See 9:15.

(8) Training publishers for witnessing at schools, universities, nursing homes, and retirement homes. —See 23:18-19.

# *Watchtower* Study Conductor

| | Paragraphs |
|---|---|
| **Qualifications** | 1 |
| **Conducting the Study** | 2-9 |

## QUALIFICATIONS

**1.** The body of elders selects the *Watchtower* Study conductor. Since *The Watchtower* is the principal means by which the faithful and discreet slave dispenses spiritual food, the conductor should be one of the best teachers on the body. (Jas. 3:1) He should also be one who has "great freeness of speech." (1 Tim. 3:13) The body of elders may assign another elder to assist the *Watchtower* Study conductor. This brother would conduct in the assigned conductor's absence.

## CONDUCTING THE STUDY

**2.** The conductor presents brief, well-prepared opening remarks for no more than 90 seconds. He highlights the theme and theme text and in a warm and enthusiastic manner tries to stimulate interest in the lesson. He does this by commenting on the preview of the article, by calling attention to the subheadings, by mentioning the review questions, or by raising two or three rhetorical questions answered by the lesson.

**3.** He does not comment excessively and avoids the tendency to summarize or enhance comments from the audience. If the audience fails to comment on an important point, asking an auxiliary question may stimulate the thinking of the audience and prompt

an appropriate comment. However, asking additional questions unnecessarily tends to stifle commenting.

**4.** He concentrates on the theme and main points, makes good use of the artwork, and highlights the practical value of the article. He avoids focusing on minor details and bringing into the discussion extensive outside theocratic or secular material from personal research.

**5.** He emphasizes the Bible. He may choose to have "Read" Scripture texts read by the assigned paragraph reader or by someone from the audience who reads well. The paragraph reading should not be interrupted by the reading of such texts. When a "Read" scripture is cited at the very beginning of a paragraph, the text should be read *before* the paragraph is read. When a "Read" scripture is cited in the middle or at the end of a paragraph, the conductor may determine when to have the text read after the reading of the paragraph has concluded. He may decide to have the text read before the question is asked, particularly if the answer to the question is found in the scripture. At other times, he may decide to have the text read during the general discussion of the material.

**6.** Footnotes and endnotes are not read by the assigned paragraph reader. The conductor decides to what extent the thought in a footnote or an endnote should be included in the discussion. After the paragraph has been read, the conductor might choose to have someone in the audience read the footnote or endnote or he might choose to ask for a comment on it. In some cases, he may not refer to it at all. Material in parentheses or in brackets within a paragraph is usually read aloud. A reference that simply identifies source material, such as a scripture citation, is not read aloud.

**7.** He encourages as many as possible to participate and tactfully reminds the audience that the first answer should be a direct answer to the printed question. After the direct answer is given,

the audience may comment on cited scriptures, supporting arguments, practical application of the material, and so forth. He encourages individuals to comment in their own words, calls on only one person at a time, and does not scold the audience if answers are not forthcoming.

**8.** At the conclusion of the article, he asks the review questions. His concluding remarks should be no more than 90 seconds. The study should last no more than 60 minutes, excluding the songs and closing prayer.

**9.** Only exemplary individuals who read very well should be approved by the body of elders as paragraph readers. If no brothers meet these qualifications, then qualified sisters may be used. Readers should be assigned in advance. (See 3:3.19.) It is preferred that the paragraphs be read live during congregation meetings. However, if no qualified readers are available, it is permissible to use audio recordings found on jw.org.

CHAPTER SEVEN

# Field Service Group Overseer

Paragraphs

**Qualifications** ............................................................................................... 1

**Responsibilities** ............................................................................................. 2

## QUALIFICATIONS

**1.** The body of elders should assign one overseer and one assistant to each field service group. The group overseer is responsible to assist all in his assigned group to make spiritual advancement. (1 Tim. 4:15; Heb. 12:12) He should be an alert, caring shepherd. (Isa. 32:2) His zealous lead in the field ministry will encourage others to keep active in preaching the good news. (Heb. 13:15-17) In view of the importance of this assignment, the body of elders should select those elders most qualified to fulfill all the aspects of this assignment. If there are not enough elders in the congregation who are able to serve as group overseers or group assistants, ministerial servants may be assigned as group servants or group assistants. If there are not enough ministerial servants, a baptized brother who is a good example may serve as the group assistant. The other elders and ministerial servants in each group should be alert to support the group overseer and his assistant in caring for these responsibilities.—Eph. 4:15, 16; *od* chap. 5 pars. 29-34.

## RESPONSIBILITIES

**2.** The responsibilities of field service group overseers include the following:

(1) Taking an active interest in the physical and spiritual needs of each one in the group by maintaining regular contact with each family—weekly, if possible.—Jas. 1:27; 2:15, 16; see Chapter 25.

(2) Taking the lead when the group meets for field service, especially on weekends. Periodically, he may assign his assistant or another brother to conduct such meetings. If he cannot be present, he makes sure that the group will be cared for by his assistant or another brother. —See 1:2.8.

(3) Arranging to work regularly in the ministry with each one in the group to provide encouragement and training in various aspects of the Kingdom-preaching and teaching work.—Luke 8:1.

(4) Arranging to shepherd periodically all in the group. —See Chapter 25.

(5) Developing, along with the Congregation Service Committee, a plan to assist those with special needs in times of emergency or disaster.—See Chapter 26.

(6) Reviewing periodically with his assistant the activity of those in his group to determine their strengths and weaknesses in the ministry.

(7) Meeting with publishers one year after baptism to provide encouragement and helpful suggestions. He will be accompanied by an elder assigned by the coordinator of the body of elders.—See 4:2.7; *od* pp. 211-212.

(8) Assisting and training exemplary, baptized brothers in the group to reach out and qualify for congregation responsibilities.

(9) Helping to collect the monthly field service reports. When the secretary informs him of missing reports, he immediately follows through. If someone did not participate in field service for an entire month, he offers help as needed, according to the circumstances of the individual.

FIELD SERVICE GROUP OVERSEER

CHAPTER EIGHT

# Appointment and Deletion of Elders and Ministerial Servants

Paragraphs

**Considering Scriptural Qualifications** ...................................................... 1-5

**Cautions Before Recommending Certain Brothers** ................. 6-11

Previously Reproved, Disfellowshipped, or Disassociated ....... 7

Guilty of Adultery in the Past ........................................................... 8

Separated or Unscripturally Divorced ...................................... 9

Served as an Elder or a Ministerial Servant in the Past ...... 10

Baptized for Many Years but Only Now
   Being Recommended ....................................................................... 11

**When an Appointed Brother Moves Out
of the Congregation** ......................................................................... 12

**When an Appointed Brother Moves
Into the Congregation** ..................................................................... 13-14

**Recommendations for Appointment During the Circuit
Overseer's Regular Visit to a Congregation** .............................. 15-20

**Recommendations for Appointment Between the Circuit
Overseer's Regular Visits to a Congregation** .................................... 21

**Situations That Require a Review of an
Appointed Brother's Qualifications** ...................................................... 22-28

Member of His Household Gets Involved
   in Serious Wrongdoing ...................................................................... 22

Allows Disfellowshipped or Disassociated Family Member
   to Move Into His Home ...................................................................... 23

Supports the Marriage of a Baptized Christian to an
   Unbaptized Person ............................................................................. 24

Committed a Disfellowshipping Offense Years in the
Past and the Matter Was Never Addressed ........................ 25-27

Viewed Pornography ................................................................................ 28

**Situations That May Require a Review of an Appointed
Brother's Qualifications** ................................................................. 29-30

Files for Bankruptcy ................................................................................ 29

He or a Member of His Household Pursues
Higher Education ................................................................................ 30

**Procedure for Reviewing an Appointed
Brother's Qualifications** ................................................................. 31-33

**Recommendations for Deletion During the
Circuit Overseer's Regular Visit to a Congregation** ................... 34

**Recommendations for Deletion Between the
Circuit Overseer's Regular Visits to a Congregation** ................ 35

**Resignations** ...................................................................................... 36

**Deletions for Judicial Reasons or Death** ............................................ 37

**Announcements of Deletion** ............................................................... 38

**Appealing Deletions** ........................................................................... 39

**Congregation File** ............................................................................... 40

# CONSIDERING SCRIPTURAL QUALIFICATIONS

**1.** Before meeting to consider recommending brothers as ministerial servants or elders, each elder should personally review the inspired qualifications found at 1 Timothy 3:1-13; Titus 1:5-9; James 3:17, 18; and 1 Peter 5:2, 3. Helpful comments on the Scriptural qualifications can be found in chapters 5 and 6 of *Organized to Do Jehovah's Will.* A brother recommended as a ministerial servant must have been baptized at least one year.

**2.** After the meeting is opened with prayer, the Scriptural requirements should be read aloud from the Bible. Although no one

could measure up perfectly to these requirements, the brother being considered should measure up to a reasonable degree, not significantly lacking in any one of the requirements. The circuit overseer relies on your good judgment and spiritual discernment in this matter.

**3.** Natural ability does not qualify a brother for appointment. He must be a spiritual man, giving evidence that holy spirit is operating on him. Is he zealous for fine works? Is he a good example in his attendance and participation at congregation meetings? Is he zealous in the ministry, doing what he reasonably can in view of his age, health, family obligations, and other theocratic responsibilities? (See 23:25-26.) Is he a student of the Bible? Does he endeavor to help his family spiritually, regularly studying with his wife and his children living at home? Does he manifest the fruitage of the spirit in his daily life?—Gal. 5:22, 23.

**4.** Though it is the brother who must measure up to the Scriptural qualifications, you should also consider the spirituality of those in his household. If his wife is baptized, is she a good example? If she is spiritually weak, is he doing what he reasonably can to assist her? Is he making family worship a priority? Are his minor children well-behaved and "believing," either progressing toward dedication to God or already baptized as Jehovah's Witnesses? Do his family members participate in congregation meetings to a reasonable extent? What does the conduct of any adult children living in the home reveal?—Titus 1:6; see 8:22.

**5.** The elders should help brothers in their late teens to reach out and qualify to be ministerial servants. The following factors will be helpful when considering the qualifications of such a brother. Does the congregation respect him as a spiritual man? (1 Cor. 2: 15, 16) Does he display "the fruitage of the spirit"? (Gal. 5:22, 23) Does he have a meaningful share in the ministry? Does his use of his time give evidence that he is putting Kingdom interests first? Do his conversation and comments give evidence of good personal study habits? What are his spiritual goals? Has he

been "tested as to fitness"?—1 Tim. 3:10; Ps. 1:1, 2; Matt. 6:33; Eph. 4:29; *w89* 7/1 p. 29; see 1:6.4-5.

## CAUTIONS BEFORE RECOMMENDING CERTAIN BROTHERS

**6.** Elders should make sure they have full and complete information regarding the brothers they intend to recommend to the circuit overseer, especially those in the following circumstances.

**7.** **Previously Reproved, Disfellowshipped, or Disassociated:** If he was reproved within the past three years or reinstated within the past five years, please provide the following information: What was the offense? In a case of reproof, did the judicial committee make an announcement? In a case of disfellowshipping or disassociation, what is the date of reinstatement? When were the last restrictions lifted? Are you aware of his having been reproved, disfellowshipped, or disassociated on any other occasions? What convinces you that he has lived down his past wrongdoing and that others now view him as a good example? If the wrongdoing took place in another congregation, how would that congregation view his appointment? Recommending him prematurely could minimize the seriousness of wrongdoing in his own eyes and in the eyes of others. It could also disturb those who still have his wrongdoing fresh in their memories.

**8.** **Guilty of Adultery in the Past:** When did the adultery occur? Was he reproved or disfellowshipped? If he was reproved, was an announcement made? Did the innocent mate reject him? How do you know this? If he divorced and remarried, did he marry the individual with whom he committed adultery? Is there evidence that he schemed to put away his former mate or that he pressured her to accept a divorce? Did the adultery break up the marriage of the other person? How were others affected by his adultery? Is the innocent mate still alive? Did the innocent mate remarry? What convinces you that he has lived down his past wrongdoing and is now viewed with respect? If the wrongdoing

took place in another congregation, how would that congregation view his appointment?—See 12:10-12.

**9. Separated or Unscripturally Divorced:** Who is primarily to blame for the marital problems? What were the circumstances surrounding the separation or divorce? Who was responsible for the separation, or who pursued the divorce? Did both sign the decree or in some other way indicate their agreement? How long ago did the separation or divorce occur? What is the brother doing to try to reconcile? Is his mate unwilling to cooperate with his efforts? If so, why? How is his situation viewed by the congregations involved? How do the elders of the mate's congregation feel about the brother? When separation and divorce are involved, there may be deficiencies on the part of one or both mates that make it necessary to limit special privileges because one or both mates may not be viewed as exemplary.—*w00* 12/15 pp. 28-29; *lvs* pp. 250-251.

**10. Served as an Elder or a Ministerial Servant in the Past:** With what congregation did he previously serve, and when did he stop serving? Why did he stop serving? What makes his circumstances different now? What progress has he made since he stopped serving? If he stopped serving in another congregation, how would that congregation view his reappointment? If he previously served as an elder and was not guilty of gross wrongdoing, it may not be necessary for him now to serve first as a ministerial servant, depending on the length of time since he stopped serving as an elder.—See 13:8.

**11. Baptized for Many Years but Only Now Being Recommended:** What prevented the brother from being recommended in the past?

## WHEN AN APPOINTED BROTHER MOVES OUT OF THE CONGREGATION

**12.** Unless there are serious reservations about the qualifications of an appointed brother who is moving, the Congregation Service

Committee should send a letter of introduction to the elders in the new congregation plainly stating that the body of elders recommends that he continue to serve and in what assignments he has experience. (See 22:5-8.) If there are serious reservations, the body of elders should meet as soon as possible to determine whether they will recommend him for reappointment or not. (See 8:31-33.) If they do not recommend him, two or more elders should meet with him and explain the Scriptural reason for the body's decision. The letter of introduction should clearly explain their concerns, the counsel they gave him, and whether he agrees with the decision. (See 8:38.) At the next visit of the circuit overseer, the elders should inform the circuit overseer of the brother's move. This is true whether he received a favorable recommendation or not.

## WHEN AN APPOINTED BROTHER MOVES INTO THE CONGREGATION

**13.** Elders and ministerial servants who move to a new congregation with a favorable letter of recommendation and who have a favorable recommendation from the elders of the new congregation but who have not yet been reappointed may be used to present parts on the midweek meeting and to give public talks, according to their abilities. (See 22:6.7.) They may attend a Kingdom Ministry School. In addition, they can be present with the ministerial servants during the meeting the circuit overseer conducts with the appointed servants in the congregation. If the circuit overseer's outline includes additional information for elders only, recommended elders who have not yet been reappointed can remain as this information is discussed. However, they should not be present when recommendations and local congregation needs are considered. Neither should they serve on judicial committees or attend other meetings of the body of elders.

**14.** If an elder or a ministerial servant regularly moves away to live at a second residence, he should not be appointed in both congre-

gations. One congregation should hold the *Congregation's Publisher Records* (S-21). Each time he leaves, the elders should write a letter to the congregation he will be attending temporarily, explaining his circumstances and how he was being used. The elders of the congregation he is visiting can use him to care for duties and responsibilities in the congregation as outlined above. Even if he will be away for more than three months, he should send his field service reports to his home congregation.

## RECOMMENDATIONS FOR APPOINTMENT DURING THE CIRCUIT OVERSEER'S REGULAR VISIT TO A CONGREGATION

**15.** At least one month before the circuit overseer's visit, the Congregation Service Committee should send to the circuit overseer the full name, date of birth, and date of baptism of any brother the body of elders will be recommending for appointment as an elder or a ministerial servant. The *Recommendations for Appointment of Elders and Ministerial Servants* (S-62) form should be used for this purpose. (See *Instructions for Congregation Use of JW.ORG* [S-135].) Any ministerial servants who substitute as members of the service committee should not be aware of or be involved in any discussions regarding the recommendation. Ministerial servants should have no access to any forms or correspondence related to the appointment or deletion of elders and ministerial servants.

**16.** No earlier than a day or two before the start of the visit, perhaps when other congregation records are provided, the elders should provide the circuit overseer with any background information that has a bearing on the qualifications of the brother(s) being recommended for appointment. Such information would include letters of recommendation (or perhaps letters of introduction) from a previous congregation. (See 8:6-11.) During the meeting with the elders later in the week, the circuit overseer will discuss the Scriptural qualifications of each brother recommended. (See 8:1-5.) If

the circuit overseer determines that the brother does not measure up to the Scriptural requirements to a reasonable degree, he will advise the elders accordingly and inform them how they can help the brother to qualify in the future.

**17.** When the circuit overseer decides to appoint a brother, the circuit overseer and another elder will meet with the brother to inform him of his appointment. If the brother is (1) being appointed for the first time as a ministerial servant or (2) being reappointed as an elder or a ministerial servant for reasons *other than* his move from one congregation to another, the circuit overseer will ask the following questions: "(1) Is there anything from your past, even before baptism, or in your personal or family life that disqualifies you or that would prevent you from accepting this appointment? (2) Is there any reason why your appointment should not be announced to the congregation? (3) Have you ever been involved at any time in the past with child sexual abuse?" If the brother answers no to the questions, the circuit overseer will provide the elders with a signed appointment letter that includes the brother's name in the list of those appointed during the visit. The appointment should be announced to the congregation at the next midweek meeting.

**18.** If the brother approved for appointment is not present at the conclusion of the visit and it is necessary to ask him the questions mentioned in the preceding paragraph, the circuit overseer will *not* include the brother's name in the appointment letter, if any, left with the elders at the end of the visit. Rather, when the brother returns, the coordinator of the body of elders should assign two elders to ask the brother the questions. The coordinator of the body of elders will then inform the circuit overseer of the brother's answers. If the brother answers no to the questions, the circuit overseer will provide the elders with a signed appointment letter. At the midweek meeting following the receipt of the appointment letter, the brother's appointment should be announced to the congregation.

**19.** If the brother approved for appointment is not present at the conclusion of the visit but it is *not* necessary to ask him the questions mentioned in paragraph 17, the circuit overseer will include the brother's name in the appointment letter left with the elders at the end of the visit. When the brother returns, the coordinator of the body of elders should assign two elders to meet with the brother to inform him of his appointment before it is announced to the congregation.

**20.** If the circuit overseer decides not to appoint a brother, two elders may speak with the brother at an appropriate time and discreetly explain what he needs to do to qualify. The elders should not inform him that the body of elders recommended him. On occasion the circuit overseer will not approve a recommendation so as to allow time for the brother to develop maturity and experience or to live down past wrongdoing. In such cases, there may be no need to discuss matters with the brother.

## RECOMMENDATIONS FOR APPOINTMENT BETWEEN THE CIRCUIT OVERSEER'S REGULAR VISITS TO A CONGREGATION

**21.** When an elder or a ministerial servant moves into the congregation with a favorable letter of recommendation for reappointment and the next visit of the circuit overseer is *not in the near future,* the body of elders may recommend his immediate reappointment. In such cases, the Congregation Service Committee should submit the *Recommendations for Appointment of Elders and Ministerial Servants* (S-62) form to the circuit overseer along with a copy of the letter of recommendation from the service committee of his former congregation. If the recommendation is approved, an appointment letter will be sent to the body of elders. A brother who has been reappointed as an elder or a ministerial servant should be informed of his appointment before it is announced to the congregation.

# SITUATIONS THAT REQUIRE A REVIEW OF AN APPOINTED BROTHER'S QUALIFICATIONS

**22. Member of His Household Gets Involved in Serious Wrongdoing:** If a brother's wife or child, including an adult child living in his home, is involved in serious wrongdoing, the body should seek to determine whether the brother was negligent. Was he permissive? Was he alert to provide needed direction, anticipating potential problems? Was he regularly conducting family worship? Was he giving his family needed time and attention? When he became aware of serious wrongdoing, did he promptly inform the body of elders so that they could properly investigate the matter? Did he shield his family from discipline or try to manipulate the elders' handling of the situation? Does he continue to have the respect and confidence of the congregation as an exemplary family head? If one of his children was guilty of serious wrongdoing, are the other children doing well spiritually? If the brother has done all that can reasonably be expected and especially if he has had spiritual success with others in his household, rejection of his fine direction by one family member would not necessarily disqualify him if he continues to have the respect of the congregation.

**23. Allows Disfellowshipped or Disassociated Family Member to Move Into His Home:** Is the disfellowshipped or disassociated individual unable to live on his own, or has he moved because it is an easier life? Are there valid reasons for allowing him back in the home, or is it primarily so that the Christian family members can have a measure of association with him? Did the family avoid unnecessary contact with him when he was living outside the home? Is the arrangement short-term or long-term? What is the disfellowshipped or disassociated individual's conduct? What spiritual effect is he having on others in the household, especially siblings? Is the congregation disturbed by the brother's decision? Have a number lost respect for him? Similar questions

should be considered when an adult child living at home is disfellowshipped or disassociated and allowed to remain in the home.

24. **Supports the Marriage of a Baptized Christian to an Unbaptized Person:** An appointed man should be loyal to Jehovah's standards, including the Scriptural command to marry "only in the Lord," that is, to marry a dedicated, baptized Christian. (1 Cor. 7:39; 2 Cor. 6:14, 15; Titus 1:8; *w04* 7/1 p. 31; *lvs* pp. 134-136) This command applies to all Christians, including those who are inactive. Questions about an appointed brother's qualifications would result if he encouraged or gave unspoken approval to such a marriage, for example, by supporting the courtship or by supporting, attending, or participating in the wedding or wedding reception. A brother's qualifications should also be reviewed if he did not get involved personally but allowed his wife or others in his household to do so. If an elder or a ministerial servant displays poor judgment in these areas to a degree that it raises serious questions in the minds of others, he may be Scripturally disqualified from serving.

25. **Committed a Disfellowshipping Offense Years in the Past and the Matter Was Never Addressed:** The body of elders may determine he can continue to serve if the following is true: The immorality or other serious wrongdoing occurred more than a few years ago, and he is genuinely repentant, recognizing that he should have come forward immediately when he sinned. (Perhaps he has even confessed to his sin, seeking help with his guilty conscience.) He has been serving faithfully for many years, has evidence of God's blessing, and has the respect of the congregation.

26. If the sin occurred before he was appointed as an elder or a ministerial servant, the elders will need to take into consideration the fact that he should have mentioned this possible obstacle to his being qualified when elders met with him just prior to announcing his appointment. Moreover, the nature of the sin may reflect greatly on his qualifications to serve. For example, the sin may

involve past child sexual abuse, which means that he would not qualify for many years, if ever.—See 14:22-24.

**27.** If the wrongdoing occurred *within the past few years while he was serving* as an elder or a ministerial servant, he is disqualified from serving as such, not being "free from accusation." (1 Tim. 3:2, 10; Titus 1:6, 7) Depending on the circumstances, the situation may also need to be handled by a judicial committee.—See 12:57-59.

**28. Viewed Pornography:** See 13:5-6.

## SITUATIONS THAT MAY REQUIRE A REVIEW OF AN APPOINTED BROTHER'S QUALIFICATIONS

**29. Files for Bankruptcy:** Have individuals in the congregation or the community become upset? Did the brother lack self-control in his spending or fail to use reasonable foresight in his business decisions? Does he have a reputation for being honest and responsible? Is he viewed as one who conscientiously tries to pay his debts? Does he feel a moral responsibility to repay canceled debts if former creditors would accept payment? Does he still have the respect of the congregation? Does he continue to have "a fine testimony from outsiders"?—1 Tim. 3:7; *w94* 9/15 pp. 30-31.

**30. He or a Member of His Household Pursues Higher Education:** If an appointed brother, his wife, or his children pursue higher education, does his life pattern show that he puts Kingdom interests first in his life? (*w05* 10/1 p. 27 par. 6) Does he teach his family members to put Kingdom interests first? Does he respect what has been published by the faithful slave on the dangers of higher education? Do his speech and conduct reveal that he is a spiritual person? How is he viewed by the congregation? Why is he or his family pursuing higher learning? Do they have theocratic goals? Does the pursuit of higher education interfere with regular meeting attendance, meaningful participation in field service, or other theocratic activities?

## PROCEDURE FOR REVIEWING AN APPOINTED BROTHER'S QUALIFICATIONS

**31.** When preparing to review the qualifications of a brother, elders should first research current direction that applies to the issue at hand. Avoid dogmatic viewpoints or quick decisions based solely on personal preferences. (Phil. 4:5) Do not be quick to recommend deletion unless there is a solid basis for doing so. It may be possible to assist the brother to make the needed adjustments and continue to serve. Has the brother served faithfully for many years? What has he done or failed to do that raises questions? How did he react to counsel? Has he had such difficulties in the past, and how did he then respond to efforts to help? Was his wrongdoing really so serious that it requires restricting his privileges? Possibly he just made a mistake, using poor judgment. The congregation in general may still have respect for him and confidence in him as an elder or a ministerial servant. Perhaps the matter is not widely known, if at all. If he realizes that his action was unwise, has learned from his mistake, has a good attitude, and wants to improve, it may be that he can continue to serve.

**32.** If it is necessary to review an elder's qualifications, the body of elders should consider the matter, with the brother in question present, using the following procedure:

   (1)   After seeking Jehovah's guidance in prayer, make sure all the facts are presented. Maintain a respectful, orderly atmosphere that is conducive to such a discussion.

   (2)   Allow the brother adequate time to express his feelings and to answer any questions. Ask him for his view of the matters being discussed regarding his qualifications.

(3)   Ask the brother to leave the room while the other elders continue their discussion and decide what they will recommend.

(4)   Invite the brother back into the room. If the decision is to recommend his deletion, inform him of this and the Scriptural reasons.

(5)   Give the brother the opportunity to comment on the decision. It may be necessary for the brother to leave the room again so that the elders can discuss the matter further before making a final decision.

**33.** If the qualifications of a ministerial servant are being reviewed, the same basic procedure is followed except that rather than having the brother present during the meeting of the body of elders, it would usually be sufficient for two elders to speak with him in advance to hear him out. If the body of elders decides to recommend his deletion, the two elders would meet with him again to inform him of the recommendation and the Scriptural reasons and to give him the opportunity to express himself. Based on his comments, it may be necessary for the elders to discuss the matter further before making a final recommendation.

## RECOMMENDATIONS FOR DELETION DURING THE CIRCUIT OVERSEER'S REGULAR VISIT TO A CONGREGATION

**34.** Recommendations for deletion because of poor judgment not of a judicial nature are usually best submitted during the visit of the circuit overseer rather than between visits. At the start of the circuit overseer's visit, the elders should provide any background information, including any conclusion that the body of elders may have already reached, that will help the circuit overseer have a complete view of the matter. (See 8:31-33.) During his meeting with the elders later in the week, the circuit overseer will discuss

the Scriptural qualifications of the brother. If the circuit overseer agrees with the recommendation, the brother will be informed of his deletion. If the brother agrees with the decision, the circuit overseer will generate a letter of deletion. The announcement of deletion should be made at the next midweek meeting. (See 8:38.) If the brother disagrees with the decision, he will be informed of his right to appeal.—See 8:39.

## RECOMMENDATIONS FOR DELETION BETWEEN THE CIRCUIT OVERSEER'S REGULAR VISITS TO A CONGREGATION

**35.** If serious questions arise concerning a brother's qualifications and the next visit of the circuit overseer is not in the near future, the body of elders should follow the procedure outlined in Chapter 8, paragraphs 31-33. If the body of elders decides to recommend a brother's deletion after reviewing his qualifications, the Congregation Service Committee should send the recommendation to the circuit overseer immediately. The letter to the circuit overseer should provide complete details and indicate whether or not the brother agrees with the recommendation. Meanwhile, the brother will continue to serve as an elder or a ministerial servant. The body of elders will determine what congregation responsibilities he will have in the interim, according to the circumstances. If the circuit overseer agrees with the recommendation and believes it should be processed immediately, he will send a letter of deletion to the body of elders. Upon receipt of the letter, the coordinator of the body of elders should assign two elders to inform the brother of the circuit overseer's decision. If the brother accepts the circuit overseer's decision, the announcement should be made at the next midweek meeting. (See 8:38.) If the brother does not accept the decision, he should be informed of his right to appeal, the announcement to the congregation should be held in abeyance, and the coordinator of the body of elders should inform the circuit overseer.—See 8:39.

## RESIGNATIONS

**36.** If a brother expresses a desire to resign, two elders should first discuss the matter with him. Why does he wish to resign? Is he Scripturally disqualified? If his personal circumstances hinder him from doing what he would like, can the elders be of any assistance and encouragement? Until his circumstances change, perhaps they can lighten his load for a period of time while he continues to serve. If he still feels he wants to resign after this discussion, the Congregation Service Committee should write the circuit overseer and provide full details as to why the brother chose to relinquish his privilege of service. The circuit overseer will send a letter of deletion to the body of elders.—See 8:35.

## DELETIONS FOR JUDICIAL REASONS OR DEATH

**37.** The Congregation Service Committee should immediately inform the circuit overseer of (1) the deletion of an elder or a ministerial servant because of judicial reproof, disfellowshipping, or disassociation or (2) the death of an elder or a ministerial servant. For deletions resulting from judicial reproof, disfellowshipping, or disassociation, the information sent to the circuit overseer should include the specific judicial offense and the action taken by the committee. In cases involving judicial reproof, the circuit overseer will send a letter of deletion to the body of elders. No letter of deletion will be sent in cases of disfellowshipping, disassociation, or death.—See 8:38.

## ANNOUNCEMENTS OF DELETION

**38.** Announcements of deletion, including those because of resignations, should read as follows: "Brother [name of person] is no longer serving as an elder (a ministerial servant)." When an elder or a ministerial servant moves out of the congregation, an

announcement of deletion would not be made. When a brother resigns, an announcement should be made without waiting for the letter of deletion from the circuit overseer. After guilt is clearly established in a judicial matter, an announcement of deletion should be made to the congregation at the next midweek meeting, even if the judicial hearing is not yet completed.

## APPEALING DELETIONS

**39.** If an elder or a ministerial servant disagrees with his deletion by the circuit overseer and wishes to appeal, he should immediately write a brief letter to the Service Department, with a copy to the body of elders and a copy to the circuit overseer, explaining why he disagrees with the deletion. It would be inappropriate to pressure a brother who wishes to appeal not to do so by suggesting, for example, that it would take longer for him to be reappointed or that the branch office would view him negatively. The announcement of deletion should be held in abeyance, and the letter of deletion should be destroyed (if one had been generated). Thereafter, the Service Department will select an experienced circuit overseer who, along with the original circuit overseer, will rehear the entire matter. The two circuit overseers will listen carefully to the brother and the elders and will deal justly and kindly with all involved. After the circuit overseers hearing the appeal reach a joint decision, there is no further right to appeal. If it is decided that the brother should be deleted, the circuit overseer who serves the brother's congregation will generate a letter of deletion to the body of elders. Upon receipt of the letter of deletion, the announcement of deletion should be made at the next midweek meeting.

## CONGREGATION FILE

**40.** Records related to the appointment and deletion of elders and ministerial servants should be retained indefinitely.—See 22:19.

# Pioneers

| | Paragraphs |
|---|---|
| **Appointments** | 1-3 |
| **Deletions** | 4-5 |
| **Congregation Changes** | 6-7 |
| **Changes to Pioneer Information** | 8 |
| **S-202 Letters** | 9 |
| *Field Service Reports* **(S-4)** | 10 |
| **Hour Credit** | 11-13 |
| **Special Consideration** | 14 |
| **Review of Pioneers' Field Service Activity** | 15-17 |
| **Infirm Regular Pioneers** | 18-19 |

## APPOINTMENTS

**1.** When a publisher submits an *Application for Regular Pioneer Service* (S-205), the Congregation Service Committee should obtain comments from the appropriate group overseer and then meet promptly to consider the applicant's qualifications, keeping in mind the following guidelines. The service committee should use good judgment in determining when it would be wise to confer with the other elders.—Prov. 15:22.

   (1)   The information provided by the applicant should be complete and correct.

   (2)   The applicant must be baptized for at least a full six months.

   (3)   The applicant must be an exemplary Christian.
—See 2:4.

(4) The applicant must have organized his personal affairs so that he can reach the annual requirement of 840 hours.

(5) Those who discontinue pioneer service must be off the pioneer list a full six months before starting again.

(6) The applicant must not have been reproved or reinstated within the past year, and all restrictions must have been lifted.

(7) The applicant should indicate the date he wishes to begin pioneering. No retroactive appointments should be made unless there are significant extenuating circumstances, such as in the rare instance that an application was lost or unduly delayed by the elders.

**2.** Once the service committee has decided whether to appoint the applicant or not, the body of elders should be updated on how the matter was handled. This should be done before any announcement of appointment is made to the congregation. If it is decided that the applicant is not qualified to serve as a regular pioneer, two members of the service committee should kindly explain the reasons to him. If the service committee decides to appoint him as a regular pioneer, each member of the committee should sign the application. The application should be kept in the congregation file. Applications should *not* be sent to the branch office unless specific instructions are given to do so.

**3.** The secretary should enter information from the approved application into the appropriate section of jw.org. After the information has been submitted, the new pioneer's name will be listed under the section "Appointed Pioneers Not Yet Registered." The secretary should check the site every few days until the pioneer's name is listed under the section "Regular Pioneers." Thereafter, the regular pioneer welcome letter (S-236), found under the "Documents" tab in the "Forms" section, should be printed out and pro-

vided to the pioneer to inform him of the appointment. An announcement should be made to the congregation at the next midweek meeting that the publisher has been appointed as a regular pioneer. Please *do not* announce to the congregation the appointment of the regular pioneer until his name is listed under the section "Regular Pioneers," thus indicating that the appointment has been registered by the branch office.

## DELETIONS

**4.** Before deleting an individual as a regular pioneer, the Congregation Service Committee should obtain comments from the appropriate group overseer. They should also consider whether the pioneer may qualify for special consideration. (See 9:14.) The service committee should use good judgment in determining when it would be wise to confer with the other elders. (See 2:1.) In all cases, before any announcement is made to the congregation, the body of elders should be updated on how the matter was handled and two members of the service committee should inform the individual of the decision. If a pioneer no longer qualifies or must discontinue for personal reasons, an announcement should be made to the congregation. The announcement of deletion should read as follows: "Brother (Sister) [name of person] is no longer serving as a regular pioneer." Inform the branch office of the deletion using jw.org. If the discontinuation is because of health, family responsibilities, secular work, and so forth, choose the option "Personal reasons." If the discontinuation is because of a poor example that did not involve judicial action, choose the option "No longer qualifies." For discontinuation because of other reasons, choose the appropriate option.

**5.** If the pioneer was reproved by a judicial committee, he is automatically disqualified and his deletion should be reported immediately on jw.org.

## CONGREGATION CHANGES

**6.** If a pioneer transfers to another congregation, the secretary of his former congregation should indicate his deletion on jw.org and should show the reason as transferring to another congregation. Type the name of the new congregation or area in the space provided. Include the country if the pioneer is transferring to a congregation outside the branch territory.

**7.** Upon receipt of the letter of introduction from the previous congregation, the Congregation Service Committee of the new congregation should confirm that the individual desires to continue pioneering. If so, and if there is no exceptional reason to do otherwise, the service committee of the new congregation should reappoint the pioneer. The secretary of the new congregation should enter the appropriate information on jw.org as follows, and the appointment should be announced at the next midweek meeting.

   (1) **If transferring from a congregation in the same branch territory:** Click on the appropriate link and enter the pioneer's name and former congregation. Then click "Search."

   (2) **If transferring from a congregation in another branch territory:** Enter the pioneer's information as if he were a newly appointed pioneer. Be sure to complete the section for full-time service history.

## CHANGES TO PIONEER INFORMATION

**8.** Changes to a pioneer's name, birth date, baptism date, marital status, or spouse's name may be made on jw.org. If any other information about the pioneer needs to change, please contact the Service Department.

## S-202 LETTERS

**9.** Congregations not able to use jw.org may send approved *Applications for Regular Pioneer Service* (S-205) to the Service Department so that the appointments may be registered. In this circumstance, please *do not* announce to the congregation the appointment of the regular pioneer until you receive an S-202 letter indicating that the appointment has been registered. Congregations not able to use jw.org may also use the S-202 letter to inform the Service Department of a change in a pioneer's personal information or to inform another congregation that a pioneer is transferring to their congregation.

## *FIELD SERVICE REPORTS* (S-4)

**10.** *Field Service Reports* for regular pioneers should be handled in the same way that publisher reports are handled. Late reports should be added to the total activity for regular pioneers on the following month's report to the branch office.

## HOUR CREDIT

**11.** Regular pioneers may be invited to share in certain theocratic assignments as part of their sacred service. The spirituality, availability, and willing spirit of pioneers may allow them to support Kingdom interests in a special way. Such approved assignments include serving in construction oversight, Assembly Hall oversight, assembly oversight, and convention oversight, as well as serving as commuter Bethelites, remote volunteers, Bethel consultants, Hospital Liaison Committee members, Patient Visitation Group members, Disaster Relief Committee members, Local Design/Construction Department field representatives and maintenance trainers, and so forth. Approved assignments also include assisting with Kingdom Hall construction when such is done at the request of the branch office or its representatives

overseeing the project, assisting with pre- and post-assembly or convention work, assisting with work at Assembly Halls, conducting or participating in congregation meetings held in prison, and so forth.

**12.** When a pioneer's assistance is authorized, he will keep a record of all the hours spent working on the assignment during the month. He will report this activity to the congregation in the "Comments" section of his *Field Service Report* (S-4). It should be explained clearly to the pioneer that when he submits his report he should not combine the hours spent working on an approved assignment with the hours spent in field service and that some time should be spent in the ministry each month.

**13.** The hours spent working on an approved assignment should not be included with the field service report submitted to the branch office. The figure recorded in the "Hours" column of the *Congregation's Publisher Record* (S-21) should reflect only the actual hours spent by the pioneer in field service. All the hours spent working on an approved assignment should be noted in the "Remarks" column along with a notation of how much of that time can be considered hour credit. Those properly authorized are given credit to the extent that the total number of hours actually spent in field service plus time credit for approved assignments does not exceed 75 hours. No credit will be carried over to any other month. The credit received for attendance at a theocratic school or class is in addition to any time spent in the field ministry that month and in addition to any credit received for approved theocratic assignments. If a theocratic school or class spans more than one month, the pioneer student will be allowed to determine how much of the allotted hour credit will be applied to each month.

## SPECIAL CONSIDERATION

**14.** In some situations, pioneers spend more hours in a month on theocratic projects than they can receive hour credit for. Later in

the service year, they may need to take a vacation, spend time in secular work, or care for some other pressing issue that precludes their reaching 840 hours for the service year. The Congregation Service Committee should take into consideration all that such pioneers are doing in behalf of Kingdom interests and grant special consideration to them. A pioneer would not lose his privileges if he has worked extensively on theocratic projects and did not reach the annual hour requirement because he spent more time on such projects than he could receive hour credit for. The elders, being aware of the pioneer's work to support Kingdom interests, will offer warm commendation. A notation can be made on the *Congregation's Publisher Record* (S-21) to indicate that special consideration has been granted.

## REVIEW OF PIONEERS' FIELD SERVICE ACTIVITY

**15.** Each year around March 1, the secretary and the service overseer should review the field service activity and hour credit of all regular pioneers. If a pioneer is consistently not meeting the monthly hour goal, factoring in any hour credit, the service overseer and group overseer should meet with the pioneer to discuss his circumstances and endeavor to offer assistance. Is it because of health problems, increased family responsibilities, poor scheduling, or secular work? Are other activities consuming his time and energy? Is the problem temporary or ongoing? Does he have a realistic schedule that will allow him to reach the monthly hour goal for the rest of the service year?

**16.** At the end of the service year, the Congregation Service Committee should meet to review the activity of any regular pioneers who did not reach the annual hour requirement and determine if they should be allowed to continue pioneering. (If a regular pioneer reaches at least 800 hours for the year—hours spent in field service in combination with any hour credit—he may continue to

serve as a pioneer.) In addition to the factors noted in the preceding paragraph, the following factors should be taken into consideration before a decision is made. How long has the individual been serving as a full-time minister? What is the age of the pioneer? Might it be better for him to discontinue regular pioneer service until his circumstances change? Discontinuing pioneer service for a time may relieve him of the stress of trying to meet the hour requirement while coping with difficult or adverse circumstances. Be balanced and use good judgment when making such decisions. Consider what course of action will be in the best interests of the individual and, at the same time, will uphold the high standards of regular pioneer service.

**17.** If the service committee delays in handling matters, further problems may develop. A pioneer may begin to minimize the need to meet the hour requirement. Or he may feel stress, wondering when the elders will recommend his removal. A pioneer may try unrealistically to increase the hours he spends in field service in an attempt to reach the hour requirement, thinking that is the only course to be taken. These situations may cause the pioneer to develop a poor attitude or even health problems. Therefore, the long-term interests of the pioneer are best served when matters are handled promptly.—Gal. 6:10.

## INFIRM REGULAR PIONEERS

**18.** In rare circumstances, a brother or sister may be approved to remain as a pioneer without having a minimum hour requirement. This provision is only for exemplary, longtime pioneers who have a heartfelt desire to serve always as regular pioneers and who feel they would be taking a backward step if they had to discontinue but who are unable to meet the hour requirement because of infirmity. The elders may consider designating such a pioneer as an infirm regular pioneer if he (1) is over 50 years old and (2) has pioneered for at least 15 cumulative years. This decision

should be made by the elders only after consulting with the circuit overseer regarding the situation. This arrangement is not a provision to allow an individual to care for sick relatives, do added secular work, and so forth. Those who first enter the pioneer service when they are 60 or 70 years old do not come under this arrangement simply because of their age. There is no need to give consideration to allowing an older pioneer who develops health problems to serve as an infirm regular pioneer if he is willing to transfer to the publisher ranks.

**19.** When the body of elders decides that a pioneer may serve as an infirm regular pioneer, a notation should be made on the *Congregation's Publisher Record* (S-21). It is not necessary to notify the branch office of this decision. Two members of the Congregation Service Committee should meet with the pioneer to inform him of this loving provision made in his behalf. Encourage the pioneer to continue exerting himself in his ministry to the extent that his circumstances allow. (Luke 13:24; Col. 3:23, 24) Assure the infirm pioneer that he has the full support of the elders in the congregation and that Jehovah is aware of the sacrifices that he has made during his many years of service.—Heb. 6:10, 11.

PIONEERS

CHAPTER 9                    "SHEPHERD THE FLOCK OF GOD"

# Circuit Overseer

|                                                  | Paragraphs |
|--------------------------------------------------|------------|
| **Accommodations and Meals**                     | 2-5        |
| **Expenses During the Week of the Visit**        | 6-8        |
| **Proper Use of Congregation and Circuit Funds** | 9          |

**1.** Four to six weeks before a regular visit of the circuit overseer, the elders should begin to remind the congregation of the visit. The elders should encourage full participation in the field ministry and remind the congregation of the opportunity to auxiliary pioneer with a 30-hour requirement and attend the pioneer meeting with the circuit overseer. See Chapter 8, paragraphs 15-16, if recommending a brother for appointment as an elder or a ministerial servant during the visit. The coordinator of the body of elders should follow closely the instructions provided on the *Information Needed for Visit of Circuit Overseer* (S-61) form. Early in the week, the elders should alert the circuit overseer to any serious problems the congregation is facing.

## ACCOMMODATIONS AND MEALS

**2.** It is a privilege for the congregation to show genuine hospitality to the circuit overseer and his wife. This enables the circuit overseer to get the most accomplished and to cultivate a warm relationship with the brothers. (Rom. 12:13; 3 John 5, 6) Even if an apartment is provided by the circuit, the circuit overseer may on occasion need to stay locally instead of commuting to a distant apartment. (See *Instructions for Circuit Accounting* [S-331] for direction regarding circuit apartments.) It is the responsibility of the coordinator of the body of elders or another elder designated

by him to ensure by personal observation that clean and suitable accommodations are arranged for the circuit overseer and his wife during the week of his visit. If there is a need to rent a place for the week, the elders should contact the Service Department.

**3.** Private accommodations should provide a clean place to store clothes and belongings. A chair, a table, and good lighting are important. Circuit overseers need adequate time to themselves and sufficient rest. The coordinator of the body of elders or another elder designated by him should ask the circuit overseer if he or his wife have any allergies or health problems that might affect the selection of accommodations. Additionally, it is best to avoid homes where there are family problems or where a family member has a serious illness requiring specialized attention.

**4.** Midday meals are fine occasions for upbuilding conversations, for forming close friendships, and even for shepherding. Thus, when visiting congregations, it is preferred that circuit overseers accept the hospitality of the local brothers as arranged by the elders. The elders should use good judgment when selecting those who will serve as hosts for the midday meal. Circuit overseers deeply appreciate the congregation's hospitality. Wholesome, nourishing food enables them to feel well physically and to keep up with their schedule. The circuit overseer may decide whether he will accept invitations for other meals.

**5.** It is beneficial when the coordinator of the body of elders asks the circuit overseer at the end of his visit about the accommodations. It is not necessary to have the circuit overseer stay in a different home each time he visits the congregation.

## EXPENSES DURING THE WEEK OF THE VISIT

**6.** Circuit overseers generally incur some expenses during the week of the visit. Such expenses may include food expenses, routine office expenses, transportation expenses that are not covered

by the branch office, and certain moderate personal expenses. (See *Instructions for Congregation Accounting* [S-27] and *Instructions for Circuit Accounting* [S-331] for details on how circuit overseers are reimbursed.) At no time should the circuit overseer and his wife be a financial burden to any congregation. —2 Cor. 11:9.

**7.** The circuit overseer will be considerate and discerning in submitting his expenses. Some personal expenses could be covered by the monthly allowance from the branch office or from personal contributions he may have received from individuals in the congregation. Other personal expenses, such as clothing, cosmetics, vitamins, over-the-counter drugs, insurance for personal property, or life insurance would not be submitted for reimbursement. Rather, they should be covered by the circuit overseer's personal funds. A circuit overseer should not solicit funds from individuals.

**8.** If Internet or mobile telephone service is used to communicate with congregations and with the branch office, the expense incurred may be submitted for reimbursement. However, Internet or mobile telephone service beyond what is needed to communicate with congregations and the branch office would be covered by the circuit overseer as a personal expense, as would expenses related to Internet or mobile telephone service for the wife of a circuit overseer.

## PROPER USE OF CONGREGATION AND CIRCUIT FUNDS

**9.** Congregation and circuit funds should not be used to make monetary gifts to circuit overseers or visiting speakers beyond their actual expenses. Likewise, it would be inappropriate for individuals to solicit money from brothers and sisters and then provide this as a gift to a circuit overseer. (2 Cor. 8:20) Nevertheless, if someone desires to make a heartfelt contribution to a circuit

overseer, that is his prerogative and is a private matter that need not concern others.—2 Cor. 9:7.

# Medical Matters

|  | Paragraphs |
|---|---|
| **Newly Baptized Publishers** | 1 |
| **Parents and Pregnant Sisters** | 2 |
| **Elderly** | 3 |
| **Admission to the Hospital** | 4 |
| **Communication With Medical Personnel** | 5 |
| **Hospital Liaison Committee** | 6-9 |
| **When Traveling to Care for Medical Needs** | 10-15 |
| **Baptism of an Individual With a Communicable Disease** | 16-17 |

## NEWLY BAPTIZED PUBLISHERS

**1.** The secretary should provide newly baptized publishers with the following materials:

(1) Durable power of attorney (DPA) card. The publisher should be informed of the importance of having a properly completed DPA card and of providing a copy of it to his health-care agents and his doctor or hospital.

(2) "How Do I View Blood Fractions and Medical Procedures Involving My Own Blood?" (*kmi11/06*)—November 2006 *Our Kingdom Ministry* insert.

(3) "Are You Ready to Face a Faith-Challenging Medical Situation?" (*kmi11/90*)—November 1990 *Our Kingdom Ministry* insert.

## PARENTS AND PREGNANT SISTERS

**2.** When the elders learn that a sister is pregnant, they should provide her (and her husband, if he is a Witness) with a copy of *Information for Expectant Mothers* (S-401). Soon after, the elders should inquire whether the assistance of the Hospital Liaison Committee (HLC) is desired. If the sister requests assistance, the elders should contact the HLC. Elders should ensure that any parents with minor children are familiar with the points contained in *How Parents Can Protect Their Children From Misuse of Blood* (S-55).

## ELDERLY

**3.** If they do not have Witness family members with them in a hospital, older brothers and sisters may be particularly vulnerable to intimidation by medical personnel. Elders would do well to encourage such ones to have a duly-completed DPA card and remind them to confirm periodically that their designated health-care agents understand their decisions and will uphold them.

## ADMISSION TO THE HOSPITAL

**4.** When the elders learn that a publisher is being admitted to the hospital, the publisher should be reminded that if he wishes to receive visits from congregation elders, including members of the Patient Visitation Group, he should inform the hospital that he would welcome a visit from a minister of Jehovah's Witnesses. A publisher needs to read hospital forms very carefully to ensure that his health-care decisions are properly recorded. A patient has the right to modify such documents as necessary, initialing each adjustment he makes. A publisher will want to ensure that a copy of his DPA card is included with his medical records. To help ensure that his wishes are honored, a publisher may choose to appoint two of Jehovah's Witnesses as his health-care agents instead of non-Witness family members. If this is done, it

is both prudent and a kindness for the publisher to advise his non-Witness family members of this.

## COMMUNICATION WITH MEDICAL PERSONNEL

**5.** Well in advance of a scheduled operation, a publisher should speak with his doctor, the surgeon, and the anesthesiologist about his health-care instructions. Surgery is a team effort, and all members of the team need to understand the publisher's position on blood, on any pharmaceuticals containing minor blood fractions, and on medical procedures involving the use of his own blood. It is unfair to the medical team when a publisher fails to communicate his wishes well in advance of the surgery. With the publisher's permission, Hospital Liaison Committee members or others may discuss the publisher's case with medical personnel. However, it is the responsibility of the patient or his health-care agents to make health-care decisions.

## HOSPITAL LIAISON COMMITTEE

**6.** Hospital Liaison Committees (HLC) play a vital role in helping medical and legal communities understand our religious position regarding blood transfusions. HLCs coordinate the activities of Patient Visitation Groups (PVG) in key cities to provide spiritual support for hospitalized Witness patients from outside the local area. The HLC and PVG arrangements do not relieve the elders or others in the congregation of their responsibility to support publishers who are hospitalized.—Prov. 17:17; 1 John 3:18.

**7.** The activity of HLCs is completely separate from hospital programs, such as bloodless medicine and surgery programs. Neither the branch office nor the HLCs endorse health-care providers or any business organization.

**8.** Elders should ensure that they have ready access to the contact information for their HLC. In most cases, elders should contact the HLC directly and only in behalf of baptized and unbaptized

publishers (including inactive publishers) who request help to find a cooperative doctor (either for themselves or for their children) or whose medical condition has led to the threat of a blood transfusion. At times, the elders may determine that it would be best for the patient or a family member to contact the HLC directly, especially in emergency situations. When calling the HLC, the caller should have the following information available:

(1) Name, age, congregation, and telephone number of patient.

(2) Spiritual standing of patient and family, and whether unbelieving family members are involved.

(3) Name of hospital, name of doctor, patient's room number and, if applicable, telephone number of patient's room.

(4) Whether a completed DPA card is available. (If not, the patient should be encouraged to fill one out immediately. Unbaptized publishers may adapt the language of the DPA card and *Identity Card* [ic] to write health-care instructions for themselves and their children.)

(5) Reason for calling the HLC.

**9.** If a publisher has a doctor who says he will respect the publisher's wishes, there may not be a need to contact the HLC before treatment. However, the publisher will want to confirm that the doctor is experienced in using nonblood medical alternatives and strategies.

## WHEN TRAVELING TO CARE FOR MEDICAL NEEDS

**10.** At times, a publisher requires specialized medical care that is unavailable locally. The *Special Medical Needs Room Request*

(*hlc*-20) form, which elders may obtain from the Hospital Liaison Committee (HLC), allows Witness patients and family to request assistance with lodging during their stay. There is no obligation for patients to use this provision, especially when financial circumstances allow the patient to cover his needs. If the patient simply wants information on what accommodation options are available locally, he should indicate that he is able to cover such expenses and the HLC can then provide such information.

**11.** For patients needing assistance in nonemergency situations, the elders should obtain the form from their local HLC and then assist the publisher or his family to fill it out. The elders will promptly send the completed form to the HLC in the city where the patient will receive care. In emergency situations, the elders may ask their local HLC to expedite such rooming requests.

**12.** Families should limit the size of the group traveling with the patient. The HLC in the city where the patient will receive care will use the completed form to locate lodging for the group. Accommodations may be arranged in the following ways:

 (1) Standing agreements that hospitals have negotiated with nearby hotels or private residential facilities for discounted rates. Such arrangements are usually available to anyone, including non-Witnesses.

 (2) Discounted rooms for Witnesses at hotels used in connection with circuit assemblies and conventions, if available.

 (3) Private homes of Witness families living near the medical facility. If accommodations are required for an extended period of time, the homes of multiple families may be used on a rotational basis so as not to impose a burden on any one family.

**13.** If a non-Witness relative or a disfellowshipped family member is accompanying the Witness patient, no special arrangements or

rates would be extended beyond accommodations for the patient and immediate family members who are in good standing.

**14.** The patient and his family have the primary obligation to care for the cost incurred for lodging, transportation, meals, and other related expenses. However, the patient's congregation may also be able to offer assistance in certain cases.—*od* chap. 12 pars. 12-15; chap. 16 pars. 9-11.

**15.** If a congregation is near a medical facility where Witness patients from other areas often seek medical care, elders may communicate to the local HLC chairman information about exemplary publishers who can provide suitable accommodations to visiting Witnesses.

## BAPTISM OF AN INDIVIDUAL WITH A COMMUNICABLE DISEASE

**16.** Out of loving concern for others, a baptism candidate may inform the elders that he has a communicable disease, such as HIV/AIDS, hepatitis, and so forth. (*od* p. 197) If so, the coordinator of the body of elders should inform the candidate of the following options regarding immersion:

(1) He may attend the convention or assembly, listen to the baptism talk, and then be taken to a stream, river, lake, or sea to be baptized.

(2) He may attend the convention or assembly, listen to the baptism talk, and then be baptized in his hotel room or in a private home where there is a large tub that can be used for this purpose.

(3) If he is sensitive to others becoming aware of the fact that he has such a disease, he may attend a convention or assembly to which his congregation is

not assigned, listen to the baptism talk, and then be baptized in a stream, river, lake, or sea.

(4) He may request that the local elders arrange for a private baptism. The elders should inform the circuit overseer of the baptism.

**17.** The brothers performing the baptism should be informed of the health issue so as to decide whether this would be a risk that they would be willing to take.

# Determining Whether a Judicial Committee Should Be Formed

| | Paragraphs |
|---|---|
| **Offenses Requiring Review by the Elders** | 2-39 |
| Sexual Immorality (*Por·nei′a*) | 3-6 |
| Strong Circumstantial Evidence of Sexual Immorality (*Por·nei′a*) | 7-9 |
| Adulterous Marriage | 10-12 |
| Child Abuse | 13 |
| Gross Uncleanness, Uncleanness With Greediness | 14-15 |
| Momentary Touching of Intimate Body Parts or Caressing of Breasts | 15.1 |
| Immoral Conversations Over the Telephone or the Internet | 15.2 |
| Viewing Abhorrent Forms of Pornography | 15.3 |
| Misuse of Tobacco or Marijuana and Abuse of Medical, Illicit, or Addictive Drugs | 15.4 |
| Extreme Physical Uncleanness | 15.5 |
| Brazen Conduct | 16-17 |
| Unnecessary Association With Disfellowshipped or Disassociated Individuals | 17.1 |
| Dating Though Not Scripturally Free to Remarry | 17.2 |
| Drunkenness | 18-19 |
| Gluttony | 20 |
| Stealing, Thievery | 21 |
| Deliberate, Malicious Lying; Bearing False Witness | 22-23 |
| Fraud, Slander | 24-28 |

Reviling ............................................................................................... 29

Obscene Speech ............................................................................... 30

Greed, Gambling, Extortion ................................................... 31-34

Refusal to Provide for Family ............................................... 35

Fits of Anger, Violence, Domestic Violence ........................... 36-37

Manslaughter ..................................................................................... 38

Apostasy ............................................................................................ 39

   Celebrating False Religious Holidays ....................................... 39.1

   Participation in Interfaith Activities .......................................... 39.2

   Deliberately Spreading Teachings Contrary
     to Bible Truth ........................................................................... 39.3

   Causing Divisions, Promoting Sects ......................................... 39.4

   Employment Promoting False Religion ..................................... 39.5

   Spiritism ............................................................................................ 39.6

   Idolatry ............................................................................................. 39.7

**Evidence Establishing Wrongdoing** ................................................ 40-42

   Confession ...................................................................................... 40.1

   Eyewitnesses ...............................................................................40.2

**Those Having Certain Privileges of Service** .......................................43

**Those Who Have Not Associated for Many Years** ............... 44-46

**Unbaptized Publishers** ...........................................................................47-56

**Serious Wrongdoing That Occurred Years in the Past**....... 57-59

**Validity of Wrongdoer's Baptism** ........................................................ 60-62

**Determining Which Congregation Should
Handle the Matter** ............................................................................. 63-65

**Wrongdoing Involving Individuals From
Different Congregations** ...................................................................... 66

**Permitting Individuals to Commit Sexual
Immorality in the Home** ........................................................................ 67-70

**Scriptural Freedom to Remarry** ........................................................... 71-76

**Marking Disorderly Ones** ..................................................................... 77-80

**Attempted Suicide** ..................................................................................... 81

**1.** Elders should act promptly when they receive a report of serious wrongdoing so as to safeguard the congregation and provide assistance to the wrongdoer. (Jude 4) Neglecting to care for such matters can hinder the flow of Jehovah's holy spirit to the congregation. Elders must first assess whether the wrongdoing, if established, is serious enough to require a judicial committee. —See 12:2-39; 15:1.

## OFFENSES REQUIRING REVIEW BY THE ELDERS

**2.** Listed below are offenses that may require review by a judicial committee. Of course, this list is not comprehensive. There may be other matters that would also merit the attention of a judicial committee. The elders must use good judgment and reasonableness when evaluating the seriousness of the alleged wrongdoing. They should consider the extent and nature of the misconduct, intent and motive, frequency or practice, and so forth. If there is a question about whether certain wrongdoing merits judicial action, the body of elders may write to the Service Department requesting further direction concerning the case.

**3. Sexual Immorality (*Por·nei'a*):** (Lev. 20:10, 13, 15, 16; Rom. 1: 24, 26, 27, 32; 1 Cor. 6:9, 10) *Por·nei'a* involves immoral use of the genitals, whether in a natural or in a perverted way, with lewd intent. There must have been another party to the immorality—a human of either sex or a beast. Willing participation incurs guilt and requires judicial action. It is not a casual touching of the sex organs but involves the manipulation of the genitals. It includes oral sex, anal sex, and manipulation of the genitals between individuals not married to each other. (*w06* 7/15 pp. 29-30; *w04* 2/15 p. 13; *w00* 11/1 p. 8 par. 6; *w83* 6/1 pp. 23-26; *lvs* p. 120) *Por·nei'a* does not require skin-to-skin contact, copulation (as in penetration), or sexual climax.

   (1)  "Immoral use of" conveys the thought not just of touching but of operating, manipulating, or employing

something. For example, it is one thing to touch a musical instrument; it is something different to make "use of" a musical instrument.

(2) "Lewd intent" identifies the motive. For example, a doctor may need to manipulate the genitals in examining a patient. A veterinarian, farmer, or rancher may do something similar to an animal. However, the intent is not sexual gratification.

(3) "Manipulation" conveys the idea of operating something, whether by use of the hands or some other means, and does not require skin-to-skin contact. Momentary touching of another's genitals, even if intentional, would generally not be considered *por·nei′a.*

**4.** Masturbation of oneself is not *por·nei′a.—lvs* p. 250.

**5.** One who was raped would not be guilty of *por·nei′a.* Discernment is needed in considering claims of rape, taking into consideration such factors as the mental disposition of the person, the circumstances that led up to the incident, and any delay in reporting. —*w03* 2/1 pp. 30-31; *w83* 3/15 p. 30, ftn.; *it-*1 pp. 862-864.

**6.** When determining if an individual is guilty of *por·nei′a,* it is important to establish the facts. This is especially true when Scriptural freedom to remarry is involved. (Mal. 2:16a) In situations in which the elders are uncertain or divided on their conclusions, it is best to write the Service Department.—See 12:71-76.

**7. Strong Circumstantial Evidence of Sexual Immorality (*Por·nei′a*):** If at least two eyewitnesses report that the accused stayed all night in the same house with a person of the opposite sex (or with a known homosexual) under improper circumstances, judicial action may be warranted. (*w18.07* p. 32) The elders cannot apply one rule to every case; each situation has unique circumstances. After two elders have thoroughly investigated, the body of elders must use good judgment in determining whether serious wrongdoing has occurred. If the elders are unsure how to

proceed, they should consult with the Service Department.—If questions are raised regarding Scriptural freedom to remarry, see Chapter 12, paragraphs 71-76.

(1) Have the couple been pursuing a romantic relationship? Have they been previously counseled regarding their conduct with each other? What circumstances led to their spending the night together? Did they plan ahead to do so? Did they have a choice in the matter, or were there extenuating circumstances, perhaps an unforeseen occurrence or genuine emergency that left them with no choice but to spend the night together? (Eccl. 9:11) What were the sleeping arrangements? Since each situation is different, there may be other relevant factors. If there are no extenuating circumstances, a judicial committee would be formed on the basis of strong circumstantial evidence of sexual immorality.

(2) Depending upon the attitude of the accused, there might even be evidence of brazen conduct.

**8.** Consider an example in which judicial action would be warranted: A married brother spends an inordinate amount of time with his female secretary after work hours but insists there is no romantic interest. His concerned wife informs the elders, who give him strong counsel. Later, when he claims to be leaving overnight for a "business trip," his suspicious wife and a relative follow him to the secretary's home. They observe the secretary invite him inside at 10 p.m. and continue watching *all night* until he leaves the home at 7 a.m. When the elders speak to him, he admits that he spent the night with his secretary, but he denies that he committed adultery. In such a case, the elders have a basis to take judicial action because there is strong circumstantial evidence of *por·nei′a* and there may be elements of brazen conduct. The innocent mate's conscience may allow her to divorce him and remarry; she should not be criticized if that is her decision.

**9.** Below are examples in which judicial action would likely not be warranted:

(1) An elderly Christian living alone has a member of the opposite sex move into the home to help care for him. There is no evidence of a romantic attachment or reason to suspect sexual immorality.

(2) After attending a social gathering at a single sister's home, a brother walks to a train station to catch the train home. After waiting for some time, the brother learns that the last train for the day has already left the station. He walks back to the sister's home, but by the time he arrives, everyone has left and it is quite late. The sister allows him to sleep in the living room while she sleeps in her bedroom.

(3) A single brother visits a married couple for several days. One night after everyone goes to bed, the husband is called to an emergency at his place of work and does not return until morning. The wife and the single brother are alone in the home all night sleeping in separate bedrooms.

**10. Adulterous Marriage:** If a divorced person remarries and he was not Scripturally free to do so—in other words, if adultery and rejection by the innocent mate had not occurred—he has entered into an adulterous marriage. In Jehovah's eyes, he has married someone while still bound to another. Entering into such a marriage would call for judicial action.—See 12:76.

**11.** The elders should be very cautious in extending any special privileges to such an individual, even after judicial restrictions have been lifted. He could share in the cleaning and repair of the local Kingdom Hall. He may eventually present student assignments on the midweek meeting if his doing so would not disturb others. However, he would not be assigned to help with literature,

accounts, attendants, sound, video, or similar privileges in the congregation as long as the innocent former mate is alive, unmarried, and has not been guilty of *por·nei′a.*

**12.** Although a Christian's remarriage may not be adulterous, if he deliberately committed adultery in a scheming way so as to end his previous marriage or he pressured his innocent mate to reject him so that she eventually agreed to a divorce, he has dealt treacherously with her. (Mal. 2:14-16) His conduct is similar to entering into an adulterous marriage, and he would not qualify for special privileges for many years.—See 22:26-27.

**13. Child Abuse:** Child abuse includes the sexual or physical abuse of a minor. It would also include the extreme neglect of a minor by her parent. Child sexual abuse is a perversion and generally includes sexual intercourse with a minor; oral or anal sex with a minor; fondling the genitals, breasts, or buttocks of a minor; voyeurism of a minor; indecent exposure to a minor; or soliciting a minor for sexual conduct. Depending on the circumstances of the case, it may include involvement with child pornography or "sexting" with a minor. "Sexting" involves the sending of sexually explicit messages or images electronically.—See Chapter 14.

**14. Gross Uncleanness, Uncleanness With Greediness:** (2 Cor. 12: 21; Gal. 5:19; Eph. 4:19) Galatians 5:19-21 lists many vices that are not classed as *por·nei′a* but that could lead to one's being disqualified from God's Kingdom. Among them are uncleanness (Greek, *a·ka·thar·si′a*). When one practices uncleanness to a serious degree, it can be grounds for disfellowshipping from the Christian congregation. Elders should use good judgment in discerning whether the conduct is minor uncleanness that can be handled by counsel or is gross uncleanness that requires the formation of a judicial committee.—*w06* 7/15 pp. 29-31; *w83* 3/15 p. 31; *lvs* p. 249.

**15.** Though this is not an exhaustive list, gross uncleanness may be involved in the following:

(1) **Momentary Touching of Intimate Body Parts or Caressing of Breasts:** If such conduct occurred on a few isolated occasions, especially between two persons involved in a courtship with the intent to marry, counsel from two elders may suffice to handle such minor uncleanness. The elders should inform the coordinator of the body of elders of the situation. However, if the conduct occurred on numerous occasions and the actions escalated in gravity and frequency, it may constitute gross uncleanness with greediness, requiring judicial action. Their wrongdoing may constitute brazen conduct if they give evidence of a disrespectful, insolent attitude toward God's laws. For example, the individuals may have no intentions of pursuing marriage.

(2) **Immoral Conversations Over the Telephone or the Internet:** A practice of engaging in immoral conversations over the telephone or the Internet, including "sexting," can involve obscene speech or gross uncleanness, either of which can be a basis for judicial action. If such conduct occurred on a few isolated occasions, judicial action may not be necessary. Counsel from two elders may be sufficient to handle such minor uncleanness. The elders should inform the coordinator of the body of elders of the situation. However, such conduct may escalate in gravity and by frequent repetition become gross uncleanness with greediness requiring judicial action, especially if the individual had been previously counseled. The elders must use good judgment in determining whether the wrongdoing has escalated to a point warranting judicial action.—*w06* 7/15 pp. 30-31.

(3) **Viewing Abhorrent Forms of Pornography:** See 13:2-4.

(4) **Misuse of Tobacco or Marijuana and Abuse of Medical, Illicit, or Addictive Drugs:** Elders should use good judgment in weighing the circumstances and extent of the wrongdoing so as to determine whether a judicial committee should be formed. For example, one or two elders may handle matters by means of counsel if a Christian abused an addictive drug or smoked cigarettes *on one or two occasions and the matter is not widely known.* The coordinator of the body of elders should be informed. However, a judicial committee is required for a *practice* of abusing addictive drugs, including betel nut, marijuana, and tobacco. (2 Cor. 7:1; *w06* 7/15 pp. 30-31; *lvs* pp. 110-117) If a medical doctor authorizes and/or prescribes marijuana for a medical problem, a Christian may choose to make use of this form of treatment. Although no judicial action would be taken, if an issue arises in the congregation, the elders will need to determine whether the individual can be viewed as exemplary. The proper use of addictive drugs under medical supervision, such as for pain management, would not require judicial review. When questions arise, consult with the Service Department.

(5) **Extreme Physical Uncleanness:** (Deut. 23:12-14; 2 Cor. 7:1; *lvs* pp. 108-110) Every effort should be made to help the offender see the need to keep his body and place of residence clean. Before judicial action would be considered, the elders would need to be certain that the uncleanness is pronounced and offensive, bringing much reproach upon Jehovah's good name and his people in the community. Appropriate counsel should be given. If this is not heeded, then a warning talk may be necessary. (See 12:77-80.) If there is blatant, willful disregard of the counsel given and extremely offensive

unclean conditions continue, judicial action would be
warranted.

**16. Brazen Conduct:** (2 Cor. 12:21; Gal. 5:19; Eph. 4:19; *lvs* p. 249)
The Greek word translated "brazen conduct" is *a·sel′gei·a.
Strong's Exhaustive Concordance of the Bible* uses very forceful
terms to define it: "licentiousness . . . filth[iness], lasciviousness,
wantonness." *The New Thayer's Greek-English Lexicon of the New
Testament* adds to the list "unbridled lust, . . . outrageousness,
shamelessness, insolence." Another lexicon defines *a·sel′gei·a* as
conduct that "violates all bounds of what is socially acceptable."
Rather than relating to bad conduct of a somewhat petty or mi-
nor nature, "brazen conduct" describes acts that reflect an atti-
tude that betrays disrespect, disregard, or even contempt for di-
vine standards, laws, and authority. Therefore, two elements are
involved in brazen conduct: (1) The conduct itself is a serious vi-
olation of Jehovah's laws, and (2) the attitude of the wrongdoer
toward God's laws is disrespectful, insolent.—*w06* 7/15 p. 30.

**17.** Though this is not an exhaustive list, brazen conduct may be in-
volved in the following if the wrongdoer has an insolent, contemp-
tuous attitude made evident by a practice of these things:

(1) **Unnecessary Association With Disfellowshipped
or Disassociated Individuals:** Willful, continued,
unnecessary association with disfellowshipped or
disassociated *nonrelatives* despite repeated counsel
would warrant judicial action.—Matt. 18:17b; 1 Cor. 5:11,
13; 2 John 10, 11; *lvs* pp. 39-40.

If a publisher in the congregation is known to
have unnecessary association with disfellowshipped or
disassociated *relatives* who are not in the household,
elders should use the Scriptures to counsel and reason
with him. Review with him information from the *Remain
in God's Love* book, page 241. If it is clear that a
Christian is violating the spirit of the disfellowshipping

decree in this regard and does not respond to counsel, he would not qualify for congregation privileges, which require one to be exemplary. He would not be dealt with judicially unless there is persistent *spiritual* association or he persists in openly criticizing the disfellowshipping decision.

(2) **Dating Though Not Scripturally Free to Remarry:** Continuing to date or to pursue a romantic relationship with a person though one or both are not legally or Scripturally free to remarry, doing so despite repeated counsel and generally after a warning talk to the congregation, would warrant judicial action.—Gal. 5:19; 2 Thess. 3:6, 14, 15.

**18. Drunkenness:** (1 Cor. 5:11; 6:9, 10; *it*-1 p. 656; *lvs* pp. 20-21, 83) A judicial committee is required when there is a practice of drunkenness or a single incident of drunkenness that brings notoriety. (*w83* 5/1 p. 8) A Scriptural description of drunkenness can be found in the following references: Job 12:25; Psalm 107:27; Proverbs 20:1; 23:29-35; Isaiah 24:20.

**19.** If an individual confesses to an elder that on one occasion he overindulged in alcohol to the point of drunkenness in a private setting, such as in his home, *and there is no notoriety,* it may suffice for the elder to give strong counsel. In any case, the elder should inform the coordinator of the body of elders of the matter.

**20. Gluttony:** (Prov. 23:20, 21; *w04* 11/1 pp. 30-31) A glutton routinely shows a lack of restraint, even gorging himself on food to the point of feeling very uncomfortable or becoming sick. Gluttony is determined, not by someone's size, but by his attitude toward food.

**21. Stealing, Thievery:** (1 Cor. 6:9, 10; Eph. 4:28; *w86* 11/15 p. 14) Though all stealing is wrong, the body of elders should use discernment in weighing the circumstances and the extent of the

involvement in wrongdoing to determine whether it is a judicial matter.—*w10* 3/1 pp. 12-14; *w94* 4/15 pp. 19-21; *jd* pp. 105-106.

**22. Deliberate, Malicious Lying; Bearing False Witness:** (Prov. 6: 16, 19; Col. 3:9; Rev. 22:15; *it*-2 pp. 244-245) Though all lying is bad, judicial action is taken only if there has been a practice of deliberate, malicious lying. "Malicious" means deliberately harmful, harboring ill will or enmity. Lying that requires judicial action involves more than just exaggerations or petty, misleading statements of relatively minor consequence or lying because of momentary pressure or fear of man.—Matt. 26:69-75.

**23.** Generally, elders should not consider administering discipline if a Christian charges another Christian with making false statements in a court dispute. For example, this may involve divorce, child custody and support, and so forth. The Christian making the charge can express his concerns to the court that has the responsibility to determine what is truthful when rendering a judgment.

**24. Fraud, Slander:** (Lev. 19:16; Matt. 18:15-17; *w97* 3/15 pp. 17-22; *it*-1 pp. 870, 989-991; *od* chap. 14 pars. 13-20; *lvs* p. 163) Fraud is defined as the intentional use of deception, trickery, or perversion of truth for the purpose of inducing another to part with some valuable thing belonging to him or to give up a legal right. Slander is defined as a false report meant to do harm to the good name and reputation of another. Such talk is generally malicious. Slander is not identical to negative gossip. Negative gossip may be true; slander is always false. Negative gossip requires counsel but not judicial action. (*w89* 10/15 p. 10; *it*-1 p. 990 par. 2) The congregation would not consider forming a judicial committee unless the offended Christian had taken steps one and two of Matthew 18:15, 16 and had initiated step three as described in Matthew 18:17.—*lvs* pp. 253-254.

**25.** If asked, elders could participate in step two, but they do not represent the body of elders. If the matter proceeds to step three,

any elders who were witnesses in step two could serve only as witnesses in step three. They would not be used to serve on the judicial committee.

**26.** It is not the place of elders to become arbitrators of financial agreements. They are not debt collectors. Nor should they be involved in formulating contracts or written agreements, not even signing as witnesses to such. The same holds true should the matter reach step three.

**27.** The body of elders may first need to investigate before appointing a judicial committee. If so, the brothers involved in step two would not be used to investigate; they would be interviewed as witnesses.

**28.** One who reports an accusation to the police, the court, the elders, or others who have authority to look into matters and render a judgment would not be viewed by the congregation as guilty of committing slander. (*it*-1 p. 990) This is true even if the accusation is not proved.—*w97* 8/15 p. 28 par. 1.

**29. Reviling:** (1 Cor. 6:10; *it*-2 pp. 801-802; *lvs* p. 164) Reviling involves subjecting a person to insulting speech, heaping abuse upon him. The body of elders should weigh the circumstances and extent of wrongdoing so as to determine whether a judicial committee should be formed. Elders should not be quick to take judicial action; a judicial committee would be formed only if the reviling is extreme, disrupts the peace of the congregation, and persists despite repeated counsel.

**30. Obscene Speech:** (Eph. 5:3-5; Col. 3:8; *lvs* p. 162) Obviously, certain words are more offensive than others. However, obscene speech involves sexually explicit, filthy expressions. (*g03* 6/8 pp. 19-20) Is the speech sexually explicit? Does it persist despite repeated counsel? This would include obscenities used both in written and in oral communication, such as Internet chat rooms, phone sex, or e-mail.—See 12:15.2.

**31. Greed, Gambling, Extortion:** (1 Cor. 5:10, 11; 6:10; 1 Tim. 3:8; *it*-1 pp. 789, 1005-1006) Elders do not generally involve themselves in what an individual does with regard to petty gambling solely for entertainment. However, if such petty gambling affects his spirituality or becomes a cause of stumbling for others, counsel should be given. If he does not respond favorably to the counsel and his conduct continues to have a negative effect on him or others, he could not be viewed as exemplary in the congregation. (Isa. 65:11; *w11* 3/1 pp. 12-14; *w02* 11/1 p. 31; *g* 3/15 pp. 14-15) If an individual's gambling reveals a course of greediness, perhaps causing harm to himself or others, and he ignores repeated counsel, judicial action would be appropriate.

**32.** An individual continuing in employment directly involved with gambling or employment making him a clear accomplice or promoter of gambling would be subject to judicial action, usually after being allowed six months to make the needed adjustments. (*lvs* pp. 204-209) In questionable cases, consult the Service Department.

**33.** If a business gives out prizes or prize money to winners of a contest or to potential customers for advertising, accepting the gift is an individual's decision to make. However, a person needs to be careful that accepting such a prize does not stir up greed. —Rom. 14:21; 1 Cor. 10:31-33; *w73* p. 127; *g75* 7/8 p. 28.

**34.** A Christian who greedily and unrepentantly extorts a high bride-price may be dealt with judicially.—1 Cor. 5:11, 13; 6:9, 10; Heb. 13:5; *w98* 9/15 pp. 24-25.

**35. Refusal to Provide for Family:** (1 Tim. 5:8; *lvs* p. 251) Adamant refusal to provide materially for one's own family, leaving wife and children destitute when having the means to provide, may warrant judicial action. Some of the factors the body of elders should consider before forming a judicial committee are the following:

(1)   Does the husband adamantly refuse to provide for his family or is the failure to provide for them because of other factors, such as health or financial difficulties? Is he doing what he reasonably can do to provide necessities for the family?

(2)   Has counsel been previously given, and has there been an opportunity for him to respond?

(3)   Does his wife have material resources affording a secure life so that the family is not destitute?

(4)   If the family is destitute, is it because they have rejected the family head's provisions by choosing to live apart from him?

(5)   When a separation is involved, to what extent is the wife responsible?

**36. Fits of Anger, Violence, Domestic Violence:** (Mal. 2:16; Gal. 5: 20; Col. 3:19) A Christian who cannot control his anger cannot be viewed as exemplary in the congregation. After his attitude, the pattern of behavior, and the severity of damage to the lives of others have been considered, a person who gives in to uncontrolled fits of anger may need to be dealt with judicially. (*g97* 6/8 p. 20) In questionable cases, consult the Service Department.

**37.** If a Christian took up professional boxing and refused to stop despite repeated counsel, judicial action would be appropriate. —*w81* 7/1 pp. 30-31.

**38. Manslaughter:** Aside from deliberate murder, bloodguilt may be incurred if a person causes loss of life through carelessness or because of violating a traffic law or other safety law of Caesar. The elders should investigate and if warranted appoint a judicial committee to hear the matter. The committee should base its decision on clearly established facts, not simply on a decision that

may have been made by secular authorities.—Deut. 22:8; *w06* 9/15 p. 30.

**39. Apostasy:** Apostasy is a standing away from true worship, a falling away, defection, rebellion, abandonment. It includes the following:

(1) **Celebrating False Religious Holidays:** (Ex. 32:4-6; Jer. 7:16-19) Not all holidays directly involve false religion and require judicial action.

(2) **Participation in Interfaith Activities:** (2 Cor. 6:14, 15, 17, 18) Apostate acts include bowing before altars and images and sharing in false religious songs and prayers.—Rev. 18:2, 4.

(3) **Deliberately Spreading Teachings Contrary to Bible Truth:** (2 John 7, 9, 10; *lvs* p. 245; *it*-1 pp. 126-127) Any with sincere doubts regarding the Bible truth taught by Jehovah's Witnesses should be helped. Loving assistance should be provided. (2 Tim. 2:16-19, 23-26; Jude 22, 23) If one obstinately is speaking about or deliberately spreading false teachings, this may be or may lead to apostasy. If there is no response after a first and a second admonition, a judicial committee should be formed.—Titus 3:10, 11; *w86* 4/1 pp. 30-31.

(4) **Causing Divisions, Promoting Sects:** (Rom. 16:17, 18; Titus 3:10, 11) This would be deliberate action disrupting the unity of the congregation or undermining the confidence of the brothers in Jehovah's arrangement. It may involve or lead to apostasy.—*it*-2 p. 886.

(5) **Employment Promoting False Religion:** Continuing in employment that makes one an accomplice to or a promoter of false worship would subject one to disfellowshipping after being allowed six months to

make the needed adjustments.—*w99* 4/15 pp. 28-30; *lvs* pp. 204-206.

(6) **Spiritism:** (Deut. 18:9-13; 1 Cor. 10:21, 22; Gal. 5:20; *lvs* pp. 216-217)

(7) **Idolatry:** (1 Cor. 6:9, 10; 10:14) Idolatry includes the use of images, including pictures, in false religious worship.

# EVIDENCE ESTABLISHING WRONGDOING

**40.** Even though a Christian has been accused of wrongdoing serious enough to require judicial action, a judicial committee should not be formed unless the wrongdoing has been established by sufficient evidence. Please note the following regarding evidence:

(1) **Confession:** Admission of wrongdoing, either written or oral, may be accepted as conclusive proof without other corroborating evidence. (Josh. 7:19) There must be two witnesses to a confession, and the confession must be clear and unambiguous. For example, a statement from a married Christian that his mate is "Scripturally free" would not by itself be viewed as a clear confession of adultery. A guilty plea entered in court by a Christian as part of a plea bargain, perhaps on the advice of an attorney so as to avoid the possibility of a harsher sentence, would generally not in itself be viewed by the congregation as an admission of guilt.

(2) **Eyewitnesses:** There must be two or three eyewitnesses, not just people repeating hearsay; no action can be taken if there is only one witness. (Deut. 19:15-17; John 8:17; 1 Tim. 5:19, 24, 25) If there are two or three witnesses to the same kind of wrongdoing but each one is witness to a separate incident, the

> elders can consider their testimony. While such evidence is acceptable to establish guilt, it is preferable to have two witnesses to the same occurrence of wrongdoing. The testimony of youths may be considered; it is up to the elders to determine whether the testimony has the ring of truth. The testimony of unbelievers and disfellowshipped or disassociated ones may also be considered, but it must be weighed carefully.

**41.** If wrongdoing has not been established but serious questions have been raised, the body of elders should appoint two elders to investigate the matter promptly. For example, there may be just one witness. In some cases, it may be appropriate for the witness to encourage the accused to approach the elders. (Jas. 5:14) The elders can then allow the accused a few days to approach them. In other cases, it may not be advisable for the witness to confront the accused. For example, the witness may be extremely timid. A victim of rape or of child sexual abuse is never required to confront the accused. (If the accusation involves child sexual abuse, see Chapter 14.) Whether the witness approaches the accused or not, the two elders appointed should speak with the accused regarding the accusation.—*w97* 8/15 p. 27.

**42.** If the accused denies the accusation, the investigating elders should try to arrange a meeting with him and the accuser together. (If the accusation involves child sexual abuse, see Chapter 14.) If the accuser or the accused is unwilling to meet with the elders or if the accused continues to deny the accusation of a single witness and the wrongdoing is not established, the matter cannot be handled judicially. The investigating elders should compose a record, sign it, put it in a sealed envelope, and give it to the secretary to be placed in the congregation's confidential file. (See 22:21-27.) Additional evidence may later come to light to establish matters.

## THOSE HAVING CERTAIN PRIVILEGES OF SERVICE

**43.** If the elders learn of an accusation of serious wrongdoing against someone in the congregation who has one of the following service privileges, two elders with knowledge of the circumstances should *immediately* contact the Service Department for direction on handling the matter. These privileges would include serving as a Bethel family member, a temporary volunteer at Bethel, a construction servant, a construction volunteer, a full-time or part-time or occasional commuter to Bethel, a full-time or part-time construction commuter, a remote servant or volunteer, a Bethel consultant, a field missionary, a temporary special pioneer, a special pioneer, an Assembly Hall servant, or a Bible school facility servant.

## THOSE WHO HAVE NOT ASSOCIATED FOR MANY YEARS

**44.** In deciding whether or not to handle such a person judicially, the body of elders should consider the following:

- (1) Does he still profess to be a Witness?

- (2) Is he generally recognized as a Witness in the congregation or the community?

- (3) To what degree have lives been affected or damaged by the wrongdoing? For example, does the matter involve child abuse or adultery?

- (4) Does the person have a measure of contact or association with the congregation so that a leavening, or corrupting, influence exists?

- (5) Is the person willing to meet with a committee, thus admitting accountability to the Christian congregation?

**45.** Depending upon the length of inactivity and other factors noted above, the elders may determine to hold the matter in abeyance. In such a case, they would make a record of the person's questionable conduct for the congregation file. (See 22:21-27.) If the individual shows interest in returning to the congregation, the elders can clarify matters at that time.—*w08* 11/15 pp. 14-15 pars. 12-13.

**46.** If the sinful conduct is known only to believing family members and no congregation action has been taken, believing relatives will likely determine to curtail family association severely, viewing the relative as bad association.—1 Cor. 15:33; *w85* 7/15 p. 19 par. 14.

## UNBAPTIZED PUBLISHERS

**47.** The elders should promptly handle a case of serious wrongdoing by an unbaptized publisher. While a judicial committee would not be formed, the body of elders should select two elders to meet with him, perhaps the ones who approved him as an unbaptized publisher. (If the unbaptized publisher is a minor, see Chapter 12, paragraph 55.) They should try to readjust him and to determine whether he continues to qualify. (*od* chap. 14 pars. 38-40) The body of elders should be updated on the results, including whether any restrictions will be imposed and whether any announcement will be made to the congregation.

**48.** If the individual is repentant, the assigned elders may decide to place certain restrictions on the individual for a time, such as not commenting at meetings, not presenting student assignments on the midweek meeting, or not sharing in the field ministry.

**49.** If the individual is repentant but the assigned elders determine that (1) the wrongdoing is widely known or might become widely known later or (2) the congregation needs to be on guard concerning the individual, the coordinator of the body of elders should arrange for an elder to make the following announcement at the next midweek meeting: "A matter involving [name of per-

son] has been handled, and he [she] continues to serve as an unbaptized publisher with the congregation."

**50.** There may be reasons for the body of elders to determine that a Scriptural talk about the sort of wrongdoing involved should be given to the congregation a few weeks after the announcement.

**51.** If the individual is unrepentant, the two elders should inform him that he no longer qualifies as an unbaptized publisher. Or if he informs the elders that he no longer desires to be a publisher, they will accept his decision. In either case, the coordinator of the body of elders should arrange for an elder to make the following announcement at the next midweek meeting: "[Name of person] is no longer recognized as an unbaptized publisher." Because of his unrepentant wrongdoing, it would be best for a time not to call on him if he raises his hand to comment at meetings.

**52.** If the elders see that such a person is a threat to the flock, they can privately warn those endangered. For example, despite the announcement, the wrongdoer might attempt to socialize with youths in the congregation. In that situation, the elders would speak privately to the parents of the endangered ones and perhaps to those youths.

**53.** There is no specific arrangement for an appeal or a seven-day waiting period before announcing the decision that one is no longer recognized as an unbaptized publisher. If he expresses dissatisfaction with the conclusion, the body of elders should choose two different elders to review the case.

**54.** If someone who was previously removed as an unbaptized publisher begins to make progress and wishes once again to share in the ministry, two elders (perhaps those who met with him earlier) should meet with him to determine his qualifications. If he qualifies, the coordinator of the body of elders should arrange for an announcement to be made that he is an unbaptized publisher. There is no need to wait until he reports field service again to make the announcement.

**55.** If the unbaptized publisher is a minor, the two elders should meet with the Witness parents to discern what occurred, the child's attitude, and the corrective steps that the parents are taking. If the parents have the situation in hand, the two elders may discern that it is not necessary to include the minor in the meeting. The elders will check with the parents from time to time to offer helpful counsel, specific suggestions, and loving encouragement.—See Chapter 14, paragraphs 29-30, if the minor engaged in sexual misconduct.

**56.** At the conclusion of the case, the two elders should prepare a written record. The secretary files this record in the congregation's confidential file.—See 22:21-27.

## SERIOUS WRONGDOING THAT OCCURRED YEARS IN THE PAST

**57.** Depending upon the circumstances, serious wrongdoing that occurred years in the past may need to be handled by a judicial committee. However, if wrongdoing occurred more than a few years ago and the individual is genuinely repentant and recognizes that he should have come forward immediately when he sinned, counsel by two elders may be sufficient.

**58.** The body of elders should appoint two elders to gather the facts so that the body can determine whether a judicial committee is needed or not, taking into consideration answers to the following questions:

    (1)   When did the wrongdoing take place?

    (2)   How widely known is the matter?

    (3)   Does the erring one show evidence of spiritual progress as opposed to evidence that progress is being hindered?

    (4)   Will counsel be sufficient to restore him, or will more be required for him to have a clean conscience?

(5) Are there works befitting repentance?

(6) Did he voluntarily confess, or did the matter come to light by other means?

(7) If the body of elders decides not to form a judicial committee, will the elders continue to have the respect of the congregation?

(8) If adultery was involved, has a confession been made to the innocent mate?—See 16:10.5.

(9) To what degree have lives been affected or damaged by the wrongdoing? For example, does the matter involve child abuse or adultery?

**59.** If the individual is serving in an appointed capacity, such as a ministerial servant, elder, or pioneer, his qualifications should be reviewed.—See 8:25-27; 9:4.

## VALIDITY OF WRONGDOER'S BAPTISM

**60.** When dealing with a wrongdoer, the elders should not raise questions about the validity of the individual's baptism. If the individual raises the issue, the elders may refer him to the February 15, 2010, *Watchtower,* page 22.

**61.** At times a wrongdoer will claim that his baptism is not valid and that he feels he is not accountable to a judicial committee because he secretly engaged in wrongdoing shortly before he was baptized. If the elders had been aware of his serious wrongdoing committed just before baptism, likely they would not have approved him for baptism. However, this does not necessarily mean that he did not make a valid dedication. Some individuals make a dedication long before their baptism; others have made a dedication shortly before. The elders are not in a position to read the heart and know for a certainty how Jehovah viewed the person at the time he was baptized. If the elders learn that a baptized

individual secretly engaged in serious wrongdoing while he was an unbaptized publisher but the wrongdoing ceased before baptism, they should give counsel and encouragement. A judicial committee should not be formed for prebaptism wrongdoing. (1 Cor. 6: 9-11) However, if the individual resumed serious wrongdoing after baptism, the elders would generally deal with him on the basis of what he has professed to be, a dedicated and baptized Christian, and would meet with him judicially.

**62.** There are rare occasions when it is obvious that the baptism was invalid because serious wrongdoing did not cease before baptism, even for a brief period of time. For example, it may be that at the time of baptism, the individual was living immorally with a member of the opposite sex or the same sex, was a member of a nonneutral organization, or something similar. If there are questions, the Service Department should be consulted.

## DETERMINING WHICH CONGREGATION SHOULD HANDLE THE MATTER

**63.** Bodies of elders should cooperate if there is a question regarding which congregation should handle a case of wrongdoing. Which congregation has the facts? Which congregation can handle the case most effectively? Jurisdiction should not become an issue.

**64.** If a wrongdoer moves before a case has been concluded, it is usually best for the elders of the original congregation to follow through if possible and if distance permits. They are acquainted with the person and his circumstances. If he has moved a great distance away, the elders of the original congregation should not insist on handling matters if the wrongdoer says he is unable to return to the congregation for the meeting. In such a case, it may be advisable to refer matters to the elders of the congregation where he now lives. There should be good communication between the two bodies.

**65.** If the elders learn that a publisher who is visiting the area for a short period of time is guilty of wrongdoing, they should promptly report the matter to the elders of his congregation.

## WRONGDOING INVOLVING INDIVIDUALS FROM DIFFERENT CONGREGATIONS

**66.** If an individual confesses to wrongdoing that involves a person in another congregation, the elders should promptly pass along what they know to the elders of the other congregation and allow them time to investigate. Does the other individual admit the wrong? Do their accounts match, or are there significant differences? The elders handling the matter should communicate freely and cooperate in obtaining the facts. There are many advantages to interviewing individuals jointly to ascertain what actually occurred and to clarify discrepancies. (Prov. 18:13, 17) If a joint meeting is held, thereafter the elders handling the matter from each congregation will withdraw and handle the case of the person from their own congregation. The elders in one congregation should generally not conclude their case before the elders of the other congregation have fully investigated the situation.

## PERMITTING INDIVIDUALS TO COMMIT SEXUAL IMMORALITY IN THE HOME

**67.** If a publisher were to allow an individual to commit sexual immorality while living in the publisher's home, he would be giving tacit approval to immoral conduct. This would also be true of allowing an individual to commit sexual immorality while visiting the publisher's home. Such a publisher would not be exemplary.

**68.** When congregation elders come to know of such a situation, they should patiently provide Scriptural counsel. The publisher should be helped to see that what he is allowing could stumble others. He may then take action to change the situation so as "not to

put a stumbling block or an obstacle before a brother."—Rom. 14:13.

**69.** Perhaps the publisher is genuinely concerned that what he has been allowing may be a cause for stumbling. For certain reasons, however, he may feel that he has no recourse at the present time. For example, elderly Witness parents may need the assistance of an unbelieving son or daughter. Under such circumstances, no judicial action would be taken, but the qualifications of the publisher to serve in an exemplary position would be reviewed by the body of elders.

**70.** Suppose the publisher, upon being approached by the elders, manifests a brazen attitude, not really caring if others are stumbled. Even if he does not encourage others to do what he is doing, the elders may decide to arrange for a talk to be given that serves as a warning to the congregation. (2 Thess. 3:14, 15; see 12:77-80.) On the other hand, if a baptized publisher actively promotes allowing individuals to commit sexual immorality in the home, then the matter could be handled judicially on the grounds of condoning sexual immorality, causing divisions, and, in effect, speaking against "the teaching of the Christ."—2 John 9-11; Gal. 5:19, 20; Rev. 2:20.

## SCRIPTURAL FREEDOM TO REMARRY

**71.** It is the responsibility of the individual desiring to remarry to produce convincing evidence to establish Scriptural freedom to remarry. If an individual's divorce occurred before baptism, the elders should not assume the individual is Scripturally free to remarry, as baptism does not dissolve previous marital ties. Elders should be very careful when it comes to giving direction on whether an individual is Scripturally free to remarry and should consult with the Service Department on any questions. This is especially true since the decisions a person makes in such matters will affect not only his relationship with his marriage mate but also

his relationship with Jehovah. Elders shoulder a heavy responsibility in such matters and need to be cautious when offering counsel, especially when the answer may not be readily apparent. —Luke 12:48; Jas. 3:1.

**72.** Scriptural freedom to remarry requires three conditions: (1) sexual immorality (*por·nei'a*); (2) a rejection (refusal to reconcile) by the innocent mate; and (3) a legal, final divorce. (Matt. 5:31, 32; 19:9; Heb. 13:4) For example, if an individual contemplating remarriage confesses that he has been guilty of sexual immorality after his former mate legally divorced him or if his former mate has admitted to committing sexual immorality since the legal divorce, both are Scripturally free to remarry.

**73.** If a baptized Christian accuses his believing mate of adultery and wishes to establish freedom to remarry, the matter should be referred to the body of elders. The publisher should be advised that he is not to view himself as Scripturally free to date or remarry until the elders have investigated the matter and guilt of *por·nei'a* is established. (Deut. 19:15; John 8:17) If the accused mate is associated with another congregation, the evidence should be presented to the elders of that congregation for review and a determination.

**74.** In some cases adultery is not established. However the accused may confess or two eyewitnesses may report that the accused stayed all night in the same house with a person of the opposite sex (or a known homosexual) under improper circumstances. (See 12:7-9.) The elders should carefully consider the situation. (See 12:7.1.) Although the elders cannot tell the innocent mate that he is free to remarry, if the innocent mate is convinced that adultery did occur, the elders may allow him to take responsibility before Jehovah for obtaining a Scriptural divorce; if he remarries, no judicial action will be taken.

**75.** Even if the accused mate is not one of Jehovah's Witnesses (disfellowshipped, disassociated, or never baptized), two witnesses

are also generally required to establish wrongdoing that would provide a basis for Scriptural freedom. An exception may be made, however, if the unbeliever privately makes an unambiguous confession of adultery to the Christian mate. In such a case, if the innocent Christian mate believes that the confession is true and does not wish to reconcile, he can submit a letter to the elders outlining his situation. The body of elders should then consider the letter. Is there any known reason to conclude other than that the unbelieving mate has been immoral? For example, was the confession worded ambiguously? Did the unbeliever later deny making the confession? If the unbeliever is willing to speak with the elders and matters are unclear, the elders may choose to ask the accused mate directly. If there is no known reason to conclude otherwise, the innocent mate can be allowed to take responsibility before Jehovah for obtaining a Scriptural divorce; if he remarries, no judicial action will be taken.

**76.** The following constitutes rejection by the innocent mate:

- (1) The innocent mate initiates a divorce either before or after learning of the adultery.

- (2) The innocent mate signs a divorce decree or in some other way indicates he does not object to a divorce initiated by the guilty mate, either before or after learning of the adultery. In some lands it is possible for the innocent mate to sign legal documents that stipulate custody of the children and financial support without indicating he agrees with the divorce; his signing such papers in itself would not indicate a rejection.—*w00* 12/15 pp. 28-29.

- (3) Though verbally expressing forgiveness and not seeking a divorce, the innocent mate refuses to resume sexual relations for a very prolonged period of time, a year or even years. Before indicating to the guilty mate that he is free to pursue a Scriptural divorce, the elders should

consult with the Service Department. The innocent mate is not required to make a quick decision to forgive or not.

## MARKING DISORDERLY ONES

**77.** At times it may be necessary to mark those who display a flagrant disregard for Jehovah's standards though not practicing a grave sin that merits judicial action. (2 Thess. 3:6, 14, 15; *w99* 7/15 pp. 29-31) This could include such things as being grossly lazy or critical or being a profitless talker who is a constant 'meddler with what does not concern him.' (2 Thess. 3:11) It may involve one who schemes to take material advantage of others, indulges in entertainment that is clearly improper, dates an unbeliever, or dates when not legally or Scripturally free.—*od* chap. 14 pars. 9-12.

**78.** If the disorderly conduct is *generally unknown to others* and poses no threat to their spiritual well-being, usually it is best to handle things through admonition and counsel. The body of elders should not be hasty in deciding to give a warning talk. However, if the individual does not see the error of his way but continues to be an unwholesome influence, a warning talk may be given to the congregation. Elders must use reasonableness and discernment in determining whether a particular situation is sufficiently serious and disturbing to require a warning talk.

**79.** For example, if a baptized Christian is dating an 'unbeliever,' the elders should first counsel him and try to help him. (2 Cor. 6:14; *w04* 7/1 pp. 30-31) If he persists in disregarding Bible principles in spite of repeated admonition, the body of elders may decide that a warning talk should be given to the congregation. If an individual is dating an *unbaptized publisher,* a warning talk may not be needed. Much would depend on the circumstances, on the attitude of the Christian, on the level of disturbance to the congregation, and other factors. Nonetheless, if he is dating with a

view to marrying someone who is unbaptized, he is not obeying the Bible's counsel at 1 Corinthians 7:39 to marry "only in the Lord," and loving counsel should be given.

**80.** If the disorderly one is moved to change, the elders can individually decide to resume personally socializing with him. This will indicate to the congregation that they consider that the individual is no longer marked.

## ATTEMPTED SUICIDE

**81.** A suicide attempt may be the result of deep despair or major depression. Elders should deal carefully and compassionately with such a person. In most cases, a judicial hearing is not required. —Ps. 88:3, 17, 18; Prov. 15:13; Eccl. 7:7; *g* 4/14 pp. 6-9.

# Pornography

Paragraphs

**Determining Whether a Judicial Hearing Is Required** ............. 2-4

**Reviewing Qualifications of Those Serving
in an Appointed Capacity** ..................................................................... 5-6

**Shepherding** ............................................................................................... 7

**Factors to Consider When Recommending Reappointment** ... 8

**1.** Helping a Christian break free from the habit of viewing pornography requires firm Scriptural counsel by loving shepherds. (Jas. 5:14, 15) Therefore, when an elder learns that a Christian has deliberately viewed pornography, the body of elders should assign two elders to meet with him to establish the facts and determine the extent of the problem. If he is married, he should be kindly encouraged to reveal the matter to his mate. After the initial investigation, the assigned elders should provide an update to the body of elders.—See 12:40-42.

## DETERMINING WHETHER A JUDICIAL HEARING IS REQUIRED

**2.** The deliberate viewing of pornography is a sin. (Matt. 5:28, 29) It can result in an addiction to sex, perverted desires, and serious marital problems. (Prov. 6:27; *lvs* pp. 121-123 pars. 9-12) However, not all cases require handling by a judicial committee.—See 12:1-2; *w12* 3/15 pp. 30-31; *w06* 7/15 p. 31.

**3.** An entrenched practice of viewing, perhaps over a considerable period of time, abhorrent forms of pornography would be considered gross uncleanness with greediness and needs to be handled

judicially. (Eph. 4:19) Such abhorrent forms of pornography include homosexuality (sex between those of the same gender), group sex, bestiality, sadistic torture, bondage, gang rape, the brutalizing of women, or child pornography. It is equally wrong for a man or woman to watch two women engaged in homosexual activity as it is for a man or woman to watch two men engaged in homosexual activity.—See 12:14-15.

**4.** If the body of elders learns that a Christian was promoting the viewing of pornography (whether abhorrent or nonabhorrent forms), such as by inviting others to view it, this could give evidence of a disrespectful, insolent attitude, which would require handling by a judicial committee on a charge of brazen conduct. —See 12:16-17.

## REVIEWING QUALIFICATIONS OF THOSE SERVING IN AN APPOINTED CAPACITY

**5.** If the body of elders determines that a judicial hearing is not needed but the matter involves an appointed person, such as a pioneer, a ministerial servant, or an elder, his qualifications should be reviewed. (See 8:31-33; 9:4.) The body of elders should consider: What type of pornography was viewed? Did the viewing of pornography consist of a few brief incidents, or was it a practice spanning many months, or even years? Was the viewing of pornography accompanied by masturbation? (See 12:4.) When was the last time the person viewed pornography? Was the person counseled in the past about viewing pornography? Did he come forward voluntarily? If married, has he informed his mate of the problem? What effect has this had on the marriage? Who else are aware of the problem? Does the person still have their respect? Does the person demonstrate an earnest desire to desist from viewing pornography? Does the person's conscience allow him to continue serving in an appointed position?

**6.** The body of elders may determine that the person still qualifies to serve in an appointed position if (1) his involvement consist-

ed of a few brief viewings of nonabhorrent forms of pornography, (2) he displays a heartfelt desire to desist from looking at pornography, (3) the elders are convinced that he will refrain from viewing it, (4) he retains the respect of others who are aware of what he did, and (5) his conscience allows him to do so. On the other hand, a Christian who persists in viewing nonabhorrent forms of pornography cannot be considered as exemplary and thus does not qualify for special privileges in the congregation.

## SHEPHERDING

**7.** Elders need to provide ongoing shepherding to a Christian who is struggling to break free from viewing pornography. The frequency and nature of shepherding visits may depend on the extent of the person's involvement with pornography in the past. Bible-based information from "the faithful and discreet slave" can serve as the basis for such visits. (Matt. 24:45) Every effort should be made to help the Christian establish a daily routine of prayer, personal study, and wholesome meditation. (Phil. 4:8) When dealing with a married person, the elders should provide spiritual assistance and comfort to the believing mate as well.

## FACTORS TO CONSIDER WHEN RECOMMENDING REAPPOINTMENT

**8.** Before consideration is given to recommending a brother for reappointment as a ministerial servant or an elder who was deleted for viewing pornography, the brother (1) must have demonstrated over a sufficient period of time that he has overcome the problem and (2) must have the respect of the congregation, including his family. (See 8:10.) If so, and the brother was previously serving as an elder, it must be decided whether to recommend that he first serve as a ministerial servant. If his viewing of pornography was for a prolonged period, it would be best to recommend him first as a ministerial servant. However, if he was

involved in only a few brief viewings of nonabhorrent forms of pornography and he took the initiative to confess to the elders, he may be recommended to serve again as an elder.

# Child Abuse

|  | Paragraphs |
|---|---|
| **Legal Considerations** | 6-10 |
| Prison Inmates | 9 |
| Child Pornography and Sexting | 10 |
| **Congregation Considerations** | 11 |
| **Providing Spiritual Assistance to Victims** | 12-17 |
| **Investigating Allegations** | 18 |
| **Judicial Committee** | 19 |
| **Reinstatement Committee** | 20-21 |
| **Restrictions** | 22-24 |
| **Filing** | 25 |
| **Moving to Another Congregation** | 26-27 |
| **Notification by Secular Authorities** | 28 |
| **Sexual Misconduct Involving Only Minors** | 29-30 |

**1.** Elders should adhere closely to the direction in this chapter when a matter involving child abuse comes to their attention. Doing so will uphold the sanctity of Jehovah's name and contribute toward the safety of minors.—Isa. 32:1, 2; 1 Pet. 2:12; *w19.05* pp. 8-13.

**2.** While the information in this chapter refers to an accused in the masculine gender and to the victim in the feminine gender, it applies equally regardless of the gender of the accused or the gender of the victim. References to parents and family heads apply equally to legal guardians.

**3.** Child abuse includes the sexual or physical abuse of a minor. It would also include the extreme neglect of a minor by her parent.

Child *sexual* abuse is a perversion and generally includes sexual intercourse with a minor; oral or anal sex with a minor; fondling the genitals, breasts, or buttocks of a minor; voyeurism of a minor; indecent exposure to a minor; or soliciting a minor for sexual conduct. Depending on the circumstances of the case, it may include involvement with child pornography or sexting with a minor. Sexting involves the sending of sexually explicit messages or images electronically.

**4.** From the Bible's standpoint, child sexual abuse is a gross sin. (Deut. 23:17, 18; Gal. 5:19-21; *w97* 2/1 p. 29) Jehovah's Witnesses abhor child sexual abuse. (Rom. 12:9) Thus, the congregation will not shield any perpetrator of such repugnant acts from the consequences of his sin. The congregation's handling of an accusation of child sexual abuse is not intended to replace the secular authority's handling of the matter. (Rom. 13:1-4) Therefore, the victim, her parents, or anyone else who reports such an allegation to the elders should be clearly informed that they have the right to report the matter to the secular authorities. Elders do not criticize anyone who chooses to make such a report.—Gal. 6:5.

**5.** The Scriptures place the responsibility on parents for teaching and protecting their children. (Eph. 6:4) As spiritual shepherds, elders can help parents to shoulder their Scriptural responsibility. Our publications and website contain much helpful information to assist parents.—*w19.05* pp. 12-13.

## LEGAL CONSIDERATIONS

**6.** Child abuse is a crime. In some jurisdictions, individuals who learn of an allegation of child abuse may be obligated by law to report the allegation to the secular authorities.—Rom. 13:1-4.

**7.** To ensure that elders comply with child-abuse reporting laws, two elders should immediately call the Legal Department for legal ad-

vice when the elders learn of an accusation of child abuse. A call should be made even when both persons involved are minors. The elders should not ask an alleged victim, the accused person, or anyone else to call the Legal Department on the elders' behalf. The elders should call the Legal Department even in the following situations:

(1) The alleged abuse occurred many years ago.

(2) The alleged abuse is based on the testimony of only one witness.

(3) The alleged abuse is believed to be a repressed memory.

(4) The alleged abuse involved perpetrators or victims who are deceased.

(5) The alleged abuse is believed to have already been reported to the secular authorities.

(6) The alleged perpetrator or victim is not in your congregation.

(7) The alleged perpetrator is a non-Witness associating with the congregation.

(8) The alleged abuse occurred before the alleged perpetrator or victim was baptized.

(9) The alleged victim is now an adult.

(10) The alleged abuse occurred in the past, and it is unclear whether your congregation elders ever called the Legal Department for direction.

**8.** The Legal Department will provide legal advice based on the facts and the applicable law. If the individual who is accused of the child abuse is associated with your congregation, the two elders

calling should provide the Legal Department with the individual's full name, date of birth and, if applicable, date of baptism. After speaking with the Legal Department, the caller will be transferred to the Service Department.

 **9. Prison Inmates:** Two elders should *immediately* call the Legal Department regarding any prison inmate, baptized or unbaptized, who has been accused of child abuse and who is now associating with a congregation. This would include his attending congregation meetings held in the prison. In some cases, elders may not be permitted to inquire about the offense that an inmate may have committed. However, if the elders learn that the alleged offense has to do with child abuse, they should *immediately* call the Legal Department.

**10. Child Pornography and Sexting:** If the elders become aware of an adult associated with a congregation who has been involved with child pornography, two elders should *immediately* call the Legal Department. Likewise, if the elders become aware of an adult or a minor associated with a congregation who is sexting with a minor, the Legal Department should be called *immediately.* The Legal Department does not need to be informed when the elders receive reports of adults sexting one another.

## CONGREGATION CONSIDERATIONS

**11.** When discussing child sexual abuse from a congregation standpoint, we are not considering a situation in which a minor who is a willing participant and who is approaching adulthood is involved in sexual activity with an adult who is a few years older than the minor. Nor, generally speaking, are we discussing situations in which only minors are involved. (See 14:29-30.) Rather, we are referring to an adult guilty of sexually abusing a minor who is a young child, or an adult guilty of sexual involvement with a minor who is approaching adulthood but was not a willing participant.

# PROVIDING SPIRITUAL ASSISTANCE
# TO VICTIMS

**12.** Elders should demonstrate empathy and compassion when anyone approaches them about a matter involving child abuse. Ongoing spiritual shepherding is especially important for victims of child sexual abuse and their families.—Isa. 32:1, 2; Eph. 4:32; 1 Pet. 5:2.

**13.** Two elders should always be involved when shepherding an adult sister who is a victim of child abuse. An elder should never become the sole confidant of a sister to whom he is not closely related.—See 25:12.

**14.** When shepherding a child abuse victim who is still a minor, two elders and the minor's parents should be involved. (Deut. 6:6, 7; Eph. 6:4) Of course, if one of the parents is the accused, the accused parent would not be involved. If neither parent can be present, then another adult publisher in the congregation who is a confidant of the victim should be included.

**15.** As spiritual shepherds, elders should be good listeners. (Prov. 21: 13; Jas. 1:19) While some victims may prefer not to talk about past abuse, others have found it helpful to talk with empathetic elders who can listen and then "speak consolingly" from God's Word. (1 Thess. 5:14; Prov. 12:25; Jas. 5:13-15) Though it may be necessary for the elders to ask a few tactful questions to help an afflicted one express herself, they should avoid probing unnecessarily or repeatedly into the details of the abuse. However, discussing Biblical examples of others who endured a difficult childhood and yet succeeded in becoming faithful servants of Jehovah may provide needed comfort. In time, Jehovah God will heal "the brokenhearted."—Ps. 30:2; 94:19; 147:3; *w19.05* pp. 14-20; *w11* 10/15 pp. 23-27; *w01* 4/15 pp. 25-28; *w83* 10/1 pp. 27-31; *g* 7/09 pp. 6-9; *g91* 10/8 pp. 3-11.

**16.** The time that elders can spend shepherding an individual in the congregation who is a victim of child abuse is limited, so they

must balance this important responsibility with their other responsibilities, which include caring for the spiritual, emotional, and material needs of their own family. In some cases, a victim of child abuse may seek more spiritual support from the elders than they can reasonably give. In such cases, some elders have found it beneficial to set limits on the time for such shepherding. It may take several visits to assist a victim effectively. When circumstances limit the extent of the assistance the elders can provide on a particular occasion, elders should still seek to share words of encouragement, assuring a victim of Jehovah's love, reading an appropriate scripture, and offering a prayer. This will confirm the elders' interest and willingness to help to the extent possible.

**17.** In addition to the spiritual shepherding provided by the elders, the victim or her family may desire other assistance. For example, an adult sister who suffered abuse as a child may choose to approach an empathetic sister for emotional support and encouragement. (Prov. 17:17) Or the victim or her family may decide to consult a mental-health professional. Whether a victim or her family pursues treatment from psychiatrists, psychologists, or therapists is a personal decision. (Gal. 6:5) If an elder is asked for advice on this matter, he may direct attention to appropriate Bible principles and material in our publications.—*w15* 9/15 pp. 9-11; *w08* 11/15 pp. 23-27.

## INVESTIGATING ALLEGATIONS

**18.** The elders may learn of an allegation of child sexual abuse directly from the victim, through her parents, or through a trusted confidant of the victim. After receiving assistance from the branch office and if the accused is a publisher in the congregation, the body of elders will appoint two elders to investigate. These elders should carefully follow Scriptural procedures and the Bible-based direction in this chapter and in Chapter 12. During the investigation process and during the judicial committee process, a victim

of child sexual abuse is not required to make her allegation in the presence of the alleged abuser. Generally, elders should be able to obtain necessary information from the parents. In addition, sufficient evidence needed to establish wrongdoing on the part of an alleged abuser may already be available to the elders. (See 12:40-42.) In the exceptional event that the two elders believe it is necessary to speak with a minor who is a victim of child sexual abuse, the elders should first contact the Service Department.

## JUDICIAL COMMITTEE

**19.** If the body of elders concludes that there is sufficient Scriptural evidence to warrant the formation of a judicial committee on the grounds of child sexual abuse, the coordinator of the body of elders should first contact the circuit overseer. (See 12:40-42; 15:1-2.) The circuit overseer will designate an experienced elder to serve as chairman of the judicial committee. If an appeal committee is needed, the circuit overseer will select experienced elders to serve on the committee and will designate the chairman. (See 17:1.) If wrongdoing is established and the wrongdoer is not repentant, he should be disfellowshipped. (See 16:26-31.) On the other hand, if the wrongdoer is repentant and is reproved, the reproof should be announced to the congregation at the next midweek meeting. (See 16:20-25.) This announcement will serve as a protection for the congregation. Victims of child sexual abuse are not handled judicially. If the body of elders believes that congregation action may be warranted in the case of a minor who was a willing participant in the wrongdoing, two elders should call the Service Department before proceeding.

## REINSTATEMENT COMMITTEE

**20.** If a person who has been disfellowshipped for child sexual abuse applies for reinstatement, the coordinator of the body of elders

should contact his circuit overseer and provide the names of those who served on the original committee. The circuit overseer will designate an experienced elder to serve as chairman of the reinstatement committee. If the decision is to reinstate, two elders serving on the committee should *immediately* call the Service Department. This call must be made before the person is informed of the decision and before the reinstatement is announced to the congregation.—See 19:10-12.

**21.** If a person who has been disfellowshipped for child sexual abuse has moved and applies for reinstatement in a different congregation, the coordinator of the body of elders of the new congregation should contact his circuit overseer. The circuit overseer of the new congregation will designate an experienced elder to serve as chairman of the reinstatement committee in the new congregation. If that committee recommends that the person be reinstated, the committee should contact the coordinator of the body of elders of the original congregation, who should then contact his circuit overseer and provide the names of those who served on the original judicial committee. That circuit overseer will designate an experienced elder to serve as chairman of the reinstatement committee in the original congregation. If that committee agrees to reinstate, two elders from each congregation's committee should *immediately* call the Service Department. These calls must be made before the person is informed of the decision and before the reinstatement is announced in both congregations.—See 19:10-12.

## RESTRICTIONS

**22.** The elders should carefully adhere to all direction provided by the Service Department. For example, the Service Department will provide direction when (1) it is determined that a publisher (baptized or unbaptized) who is guilty of child sexual abuse is repentant and will remain in the congregation, (2) one disfellowshipped

for child sexual abuse is reinstated, (3) a publisher (baptized or unbaptized) who denies an accusation of child sexual abuse is convicted by the secular authorities, or (4) one viewed as a child molester by the community or the congregation becomes a publisher or gets baptized.

**23.** In such cases, direction from the Service Department to the elders will include restrictions imposed on the individual's activities within the congregation, on his participation in the field ministry, and on his interaction with minors. The elders will be directed to caution the individual never to be alone with a minor, not to cultivate friendships with minors, not to display affection for minors, and so forth. The Service Department will direct the elders to inform family heads of minors within the congregation of the need to monitor their children's interaction with the individual. The elders would take this step *only* if directed to do so by the Service Department. The coordinator of the body of elders should ensure that newly appointed elders and elders who move into the congregation are made aware of the Service Department's direction regarding such individuals.

**24.** One who has engaged in child sexual abuse does not qualify to receive *any* privileges in the congregation for many years, if ever; this includes minor privileges. Paul's counsel to Timothy has special relevance in the case of baptized adults who have molested children: "Never lay your hands hastily on any man; neither become a sharer in the sins of others." (1 Tim. 5:22; *w97* 1/1 pp. 26-29) If the body of elders believes that one who has engaged in child sexual abuse decades ago may now qualify for minor privileges, such as carrying or adjusting microphones, operating sound and video equipment, serving as an attendant, or assisting with accounts, literature, or territories, they should assign two elders to call the Service Department. The assigned elders should call the Service Department before any congregation privileges are extended.

## FILING

**25.** Information concerning individuals associated with the congregation and accused of child sexual abuse (established or not), including letters of introduction, should be placed in an envelope labeled with the individual's name and marked "Do Not Destroy." This envelope should be kept in the congregation's confidential file. This would include *Notification of Disfellowshipping or Disassociation* (S-77) forms on individuals who have committed child sexual abuse, even if later reinstated.

## MOVING TO ANOTHER CONGREGATION

**26.** When an individual who has been accused of child sexual abuse (established or not) moves to another congregation, two elders from the congregation the individual moves *from* should *immediately* call the Legal Department. The elders should be prepared to provide the name of the new congregation, if known. This should be done even if the individual is disfellowshipped or is in prison and is transferred to another facility or is released. The Congregation Service Committee should not send any information to the new congregation until after receiving legal advice from the Legal Department and direction from the Service Department.

**27.** When the elders are informed that an individual who has been accused of child sexual abuse (established or not) has moved *into* the congregation, two elders should *immediately* call the Legal Department. This should be done even if the individual is disfellowshipped or is in prison and has transferred from another facility or is released. If the individual is disfellowshipped and living within the congregation's territory, the elders should list that address on the appropriate congregation territory card as a "do-not-call."

## NOTIFICATION BY SECULAR AUTHORITIES

**28.** From time to time, secular authorities may inform the elders that a sex offender is living in the area. The notice may provide the address of the individual and may state the nature of his criminal activity. In such a case, the elders should list that address on the appropriate congregation territory card as a "do-not-call."

## SEXUAL MISCONDUCT INVOLVING ONLY MINORS

**29.** What steps should elders take when minors engage in sexual misconduct with one another? As stated earlier, two elders should *immediately* call the Legal Department even when both persons are minors. Minors who engage in sexual misconduct with one another are not generally considered by the congregation as having engaged in child sexual abuse. However, regardless of the ages of those involved, such misconduct is serious and may even warrant congregation judicial action. The body of elders should work with the parents to ensure that the minors receive spiritual assistance. If elders have questions regarding a specific case, they should call the Service Department.—See 15:15.

**30.** When baptized minors become involved in "sexting," the elders must use good judgment in determining whether the wrongdoing has escalated to a point warranting congregation judicial action. Helpful information can be found in "Questions From Readers" in the July 15, 2006, issue of *The Watchtower.* Please review this material carefully before concluding that a baptized minor is guilty of gross uncleanness or brazen conduct. (See 12:14-17.) If a baptized minor has been previously counseled on this matter and persists in the wrong course, in most cases, judicial action would be taken. However, each case must be evaluated on its own merit. In all cases, the body of elders should work with the parents to ensure that the minors receive spiritual assistance. If elders have questions regarding a specific case, they should call the Service Department.

# Preparing for Judicial Hearings

**Paragraphs**

**Selecting the Judicial Committee and Chairman** ........................ 1-3

**Preparing the Mind and Heart to Judge** ............................................ 4-6

**Inviting the Accused to the Hearing** ..................................................... 7-11

**Meeting With Marriage Mates** .................................................. 12-14

**Meeting With Baptized Minors and Young Adults** ........................ 15

**Meeting With Incarcerated Ones** ...................................................... 16

**If the Accused Threatens Suicide** .................................................. 17

**If the Accused Threatens Legal Action** ......................................... 18-20

## SELECTING THE JUDICIAL COMMITTEE AND CHAIRMAN

**1.** While extensive details of a case do not need to be conveyed to the entire body of elders, enough information should be presented for them to determine whether a disfellowshipping offense has actually been committed and, if so, who are best qualified to handle the type of case that has arisen. When the elders determine that a judicial committee is needed, those who are present at the meeting should choose the elders who will serve on the committee and designate which one will be chairman. (If the case involves child sexual abuse, see Chapter 14, paragraph 19.) The elders chosen should be men of discernment and good judgment. It is usually best for newer elders to serve first with more experienced ones. They would never serve as observers on a judicial case. The committee should be made up of three elders. However,

complex cases may warrant having four or even five experienced elders on the committee.

**2.** If the elders know that the accused has strong feelings against a particular elder, it would be better not to use him. An elder who is a close relative, has been in business with the accused, or has had a special friendship with him would not normally serve on the committee. Ministerial servants should *not* be used to serve on judicial committees. In the rare circumstance in which three elders are not available to serve on a judicial committee, one or two elders from a neighboring congregation or the circuit overseer may be used to complete a committee of three members.

**3.** In the rare circumstance in which three elders cannot be located to serve on the judicial committee, two elders may care for the matter. The two elders will function as an appointed judicial committee. (Matt. 18:19, 20) However, prior to their informing the person of their decision, the chairman of the committee will submit a confidential report to the Service Department. The report should clearly outline the facts of the case and the conclusion reached by the committee. This report is to be sent whether the decision is to disfellowship the individual or not. The Service Department will review the report and confirm receipt of it to the committee. Thereafter, the two elders will inform the person of the committee's decision. If the decision is to disfellowship, the committee will then submit the *Notification of Disfellowshipping or Disassociation* (S-77) form to the Service Department in the usual way.

## PREPARING THE MIND AND HEART TO JUDGE

**4.** Serving on a judicial committee is a heavy responsibility. Elders are judging for Jehovah and are accountable to him for the judgment they render. (2 Chron. 19:6, 7) Their decision will likely have long-lasting and far-reaching consequences for the individual in-

volved, his Christian family members, and others in the congregation. *Each time* an elder serves on a judicial committee, he should first review Chapters 12, 15, and 16 of this publication.

**5.** Allowing an unrepentant wrongdoer to remain in the congregation could result in a leavening influence. (Gal. 5:9) Failure to remove the individual may also minimize the wrong in the mind of the wrongdoer and in the minds of others who may know of his sin. (Eccl. 8:11) On the other hand, an individual unjustly dealt with may have difficulty maintaining his spirituality.—Matt. 18:6.

**6.** Elders can render a good judgment with Jehovah's help. (Matt. 18:18-20) They must pray for wisdom, discernment, and God's holy spirit. (1 Ki. 3:9; Phil. 1:9, 10; Jas. 1:5) They must do careful, thorough research using Bible-based publications, not relying solely on past experience in handling judicial matters. (Prov. 15: 28) They must endeavor to obtain a clear picture regarding what occurred and what the individual's true attitude is.—Prov. 18: 13, 17.

## INVITING THE ACCUSED TO THE HEARING

**7.** It is best for two elders to invite him orally. Their invitation should include the following information:

- (1) Make clear that the meeting is a judicial hearing.

- (2) Explain what his course of action is alleged to have been.

- (3) State the time and place of the hearing and how the person can contact the chairman if he is unable to meet at the scheduled time and location.

**8.** If circumstances permit, hold the hearing at the Kingdom Hall. This theocratic setting will put all in a more respectful frame of mind; it will also help to ensure greater confidentiality for the proceedings.

**9.** The assigned elders should make every effort to arrange for a judicial hearing right away. Leaving the matter unresolved can harm the congregation and the accused. If the accused does not make himself available to receive an oral invitation despite repeated efforts by the judicial committee, then the judicial committee should send a written invitation. (Do not leave confidential information on an answering machine or voice mail or send by way of e-mail, text message, or other forms of electronic messaging.) A written invitation signed by the judicial committee should include the same information as outlined above for an oral invitation. If possible, send the invitation in such a way that the elders can verify that the addressee received it. If they are unsuccessful in their diligent efforts to invite him and they cannot confirm that he received the invitation, they should hold the matter in abeyance.

**10.** If he accepts the judicial committee's invitation yet fails to appear, the judicial committee should reschedule the hearing and endeavor to invite the accused again. If he does not attend after it is confirmed that he received the second invitation and if it is evident that he is unwilling to cooperate with the judicial committee, the committee will proceed with the hearing but will not make a decision until evidence and testimony by witnesses are considered.

**11.** If the accused makes known to the elders his adamant refusal to meet with a judicial committee, the judicial committee may proceed in his absence without extending further invitations.—See 16:28.

## MEETING WITH MARRIAGE MATES

**12.** If the accused is a married sister, it is best to have her believing husband present for the hearing. He is her head, and his efforts to restore her and direct her can be very helpful. (1 Cor. 11:3) If unusual circumstances are involved, for example, if the elders feel it would be best not to invite the husband because of their con-

cerns for the wife's safety, they should call the Service Department.

**13.** If the accused is a married brother and he wants his believing wife to be present for the hearing, she may attend.

**14.** If the husband committed adultery, he has an obligation to inform his wife of the facts. The judicial committee should promptly inquire of the Christian wife as to what her husband has told her. If he refuses to inform her of his adultery, the elders should inform her that because of her husband's conduct, it is up to her to decide whether to pursue a Scriptural divorce or not. Furthermore, they should inform the innocent mate that her resuming sexual relations with the guilty mate would negate any claim to Scriptural freedom. (See 12:71-76.) But they should not give her further details. On the other hand, the elders may find that while the husband did confess adultery to his wife, he did not tell her the full extent of his wrong conduct and left out important information that the wife should know. The elders should not provide this confidential information to the wife, but they can suggest that she speak with her husband again. Even if he does not tell her anything more, this will alert her to the fact that he is withholding information from her, and this may help her to determine whether to forgive or not.

## MEETING WITH BAPTIZED MINORS AND YOUNG ADULTS

**15.** It is best to meet with the youth and his Witness parents, since they have the responsibility to raise and train him. If the accused is living in the home of his believing parents but is no longer a minor, the elders would not generally invite the parents to the hearing. However, if the accused has recently become an adult and is still living in his parents' home, the parents may ask to be present. If the accused has no objection, the judicial

committee may decide to allow them to attend the hearing.—See 14:29.

## MEETING WITH INCARCERATED ONES

**16.** See 28:22.

## IF THE ACCUSED THREATENS SUICIDE

**17.** In judicial cases in which the accused threatens suicide, it may be best for the committee to suspend the hearing to focus on helping him regain his balance. (See 12:81.) They should assure him of the committee's desire to help him and then should broach the subject of depression and suicide, using the Scriptures and Bible-based publications. (Prov. 3:11, 12; 4:13; Heb. 12:5, 6, 11-13) Depending upon his emotional state, it may be best to do this a day or two later. The elders can prepare by reviewing articles that will help them deal sensitively with the depressed individual. (*g* 4/14 pp. 6-9) The judicial committee should avoid unnecessarily prolonging the case, as this can cause undue stress for the accused. They should take notes for the confidential file, outlining the dates of their conversations and the scriptures and articles that were considered. These notes should be signed and included in the file for the case. (See 22:21-27.) The judicial committee should communicate with the Service Department if there are questions about a certain case.

## IF THE ACCUSED THREATENS LEGAL ACTION

**18.** If the accused threatens legal action against the elders, the elders should suspend proceedings and promptly telephone the Legal Department.

**19.** If a member of the media or an attorney representing the accused contacts the elders, they should not give any information about

the case or verify that there is a judicial committee. Rather, they should give the following explanation: "The spiritual and physical welfare of Jehovah's Witnesses is of paramount concern to the elders, who willingly provide spiritual assistance. The elders extend this spiritual assistance confidentially. This makes it easier for those who seek the elders' help to do so without worrying that what they say to the elders will be divulged later. Consequently, we do not comment on whether elders are currently or have formerly met to assist anyone in the congregation." If there is a need to do so, the elders may obtain the inquirer's name and phone number and inform him that their attorney will contact him. The elders should then promptly telephone the Legal Department.

**20.** If the authorities request confidential congregation records or ask that elders give testimony regarding confidential congregation matters, the elders should promptly telephone the Legal Department.

# Procedure for Judicial Hearings

|  | Paragraphs |
| --- | --- |
| **Determining Genuine Repentance** | 6-12 |
| **If Repentance Is Unclear** | 13-17 |
| **If the Decision Is to Reprove** | 18-25 |
| **If the Decision Is to Disfellowship** | 26-31 |

**1.** The judicial hearing is opened with prayer with the accused present. Generally, observers are not allowed. (See 15:12-13, 15.) The chairman then states the reason for the hearing and explains that audio or video recordings of the hearing are not permitted. He should then read a scripture, such as Proverbs 28:13 or James 5:14, 15. In imitation of Jehovah, the elders will convey their desire to be helpful and will treat the accused with kindness. (Ezek. 34:11, 12) They should listen patiently and not draw conclusions before they have heard all the evidence. Even if the accused is belligerent, they should treat him kindly and respectfully, never harshly.—*w89* 9/15 pp. 19-20.

**2.** The chairman invites the accused to make a personal statement. If the accused claims that he is innocent, the witnesses to the wrongdoing are presented one at a time. It is best that the witnesses give their testimony in the presence of the accused, although a victim of rape or of child sexual abuse is *never* required to do so. If a witness lives a great distance away or for some other reason is not able to be physically present, his testimony may be presented by means of a phone call or videoconference

(if confidentiality can be maintained) or perhaps submitted in writing and read to the accused.

**3.** After each witness has testified, the accused is given opportunity to respond. If he wishes to present witnesses to establish his innocence, he may do so. Only witnesses who have relevant testimony regarding the alleged wrongdoing are allowed to testify. Witnesses should be informed of their responsibility to maintain confidentiality. Additionally, they should not be present to hear the testimony of other witnesses.

**4.** In the rare event that testimony presented during the hearing causes the judicial committee to conclude that the matter should not be handled judicially, the hearing should be suspended. Inform the person that he will be contacted further regarding the matter. The body of elders should then be consulted to determine whether the judicial committee ought to be disbanded.

**5.** The committee should first seek to establish the facts and ascertain the attitude of the accused. This requires skillful and discreet questions. The judicial committee should be thorough but not inquire about needless details, especially in regard to sexual misconduct. However, when Scriptural freedom to divorce and remarry is an issue or when the nature of Scriptural wrongdoing must be determined, details may need to be clarified. When the elders on the judicial committee feel that they have a clear understanding, they should excuse the accused from the room and discuss the case and the individual's repentance or lack thereof. The judicial committee ought to feel free to seek Jehovah's wisdom through prayer at any time during their private deliberations. —Jas. 1:5.

## DETERMINING GENUINE REPENTANCE

**6.** In the Bible, two Greek verbs are used in connection with repentance. The first stresses a changed viewpoint or disposition. The

second emphasizes a feeling of regret. Therefore, repentance involves a deep regret over a damaged relationship with Jehovah, remorse over the reproach brought upon God's name and people, and a sincere longing to come back into Jehovah's favor. It includes a heart-motivated rejection of the bad course as something repugnant, hated. (Rom. 12:9) Such an attitude should be demonstrated by "fruits that befit repentance," making evident to an adequate degree a sinner's claimed repentance.—Luke 3:8; *it*-2 pp. 770-777.

**7.** Judging repentance is not simply a matter of determining whether the wrongdoer is weak or wicked. Weakness is not synonymous with repentance. Neither should the judicial committee's decision be determined by the notoriety of the wrong. The judicial committee should look for clear works of repentance commensurate with his wrongdoing. (2 Cor. 7:10, 11) The committee must be convinced that the wrongdoer has a changed heart condition, that he has a zeal to right the wrong, and that he is absolutely determined to avoid it in the future. Even if this is the individual's first time before a judicial committee, he must give evidence of genuine repentance if he is to remain in the congregation.

**8.** The extent to which the person deviates from righteousness may be major or minor, and logically the degree of regret (repentance) ought to be commensurate with the degree of deviation. Was the individual caught off guard so that he momentarily succumbed to temptation, or did he plan to do wrong? Was he unaware of the gravity of his sin? Did he deliberately ignore counsel or warnings? Was it a single offense, or was it a practice? The more an individual repeats serious sin, the more that one reasonably gives evidence of being like wicked people who are "practicing what is hurtful."—Ps. 28:3.

**9.** The judicial committee should be very concerned about keeping the congregation clean and the need to exercise particular care if the wrongdoer has secretly carried on gross sin over a long period. In such cases, an individual might not be able to demonstrate

sufficient repentance to the committee at the time of the hearing. If so, he must be disfellowshipped, allowing time to pass for him to prove his repentance. Or it may be that the individual has been dealt with judicially a number of times in the past. Because he appeared repentant, he was reproved each time. Now he has sinned again. In these cases, the committee must consider whether the person's *life course* gives evidence that he is producing "fruit that befits repentance."—Matt. 3:8.

**10.** Below are some indications of repentance. However, none of these factors is the only consideration when determining whether the sinner is repentant.

   (1) Was his confession voluntary, or did he have to be accused by others? Some offenders are so deeply ashamed or have such difficulty expressing themselves that they are reluctant to speak.

   (2) Is the individual truthful? (Acts 5:1-10) When questioned, are his answers forthright? Is he cooperative with the judicial committee? The judicial committee should be especially cautious if the individual has shown himself to be guilty of hypocrisy, lying, or deliberate efforts to deceive.

   (3) Has he prayed to Jehovah and asked for his forgiveness? Keep in mind that some wrongdoers, though repentant, find it difficult to pray.—Jas. 5:14.

   (4) What has he done to repair his relationship with Jehovah and with others he has hurt by his actions? Has he made amends, expressed willingness to do so, or apologized to those damaged by his sinful course? Has he asked for the forgiveness of those he has wronged?

   (5) If he has committed adultery, has he confessed to the innocent mate and asked for forgiveness?—*w73* pp. 351-352.

The option to forgive adultery rests with the innocent mate. The guilty mate cannot be viewed as repentant if he refuses to inform her and allow her the opportunity to forgive. If the wrongdoer is unwilling to confess and ask for forgiveness because of *fear of violence* by the innocent mate or for some other reason, the elders should contact the Service Department before proceeding.

(6) Does he manifest a spirit of heartfelt regret over having damaged his relationship with Jehovah?—Ps. 32:3-5; 51:1-4.

(7) Does he demonstrate godly sadness or worldly sadness? (2 Cor. 7:8-11) Is his sadness primarily because of hurting Jehovah and bringing Him into reproach or because of the disappointment he has caused to family and friends and the shame he has experienced? (Ezra 10:1; Luke 22:59-62) Individuals vary in their emotional makeup and control. Tears do not necessarily indicate sincere repentance; neither does a lack of strong emotion show a lack of repentance.—Gen. 25:29-34; 27:34.

(8) Does he accept responsibility for his error, or does he rather minimize or justify his bad course?—1 Sam. 15:24; 2 Sam. 12:13.

(9) Does he recognize that lesser sins may have led up to serious wrongdoing, and is he determined to avoid these?

**11.** Each case is different. The judicial committee should consider any factors unique to the case. For example, the wrongdoer may have been a victim of abuse. Although that is not an excuse for wrong-doing, understanding any extenuating circumstances will help the judicial committee to understand the wrongdoer better.

**12.** The same is true regarding wrongdoers who suffer from mental or emotional problems. (See 15:17.) If the wrongdoer is able to carry out normal daily activities and is viewed by the community as being accountable for his actions and decisions, the congregation should not overlook his wrongdoing. However, the judicial committee should show consideration and patience in their dealings with him and be especially aware of the need for discernment in evaluating his repentance. On the other hand, if the judicial committee discerns that his mental condition is so severe that others generally regard him as not being responsible for what he does, they may recommend to the body of elders that no judicial action be taken, explaining the reasons for their recommendation.

## IF REPENTANCE IS UNCLEAR

**13.** If the extent of the wrongdoer's repentance is unclear, the committee should invite him back into the room for further discussion. They should use God's Word to help him understand why his conduct was wrong and how it has affected his relationship with Jehovah and the congregation. It is possible that even as late as the judicial hearing, he will demonstrate repentance to the point that mercy may be warranted. In most cases, the individual will show some repentance, but is it commensurate with the degree of his wrongdoing? The judicial committee needs to be modest and keep in mind that if the wrongdoer has demonstrated few or no works of repentance before the judicial hearing is held, it may not be possible during the hearing to move him to demonstrate sufficient repentance to justify extending mercy. Even if it is determined that he must be disfellowshipped, their efforts to lead him to repentance may help him to begin making straight paths for his feet and work toward reinstatement. (Heb. 12:13) After trying to help him and hearing his further expressions, the judicial committee should excuse him from the room and continue to deliberate.

**14.** In complex cases, if the judicial committee is not sure of the Bible's direction or the organization's counsel, the hearing may be adjourned and reconvened a few days later. However, an additional meeting should not be scheduled just to give the accused time to stop the wrongdoing or to demonstrate works of repentance. If he has demonstrated little or no repentance during the initial hearing, there would generally be no basis on which to prolong the case and schedule a second meeting.

**15.** At times, complicated judicial cases may necessitate consultation with an experienced elder in another congregation or the circuit overseer. In such a situation, inform the wrongdoer that the decision is pending. Do not inform him that you will be consulting with parties outside of the judicial committee, which may at times include the branch office. While pertinent details may be discussed, names should not be used when discussing the case with another elder outside the congregation. However, when the circuit overseer is consulted or when circumstances require that the branch office be contacted, the judicial committee should reveal the names.

**16.** Those serving on a judicial committee should endeavor to be unanimous in their decision. Any difference of opinion can usually be resolved by discussing matters thoroughly as a judicial committee, researching the Scriptures and Christian publications, praying for wisdom and direction, and even consulting with an experienced elder outside the congregation. However, if the committee is unable to reach a unanimous conclusion, the minority should give support to the decision reached by the majority.

**17.** Anything submitted in writing to the committee by the alleged wrongdoer or by witnesses should be kept in strict confidence. If it is necessary to continue the matter later, the members of the committee should turn over to the chairman any personal notes they have taken. The chairman will keep these notes in a secure place to prevent breaches of confidentiality. The notes

may be returned to the committee members for consultation before the hearing resumes.

## IF THE DECISION IS TO REPROVE

**18.** If the elders on the judicial committee determine that the wrongdoer is genuinely repentant, they should inform him of the decision, the judicial restrictions, and whether the reproof will be announced to the congregation. They should also give reproof from the Scriptures, showing the seriousness of the wrongdoing and the minor sins that may have led up to it. Reproof is defined as "that which is designed to convince others of their having erred, in order to move them to acknowledge their mistakes and correct these." (*it*-2 p. 780) Hence, judicial reproof includes more than just making a decision and announcing it to the congregation. It involves reinforcing the wrongdoer's resolve to do what is right. In the Bible, the original-language word for reproof comes from a verb meaning 'to show plainly, point out by facts, demonstrate, show by evident or convincing reasons or arguments.' Helpful suggestions should be given to help him make needed adjustments. If witnesses testified during the hearing, they may be invited to hear the Scriptural reproof. In this way the wrongdoer is reproved "before all onlookers." (1 Tim. 5:20) The judicial committee should pray with the repentant wrongdoer before concluding the hearing. As soon as possible after the hearing, a brief summary of the case should be prepared and signed by the judicial committee. (See 22:21-27.) The body of elders should be updated on the results of the hearing, including what restrictions will be imposed and whether any announcement will be made to the congregation.

**19.** In all cases of judicial reproof, the wrongdoer is disqualified from special privileges, such as pioneering or offering congregation prayer, until he has made further spiritual progress. This also includes other congregation assignments that might be given to those who are exemplary. In addition, some judicial restrictions

should be imposed by the judicial committee in all cases of judicial reproof. Judicial restrictions may include not commenting at congregation meetings and not presenting student assignments on the midweek meeting. When the elders inform a repentant wrongdoer of restrictions, it would be helpful to tell him the date of the next meeting, at which time his progress will be reviewed. —See 16:22.

**20.** The judicial committee determines whether the reproof will be announced to the congregation. Reproof should be announced in the following situations:

 (1) The sin is widely known or will likely become known in the congregation or community. In such cases, an announcement will safeguard the reputation of the congregation. For example, in a case of adultery, an innocent mate may lean toward forgiveness but is not ready to resume sexual relations at the time that the judicial committee concludes the case. (*w16.08* p. 12 par. 15) If the possibility of a Scriptural divorce still exists, an announcement would protect the reputation of the congregation and that of the innocent mate.

 (2) The judicial committee has specific reasons to believe that the congregation needs to be on guard concerning the repentant wrongdoer. For example, in a case involving child sexual abuse, announcing the reproof of a repentant wrongdoer will serve as a protection for the congregation.—See 14:19.

**21.** The coordinator of the body of elders should approve the announcement before an elder reads it to the congregation at the next midweek meeting. It should read as follows: "[Name of person] has been reproved." The announcement should be made in only one congregation. Restrictions are not announced.

**22.** The judicial committee should monitor the spiritual progress of the repentant wrongdoer and be alert to remove judicial

restrictions gradually as he recovers spiritually. It may be discouraging to the repentant wrongdoer if restrictions are imposed for a prolonged period. In most cases, the elders will remove some or even all of these restrictions before many months have passed. The committee should use good judgment in determining if there is a need to consult with other elders on the body before removing any restrictions. (Prov. 15:22) In all cases, the body of elders should be informed when any restrictions are removed. (See 22:21-27.) When an elder serving on the original committee moves or is no longer serving as an elder, the body of elders will select a replacement to monitor the wrongdoer's progress. If the wrongdoer moves before the committee lifts all of his restrictions, the new congregation should receive sufficient details so that the elders can evaluate his true spiritual condition. The elders should provide the type of information and details they would appreciate receiving if the individual was moving into their congregation. (If the wrongdoing involved child sexual abuse, see Chapter 14, paragraphs 26-27.) The elders of the new congregation should choose two or three elders to continue to monitor the wrongdoer's progress and lift the remaining judicial restrictions.

**23.** In some cases the body of elders may feel that it is necessary to warn the congregation about the type of wrongdoing by means of a Scriptural talk. A member of the judicial committee should generally give the talk. He should explain the wrongness of the conduct and how to avoid it but without saying anything that would connect the wrongdoer with the type of sin under discussion. In the case of an announced reproof, the elders should wait a few weeks before giving such a talk; when the reproof is not announced to the congregation, there is no need to wait.

**24.** Generally, once a case has been concluded, no further judicial action would be taken. However, as an exception, the case might be reopened if *within a few days of the decision* new information comes to light that strongly indicates that the wrongdoer was not genuinely repentant. Perhaps he gave misleading testimony or

purposely omitted important facts during the hearing. If so, two elders from the committee should contact the Service Department for direction. If the committee is directed to reopen the case, the individual would be informed of any new evidence and would be allowed to present his side of the matter.

**25.** If the person again engages in serious wrongdoing after the judicial committee renders a decision and completes the case, the body of elders should meet and select a new judicial committee. There may be advantages to assigning the same elders who served on the original committee, if they are available and still qualify.

## IF THE DECISION IS TO DISFELLOWSHIP

**26.** If the wrongdoer lacks genuine repentance, he should be disfellowshipped. The committee should inform him of this decision and express their hope that he will change his ways and in time qualify to return to Jehovah's organization. (2 Cor. 2:6, 7; *od* chap. 14 pars. 25-28; *rj* pp. 10-14) In a kind and positive way, the committee may read an appropriate concluding scripture such as Isaiah 1:18; 2 Corinthians 7:10, 11; or Hebrews 12:5-7, 11. In addition, the following information should be conveyed orally to the person:

  (1) Explain the need for repentance as well as what steps he can take toward being reinstated in due time.

  (2) Inform him that he may send a letter of appeal to the judicial committee within seven days if he feels a serious error in judgment has occurred. The judicial committee should neither encourage nor discourage him from doing so.

  (3) Inform him that he may obtain a personal copy of the magazines and other literature, including special-request items, at the Kingdom Hall.

**27.** Before dismissing the person, the elders should ask if he has any questions. After dismissing him, the judicial committee should conclude with prayer. As soon as possible after the hearing, a brief summary of the case should be prepared and signed by the judicial committee and the *Notification of Disfellowshipping or Disassociation* (S-77) form should be filled out, with the date of the announcement left blank. (See 22:21-27.) The body of elders should be informed of the committee's decision.

**28.** If the unrepentant wrongdoer did not attend the judicial hearing, the judicial committee should make reasonable efforts to inform him orally of their decision, his option to appeal, and so forth. The elders should not leave such confidential information on an answering machine or voice mail or send it by way of e-mail, text message, or other forms of electronic messaging. If he does not cooperate with the efforts to inform him, two elders from the committee should contact the Service Department before making an announcement.

**29.** The seven-day appeal period should be allowed to elapse even if the person states he does not wish to appeal. The coordinator of the body of elders should approve the announcement before an elder reads it to the congregation at the midweek meeting. It should read as follows: "[Name of person] is no longer one of Jehovah's Witnesses."

**30.** Disfellowshipping takes effect at the time of making the announcement to the congregation. In the interim before the public announcement, the wrongdoer should not be called on to comment or offer prayers at congregation meetings or care for any special privileges of service. The announcement should be made in only one congregation.

**31.** After the announcement is made to the congregation, the judicial committee should insert the date of the announcement on the *Notification of Disfellowshipping or Disassociation* form and send the form promptly to the Service Department.—See 22:21-27.

CHAPTER SEVENTEEN

# Appeal Hearings

**Paragraphs**

**If the Appeal Committee Agrees With the Judicial Committee** ............................................................................ 9-10

**If the Appeal Committee Disagrees With the Judicial Committee** ............................................................................ 11-15

**1.** If the judicial committee receives a letter of appeal within seven days from the date the wrongdoer was notified of the decision to disfellowship, the chairman should promptly call the circuit overseer, who will arrange for an appeal committee. (If a person appeals after the seven days, immediately call the Service Department for direction.) Arrangements are made for an appeal hearing even if there seems to be no valid basis for an appeal. The circuit overseer will select qualified elders to rehear the case. If possible, he will select brothers from a different congregation or congregations. Those selected should be impartial and should not be close relatives of or have a special relationship with any of the elders on the judicial committee or anyone else involved in the case.

**2.** The chairman of the judicial committee will make the *Notification of Disfellowshipping or Disassociation* (S-77) form and all other related material on the case available to the appeal committee. The committee should make every effort to conduct the appeal hearing within one week after the letter of appeal was received. —*od* chap. 14 pars. 25-28.

**3.** The appeal committee should avoid giving the impression that they are critical of the judicial committee. They must remember that the provision for an appeal does not indicate a lack of

confidence in the judicial committee. Rather, it is a kindness to the wrongdoer and ensures a fair hearing that takes into consideration all of the pertinent facts. The appeal committee should keep in mind that the judicial committee likely has more insight and experience regarding the accused.

**4.** Generally, there is no arrangement to hold an appeal hearing outside the circuit where the judicial hearing took place. Thus, if the accused has moved, he must be willing to travel back to the area so that the judicial committee can be present for the appeal hearing. Any exception must be approved by the Service Department. If the accused deliberately fails to appear at the appeal hearing, the disfellowshipping should be announced at a midweek meeting after reasonable efforts have been made to contact him.—See 16:28-29.

**5.** The appeal committee first meets to read the written material on the case. This meeting should be opened with prayer. Thereafter, the appeal committee should meet with the judicial committee. Sometime later, but preferably on the same day, the appeal committee should meet with the accused and the judicial committee together. The judicial committee has already judged him unrepentant, so the appeal committee will not pray in his presence.

**6.** The appeal hearing is conducted in a manner similar to the judicial hearing. It may be necessary to rehear all the evidence relevant to the case, including that which was presented originally and any new evidence now available. For instance, if the accused continues to assert that he is innocent, the witnesses should again give their testimony in his presence, he should be given opportunity to respond, and the appeal committee should hear any additional witnesses he wishes to present to prove his innocence. If the judicial committee or the accused believes that earlier testimony or evidence is being changed, this can be stated following the presentation of evidence that was allegedly altered. —See 16:2-3.

**7.** After gathering the facts, the appeal committee should deliberate in private. They should consider the answers to two questions:

- (1) Was it established that the accused committed a disfellowshipping offense?—See 12:2, 40-42.

- (2) Did the accused demonstrate repentance commensurate with the gravity of his wrongdoing at the time of the hearing with the judicial committee?

**8.** The appeal committee may find that while the original basis for disfellowshipping was invalid, other valid grounds for disfellowshipping exist. If so, the appeal committee should give the individual sufficient time, even several days if needed, to present any evidence or witnesses that he feels will disprove the new allegations. If the new allegations are established and if the person does not demonstrate genuine repentance, the appeal committee may decide to uphold the disfellowshipping on these new grounds. If the members of the original committee agree with the new grounds, they should adjust the *Notification of Disfellowshipping or Disassociation* form, allow seven days to pass before arranging for the disfellowshipping to be announced at the next midweek meeting, and then submit the form to the Service Department. As soon as possible after the hearing, a brief summary of the case should be prepared and signed by the appeal committee.—See 22:21-27.

## IF THE APPEAL COMMITTEE AGREES WITH THE JUDICIAL COMMITTEE

**9.** If the members of the appeal committee agree with the judicial committee, they should inform the wrongdoer of the final decision in the presence of the judicial committee. The judicial committee should allow seven days to pass before arranging for the disfellowshipping to be announced at the next midweek meeting. The judicial committee should submit the completed *Notification*

*of Disfellowshipping or Disassociation* (S-77) form to the Service Department.—See 22:21-27.

**10.** The appeal committee should not initiate discussion of a further appeal. However, if the individual persists in believing a serious error in judgment has occurred, the appeal committee should inform him that he may express his concern in a letter within seven days. If he indicates a desire to submit a letter of appeal, the announcement of disfellowshipping should be delayed. The appeal committee should submit to the Service Department a brief summary of the case, the judicial committee's summary, and the individual's letter. No announcement should be made until a reply is received from the Service Department. The body of elders should be updated on the results of the appeal hearing.—See 22:21-27.

## IF THE APPEAL COMMITTEE DISAGREES WITH THE JUDICIAL COMMITTEE

**11.** If the appeal committee feels that the decision to disfellowship the individual was made in error, the appeal committee should meet privately with the judicial committee to discuss matters and explain the reason for disagreeing.

**12.** If the judicial committee agrees not to disfellowship the individual, the appeal committee should inform him of the final decision in the presence of the judicial committee. The body of elders should be updated on the results of the appeal hearing.—See 22:21-27.

**13.** If the judicial committee does not agree with the conclusions of the appeal committee and still believes that the individual should be disfellowshipped, he should be invited back into the room, and the appeal committee should inform him that further consideration will be needed. He can be assured that the case will be concluded as soon as possible. Neither the judicial committee nor

the appeal committee should give any indication of their differing decisions to the individual. After he is dismissed, the hearing can be concluded with prayer.

**14.** The judicial committee should promptly compose a letter clearly expressing its reasons for disagreement and give this to the appeal committee. Likewise, the appeal committee should promptly compose a letter explaining the reasons for its decision. The appeal committee should send both letters and the *Notification of Disfellowshipping or Disassociation* (S-77) form to the Service Department. The branch office will thereafter provide written direction to assist both committees with bringing the case to a conclusion.

**15.** After the two committees have considered the observations of the branch office and made a final decision, the original committee should inform the person involved. The body of elders should be updated on the final decision. If the decision is to disfellowship, an announcement should be made at the next midweek meeting and the Service Department should be informed of the date of the announcement.

# Disassociations

**1.** Whereas disfellowshipping is an action taken by a judicial committee against an unrepentant wrongdoer, disassociation is an action taken by a baptized individual in the congregation who no longer desires to be one of Jehovah's Witnesses. (1 John 2:19; *od* chap. 14 pars. 30-33) In cases of disassociation, the body of elders should appoint a committee (not judicial) of three elders to consider the facts.

**2.** A judicial committee should discontinue its handling of a case as a judicial offense if the accused person makes known his decision to disassociate himself. However, at no time should the elders ask the accused if he desires to disassociate himself. If the elders are handling a particularly difficult case and there is a question about whether the person has disassociated himself, it would be best for the committee to contact the Service Department for further direction. If an individual is determined to disassociate himself, then the committee ought to prepare a summary of the alleged offense(s) and the evidence of such. This would be kept along with information regarding the disassociation. If the person later requests reinstatement, these matters would need to be considered with him at that time.—See 22:21-27.

**3.** Actions that may indicate disassociation include the following:

(1) **Making Known a Firm Decision to Be Known No Longer as One of Jehovah's Witnesses:** If the individual agrees to meet, a committee (not judicial) should first try to speak with him and provide spiritual assistance. (Gal. 6:1) Does he really desire to resign from being one of Jehovah's Witnesses, or does he simply no longer want to associate actively with the congregation? Is the desire to disassociate prompted by doubts or discouragement? If he is adamant in his

decision that he no longer be considered one of Jehovah's Witnesses, he should be asked to put this in writing and sign it. If he does not, then the witnesses to his oral statement should prepare a brief report for the confidential files and sign it.

(2) **Joining Another Religious Organization and Making Known His Intention to Remain With It:** If it is learned that a person has taken up association with another religion or religious organization and thus is identified with it, a committee (not judicial) should be selected to investigate the matter and endeavor to provide spiritual assistance. If the individual has joined another religion or religious organization and intends to remain with it, he has disassociated himself.

(3) **Willingly and Unrepentantly Accepting Blood:** If someone willingly accepts a blood transfusion, perhaps because of being under extreme pressure, a committee (not judicial) should obtain the facts and determine the individual's attitude. If he is repentant, the committee would provide spiritual assistance in the spirit of Galatians 6:1 and Jude 22, 23. Since he is spiritually weak, he would not qualify for special privileges for a period of time. In some cases, it may also be necessary to remove other privileges, such as commenting at congregation meetings and presenting student assignments on the midweek meeting. Depending on the circumstances, the committee may also need to arrange for an announcement to the congregation at a midweek meeting: "The elders have handled a matter having to do with [name of person]. You will be glad to know that spiritual shepherds are endeavoring to render assistance." On the other hand, if the elders on the committee determine that he is unrepentant, they should announce his disassociation.

(4) **Taking a Course That Violates Christian Neutrality:** (Isa. 2:4; John 15:17-19; *lvs* pp. 60-63, 244) If he joins a nonneutral organization, he has disassociated himself. If his employment makes him a clear accomplice in nonneutral activities, he should generally be allowed six months to make an adjustment. If he does not, he has disassociated himself.—See *lvs* pp. 204-206.

**4.** As soon as possible after the hearing, a brief summary of the case should be prepared and signed by the committee and the *Notification of Disfellowshipping or Disassociation* (S-77) form should be filled out with the date of the announcement left blank. The body of elders should be informed of the disassociation.

**5.** The coordinator of the body of elders should approve the announcement before an elder reads it to the congregation. It should read as follows: "[Name of person] is no longer one of Jehovah's Witnesses."

**6.** Since disassociation is an action taken by the publisher rather than the committee, there is no arrangement for an appeal. Therefore, the announcement of disassociation can be made at the next midweek meeting without waiting seven days. After the announcement is made to the congregation, the committee should insert the date of the announcement on the *Notification of Disfellowshipping or Disassociation* form and send the form promptly to the Service Department.—See 22:21-27.

# Reinstatements

|  | Paragraphs |
| --- | --- |
| **Handling Requests for Reinstatement** | 1-4 |
| **Procedure for Reinstatement Hearing** | 5-8 |
| **If the Decision Is Not to Reinstate** | 9 |
| **If the Decision Is to Reinstate** | 10-12 |
| **Communication Between Committees** | 13-16 |

## HANDLING REQUESTS FOR REINSTATEMENT

**1.** A disfellowshipped person or one who has disassociated himself from the congregation may be reinstated when he gives clear evidence of repentance and over a reasonable period of time demonstrates that he has abandoned his sinful course. (*od* chap. 14 pars. 34-36) When the body of elders receives a letter requesting reinstatement, the request should be handled promptly. Although the following direction refers to pleas for reinstatement from a disfellowshipped individual, it applies equally to one who has disassociated himself.

**2.** The body of elders should meet to determine who will serve on the reinstatement committee. If the elders who served on the original committee are available and qualified, they usually serve on the reinstatement committee. Otherwise, the elders should choose replacements.—See 15:1-3.

**3.** If the person requesting reinstatement was disfellowshipped for child sexual abuse, see Chapter 14, paragraphs 20-21.

**4.** Even if the committee feels that it is much too soon to consider reinstatement, two members of the committee should

acknowledge receipt of the request and briefly inform the person that more time must pass.

## PROCEDURE FOR REINSTATEMENT HEARING

**5.** After offering prayer without the person present, the committee will invite the disfellowshipped or disassociated person into the room. The committee should endeavor to put him at ease, commending him for his progress and desire to be reinstated. In imitation of Jehovah, the elders will convey their desire to be helpful and will treat the person with tenderness. (Isa. 1:18; Acts 3:19; *rj* pp. 10-11) They must listen patiently and not draw conclusions before they have heard all the evidence. The chairman invites the person to make a personal statement. The committee should seek to determine what his conduct was during the time that he was disfellowshipped or disassociated and should ascertain his attitude. The person is then excused from the room while the committee deliberates.

**6.** The committee should be careful to allow sufficient time, perhaps many months, a year, or even longer, for a disfellowshipped or disassociated person to demonstrate that he is genuinely repentant. (See 16:6-17.) The committee should be especially cautious in some cases. For instance, the wrongdoer may have been deceptive, may have secretly practiced wrongdoing over a long period of time, or may have been repeatedly dealt with judicially in the past for the same or other wrongdoing. If such a person is reinstated quickly, others may be emboldened to commit serious sin, as they may feel that the discipline will be light. Where there is evidence of conspiracy between individuals to put away their mates and marry each other, considerable time should elapse for them to demonstrate sufficient repentance before they qualify for reinstatement.—*w83* 3/15 p. 29.

**7.** The reinstatement committee needs to be balanced. Genuine repentance and a turning away from the wrong course—not the at-

titude of others or merely the time elapsed—are the chief de-
termining factors in deciding when a person may be reinstated.
—1 Cor. 5:1, 11-13; 2 Cor. 2:6, 7; 7:10, 11.

**8.** The committee should guard against going to extremes by exact-
ing a point-by-point admission of sins that may not have been
clearly proved. Rather, the committee should consider the over-
all pattern of the wrongdoer's life. Does it now show that he is
repentant?

## IF THE DECISION IS NOT TO REINSTATE

**9.** If it is determined that the individual should not be reinstated,
the committee should explain to the individual its reasons and
what he needs to do in the future to qualify for reinstatement.
After he is dismissed, the committee will conclude with prayer.
The body of elders should be updated on the result of the meet-
ing.—See 22:21-27.

## IF THE DECISION IS TO REINSTATE

**10.** If the decision is to reinstate, the person can be invited back into
the room and informed. At that time Scriptural encouragement
and counsel should be given to help him continue to make spir-
itual progress. Until the reinstatement is announced, he should
continue to conduct himself as a disfellowshipped person. The
committee will conclude with prayer with the individual present.
After the announcement is made, the chairman of the commit-
tee should write the date of the announcement of reinstatement
on the congregation's copy of the *Notification of Disfellowship-
ping or Disassociation* (S-77) form. He should then send a mes-
sage to the Service Department including the person's (1) full
name, (2) date of birth, and (3) date of baptism, along with
(4) the date of the announcement of reinstatement. (The same
information should be provided by a member of the committee

if a disfellowshipped or disassociated person dies, except that the date of death should be provided rather than the date of the announcement of reinstatement.) If the reinstatement involves someone who was accused of child sexual abuse, established or not, see Chapter 14, paragraphs 20-21. The body of elders should be updated on the result of the meeting.—See 22:21-27.

**11.** In all cases of reinstatement, judicial restrictions are imposed. Thus, the wrongdoer may be helped to make "straight paths" for his feet thereafter. (Heb. 12:13) The privilege of sharing in the field ministry is restored when the individual is reinstated. Other privileges, such as commenting at meetings and presenting student assignments on the midweek meeting, are restored gradually when it is determined that the individual has progressed spiritually to the point that he is qualified and when it is judged by the committee that the extending of such privileges will not be offensive to the congregation. When a person is reinstated, he will still need much spiritual assistance. The committee should continue to monitor the person's spiritual progress. It may be discouraging to the repentant wrongdoer if restrictions are imposed for a prolonged period of time. Therefore, when informing a repentant wrongdoer of restrictions, it would be helpful for the committee to inform him of the date for the next meeting when his progress will be reviewed. The committee may also arrange for a Bible study to be conducted, if needed, which would be reported as field service. In most cases, the elders will remove some or even all of these restrictions before many months have passed.

**12.** The coordinator of the body of elders should approve the announcement before an elder reads it to the congregation at the next midweek meeting. The announcement should read as follows: "[Name of person] is reinstated as one of Jehovah's Witnesses." There may be spontaneous, dignified applause when the announcement is made. (Luke 15:7) Judicial restrictions should not be announced.

## COMMUNICATION BETWEEN COMMITTEES

**13.** The final decision to reinstate a disfellowshipped or disassociated person is always made by a reinstatement committee of the congregation that originally handled the matter. Therefore, if the person requesting reinstatement has moved, the body of elders in the congregation where he now attends meetings will appoint a local reinstatement committee to hear his request. If the members of the local reinstatement committee believe he should be reinstated, they will forward their recommendation to the body of elders in the congregation that originally handled the matter. The local reinstatement committee should not let the person know what recommendation they will make to the original committee, since the original committee may not agree. If the person becomes aware of a lack of unity between the committees, he may lose respect for the original committee. Thus, the local reinstatement committee should tell him that they must first correspond with the elders in the congregation that originally handled the matter and that he will be informed of the decision in due course.

**14.** The local reinstatement committee should not pressure the original committee to reinstate the person. Those elders may be aware of important factors not apparent to the local reinstatement committee, so it is usually best to respect their judgment. Likewise, the original committee should carefully consider the recommendation of the local reinstatement committee. Sufficient time may have passed, and the individual may have made drastic changes. The original committee should keep in mind that the elders making the recommendation have met the individual and have had opportunity to observe his conduct. If the original committee decides to reinstate, the announcement is made in both congregations. (See 19:12.) The committee where he attends will supervise the gradual removal of restrictions.

**15.** If the two congregations are reasonably close to each other, the original committee should promptly arrange to meet with the

individual after receiving a positive recommendation from the local reinstatement committee.

**16.** If the elders on the original committee disagree with the recommendation to reinstate, they should clearly explain their reasons to the local reinstatement committee.

# Meetings

Paragraphs

**Public Speakers** ........................................................................................... 1-5

   Qualifications ........................................................................................... 1

   Assignments ........................................................................................ 2-3

   Symposiums ............................................................................................ 4

   Hospitality and Travel Expenses ................................................. 5

**Memorial and Special Talk** ........................................................... 6-12

   Selecting a Memorial Speaker ....................................................... 6

   Selecting Brothers to Offer Prayers at the Memorial ............... 7

   Memorial Meeting Times .................................................................. 8

   Congregation Meetings the Week of the Memorial ................... 9

   Recordings on JW Stream ............................................................. 10

   Inactive Ones ..................................................................................... 11

   Chairman and Announcements ................................................... 12

**Announcements** ........................................................................................ 13

**Local Needs Parts** .............................................................................. 14-15

**Assemblies** ................................................................................................. 16

**Conventions** ............................................................................................... 17

**_Watchtower_ Study** ................................................................................... 18

**Congregation Bible Study** .................................................................. 19

**Visual Aids** ................................................................................................. 20

**Songs and Videos** .............................................................................. 21-23

**Broadcasting Systems** ........................................................................... 24

**JW Stream** ............................................................................................. 25-27

**Sign Language** ..................................................................................... 28-36

   Seating Area ................................................................................. 28-29

   Use of Natural Sign Language ............................................... 30-31

Interpreter Attire ........................................................................................ 32-34

Songs ............................................................................................................... 35

Audio ............................................................................................................... 36

**Disruptive Individuals** ....................................................................................... 37-38

**Transportation for Disfellowshipped
or Disassociated Individuals** ................................................................... 39

# **PUBLIC SPEAKERS**

1. **Qualifications:** It is essential that only qualified elders and ministerial servants who are approved by the body of elders be assigned to give public talks. A qualified public speaker teaches effectively from the Scriptures, makes the practical value of the material clear, and reaches the heart of his listeners. (Neh. 8:8; Luke 24:32) The body of elders may decide that an elder who cares for assignments on the midweek meeting does not qualify to give public talks. In some cases, an elder with limited abilities may be approved to give public talks in his congregation, but he would not qualify to be a visiting speaker. In such cases, he would modestly decline personal invitations to give talks in other congregations. The body of elders should use balance and good judgment as they prayerfully consider the abilities of each brother. All elders, including those who presently do not qualify for certain teaching privileges, should take the initiative to approach the auxiliary counselor for suggestions as well as make good use of the *Ministry School* book, the *Teaching* brochure, and *Reminders for Those Assigned Public Talks* (S-141) to improve their teaching skills.—1 Tim. 4:15, 16.

2. **Assignments:** It is preferable that visiting speakers be elders. However, well-qualified ministerial servants may also be assigned. (See 1:2.9.) Generally, requests for speakers should be through the public talk coordinator. (See 1:2.7; 3:3.18.) A list of approved

speakers and the talks they have prepared should be provided to other congregations. (The use of such lists should comply with applicable data protection laws.) Speakers and talks should be chosen from this list. Since the number of approved speakers varies from congregation to congregation, it is not always necessary that an equal number of speakers be exchanged.

**3.** At times, the body of elders may feel that a local speaker should be assigned an outline on a particular subject in view of the needs of the congregation. Otherwise, speakers may choose which outlines they wish to prepare. (See *Public Talk Titles* [S-99] and *Public Talk Titles-Listed by Subject* [S-99a].) It is preferred that speakers not be assigned to be away from their own congregation more than once a month.

**4. Symposiums:** The body of elders determines whether it would be beneficial for an inexperienced public speaker to be assigned the first 15 minutes of a talk and for a more experienced speaker to be assigned the remaining 15 minutes.

**5. Hospitality and Travel Expenses:** The body of elders should take the lead in extending hospitality to visiting speakers by asking to cover their travel expenses and by offering them a meal. (Rom. 12:13) Since circumstances vary widely, it is up to the body of elders to decide how this should be handled locally. Congregation funds may be used to cover travel expenses for visiting speakers. (See *Instructions for Congregation Accounting* [S-27].) However, congregation funds should not be used to cover expenses for other forms of hospitality, such as entertaining or providing meals.

## MEMORIAL AND SPECIAL TALK

**6. Selecting a Memorial Speaker:** The body of elders should carefully select a speaker who can present the information in a way that will be clear and understandable to all in attendance, including those who may be present for the first time. The elders should

not simply take turns giving this talk each year. A capable anointed elder should be considered if he is not limited by age, health, or other factors. However, it is not necessary for him to be chosen every year. In this way, the audience can benefit from the good teaching of other capable brothers. The primary concern of the elders when selecting a speaker should be the quality of the talk.

**7. Selecting Brothers to Offer Prayers at the Memorial:** The body of elders should select qualified brothers to offer brief but meaningful prayers over the emblems. Those who represent the congregation in prayer should be mature baptized Christians who are known as good examples and who have the respect of the congregation. A capable, qualified, anointed brother should be considered for this privilege if he is not limited by age, health, or other factors. However, the body of elders may have reason to select other qualified brothers to offer the prayers. If an anointed brother gives the talk, it is not necessary for him to offer the prayers over the bread and wine, but he may be asked to offer the final prayer.

**8. Memorial Meeting Times:** The body of elders decides when the Memorial talk should begin. If more than one congregation will be using a facility, the bodies of elders should cooperate in determining the start time. Although the Memorial talk may begin before sundown, the emblems should not be passed until after sundown. If more than one observance will be held at the same facility, at least 40 minutes between the programs, where possible, should be allotted for those attending to enter and leave. Keep in mind that the overall program is about an hour, including the songs, the prayers, the passing of the emblems, and the chairman's comments.

**9. Congregation Meetings the Week of the Memorial:** When the Memorial falls on a weekday, no midweek meeting will be scheduled. When the Memorial falls on a weekend, no weekend meeting will be scheduled.

10. **Recordings on JW Stream:** About one month before the Memorial, a prerecorded Memorial talk will be made available on JW Stream for the benefit of those congregations, groups, and pregroups that have very few qualified speakers. The section of the outline entitled "Observing the Memorial of Christ's Death Tonight" will be omitted from the recording. The local chairman or another brother should handle this section of the talk, during which 1 Corinthians 11:23-25 will be read, the prayers will be offered, and the emblems will be passed. Thereafter, the audience should watch the concluding section of the recording. About one month prior to the special talk, a prerecorded special talk will also be made available on JW Stream. If possible, backup speakers should be assigned in case of technical problems with the recordings of the Memorial and the special talk.

11. **Inactive Ones:** For direction regarding assisting inactive ones during the Memorial season, see Chapter 25, paragraph 15.

12. **Chairman and Announcements:** In connection with the Memorial observance, the chairman should start the meeting in the usual way and then introduce the speaker. After the talk, the chairman should read the announcement provided and then announce the concluding song. In most cases, he will call on the speaker to offer the closing prayer. Following the delivery of the special talk, the chairman should read the announcement provided.

## ANNOUNCEMENTS

13. The coordinator of the body of elders reviews and approves all announcements made to the congregation.—See *Instructions for Our Christian Life and Ministry Meeting* (S-38).

## LOCAL NEEDS PARTS

14. The body of elders decides the subjects of local needs parts, the elders who will present them, and when they will be presented.

The subjects considered may include areas in which the congregation as a whole needs encouragement, commendation, or counsel. (Prov. 27:23) The part should provide sound and loving Scriptural instruction.—See 20:16-17.

**15.** The body of elders should *not* invite Hospital Liaison Committee members or medical professionals to present or to share in a local needs part, such as regarding filling out the durable power of attorney (DPA) card or some related matter. Likewise, they should *not* arrange for such individuals to present special talks or programs at Kingdom Halls or other locations for this purpose.

## ASSEMBLIES

**16.** Two to three months prior to each assembly, the elders should begin reminding the congregation of the upcoming assembly. The week before the assembly, the Life and Ministry Meeting chairman should briefly highlight the theme of the assembly and key talks while displaying the program on the video monitors. All in the congregation should be encouraged to download the program from jw.org and to bring the appropriate copy of *The Watchtower* to the assembly. Additionally, all should be encouraged to arrive on time and to be in their seats when the musical prelude begins. The elders may decide whether to use a local needs part a month or two following the assembly to review the program by means of an audience discussion, highlighting points that relate to the ministry.

## CONVENTIONS

**17.** Two to three months prior to the convention, the elders should begin reminding the congregation of the upcoming convention. During a local needs part prior to the start of the congregation's convention invitation campaign, the *Convention Reminders* video should be played. Thereafter, local arrangements for the cam-

paign, which starts three weeks before the convention, should be outlined. The theme of the convention and key talks should be highlighted while the program is displayed on the video monitors. All in the congregation should be encouraged to download the program from jw.org and to bring the appropriate copy of *The Watchtower* to the convention. During a local needs part a month or two following the convention, the convention excerpts video, which will be available to elders on jw.org, should be played. By means of an audience discussion, highlights of the program should be reviewed, particularly those that relate to the ministry.

## *WATCHTOWER* STUDY

**18.** See Chapter 6.

## CONGREGATION BIBLE STUDY

**19.** The guidelines in Chapter 6 regarding conducting the *Watchtower* Study also apply to conducting the Congregation Bible Study. —See also *Instructions for Our Christian Life and Ministry Meeting* (S-38).

## VISUAL AIDS

**20.** At congregation meetings, speakers should not project any moving video footage on screens or monitors unless directed to do so by the organization. (As an exception, speakers at sign-language meetings may show videos of scriptures and make judicious use of other videos from our organization as a visual teaching aid for the special needs of deaf audiences.) However, speakers may display still pictures, graphics, or artwork. Speakers should not contact the branch office to request pictures, graphics, or artwork for use in their presentations. Speakers may show the text of selected scriptures on the monitors if this is done sparingly. However, it would not be appropriate to display the text of each scripture used.

## SONGS AND VIDEOS

**21.** It is recommended that video files be downloaded to *JW Library* for playback rather than being streamed from jw.org. (See *Media Playback Using JW Library* [S-144].) The body of elders should assign a brother the responsibility of downloading any videos that are to be viewed during the meeting each week.

**22.** Kingdom songs from the *"Sing Out Joyfully"—Meetings* series should be played before and after congregation meetings. Such music should not be allowed to drown out or overshadow the interchange of encouragement that comes from Christian association and theocratic conversation. When songs are played for singing, they should not be played so softly that it is difficult to sing in a heartfelt manner or so loudly that they overpower the voices of those singing.

**23.** For direction regarding songs used by groups, see Chapter 24, paragraph 21.

## BROADCASTING SYSTEMS

**24.** Congregations may use broadcasting systems to benefit isolated or homebound publishers and those who otherwise are unable to attend local congregation meetings in person. The body of elders decides what technology the congregation will use, such as a telephone tie-line or video streaming. However, they should not use a service that stores the audio or video files, that subjects users to commercial advertisements, or that allows users to post comments. If the technology will be shared by multiple congregations in the same facility, the decision will be made by the combined bodies of elders. The arrangements should be in accord with the following guidelines:

(1) Congregations should transmit meetings live rather than record them for future distribution. (See 20:26.)

> However, individual publishers may record meetings for
> personal use if there are no legal concerns and if the
> recording device used is not connected to the facility's
> audio or video system. Meetings should not be made
> available indiscriminately.

(2) Broadcasting systems should not interfere with
the quality of congregation meetings. Some systems
allow for two-way conversation, making it possible for
those connected from a remote location to offer
comments. Those connected should ensure that private
conversations or sounds of other activities are not
heard by other listeners.

(3) Broadcasting systems with video capabilities should
show only what transpires on stage, along with any
approved media. (See 20:20.) Those commenting from
the audience should have only their voices transmitted.

(4) Attendants should record as meeting attenders the
number of those tied in to the live meeting.

## JW STREAM

**25.** Congregations having very few brothers qualified to handle meeting parts may request approval from the circuit overseer to view recorded meetings or portions of meetings using JW Stream. (See *Access to Programs on JW Stream by Elders and Ministerial Servants* [S-142].) The direction in Chapter 24, paragraphs 17-18, may be applied in these instances.

**26.** If a congregation does not have arrangements to tie in individuals to congregation meetings using a broadcasting system, the elders may provide publishers with access to recordings on JW Stream. (See *Access to Programs on JW Stream by E-mail Invitation* [S-143].) This provision is for the benefit of the elderly, the infirm, and those who are otherwise unable to attend in person.

> Additionally, a publisher may not understand the language spoken in the local congregation. He could be allowed to make use of the recordings of meetings conducted in his mother tongue *while continuing to associate with the local congregation.*

**27.** Many of our brothers and sisters have circumstances that limit their ability to attend an assembly or convention. In other instances, publishers may desire to attend an assembly or convention that is held in their mother tongue but do not have the means to do so. For such ones, video recordings of the current circuit assembly and convention program in many languages are made available on JW Stream. A publisher who is invited to view a program on JW Stream should be instructed not to share the program with anyone else. Additionally, the publisher should not view the program until his congregation attends the event.—See Chapter 24, paragraph 27, for direction on the use of JW Stream in multilanguage fields.

## SIGN LANGUAGE

**28. Seating Area:** If sign-language interpretation is required for congregation meetings, all deaf attendees should be seated in an area where they will be able to see the interpreter and the main stage in the same line of sight without visual distractions. This is usually at the front of the Kingdom Hall, perhaps on one side. (*w09* 11/15 pp. 30-32) The seating area should give priority to those dependent on sign language along with their families.

**29.** Tactile interpreting may be arranged for deaf-blind attendees. Their interpreters need to be located where they can clearly see the main signer without obstruction. Deaf brothers and sisters often do well at tactile interpreting.

**30. Use of Natural Sign Language:** In many countries, sign language is used in two major ways. One form uses signs as a word-for-word transliteration of the spoken language. The other form is

generally known as *natural sign language.* It is the form most commonly used by the deaf in their daily conversations. It functions separately from the spoken language and has a different grammar. It tends to put more emphasis on the use of space, facial expressions, and the inflecting of signing motions in order to achieve various shades of meaning. Even though preference for either of these two forms of sign language will vary depending on the deaf individual, the majority of deaf people converse in *natural sign language* and, therefore, understand it best. Thus, where possible, the most proficient signers in the natural sign language should be used for interpreting.

**31.** Interpreters need to understand the interpreting process. This does not mean merely matching a sign to a word while following the word order of the spoken language. Interpreting requires comprehension of thoughts. Thus, interpreters should concentrate on what is being said from the platform and endeavor to convey such thoughts clearly, accurately, and completely while keeping up with the speaker. Usually a word-for-word translation fails to convey the speaker's thoughts faithfully. Therefore, having many years of experience is not the only qualifying factor; one must have learned the interpreting process.

**32. Interpreter Attire:** The interpreter's appearance should be exemplary, measuring up to the standards set for program participants on the main stage. No distracting jewelry, watches, or clothing should be worn, and long and brightly painted fingernails should be avoided. Solid-colored clothing that contrasts with the interpreter's skin tone should be worn. This will help eliminate distractions caused by busy patterns in the clothing. Also, clothing that clings to the body should be avoided.

**33.** A sister's use of a head covering in some circumstances is not necessary, since all in attendance should be able to appreciate that she is not actually conducting the meeting. This would be the case, for example, when she interprets comments from the audience, student assignments presented by sisters, or

demonstrations. However, if a well-qualified sister must be used to interpret talks given by brothers, prayers, or songs, she should wear a modest and appropriate head covering as a sign of submission to the theocratic arrangement in the Christian congregation.—1 Tim. 2:11, 12; *w09* 11/15 pp. 12-13.

**34.** An exception to this direction can be made for a sister doing tactile interpreting for one who is both deaf and blind. Such a sister would be seated in the audience, signing into the palm of just one individual. Since she would not be situated prominently as would an interpreter for those who are deaf only, she would not need to use a head covering in this instance.

**35. Songs:** When the program calls for a song that is not available in a particular sign language, an alternate song that shares a similar theme or sentiment should be carefully chosen. Attention should be given to the timing of the alternate song so that it does not unduly delay the program. If no songs in the appropriate sign language are available, the group should sign the scheduled song through an interpreter, preferably a brother.

**36. Audio:** The audio track of sign-language videos should be made audible at the meetings held by sign-language pregroups, groups, and congregations and at sign-language assemblies and conventions. Such a provision allows hearing members of a deaf publisher's family in attendance to benefit spiritually from the video.

## DISRUPTIVE INDIVIDUALS

**37.** It is best to ignore trivial or minor disturbances created by individuals. However, if someone persists in this course of action and is distracting others, he should be asked to leave. If the disruptive individual refuses to leave, he should be informed that if he does not leave and continues to distract others, the police will be contacted. If the individual does not cooperate, the police should be called. When the police arrive, inform them that the individual is causing a disturbance and that he is no longer wel-

come at the facility. The police may also be informed that we are willing to file charges if it seems prudent and necessary under the circumstances.

**38.** Generally, the elders should not try forcibly to remove a disruptive individual from the Kingdom Hall. If the individual is violent from the outset, the police can be called immediately; there is no need to warn the individual. In the event that a Christian is physically attacked, he has the right to defend himself from harm and the elders should do what they reasonably can to help protect him. Of course, he may be able to flee from the assailant, and that would be preferable. However, if it is not possible to flee, the Christian may try to ward off such attacks and even strike out in defense if necessary. Of course, any such defensive action would solely be to protect himself or others from the attacker until the police arrive.—*g* 6/08 p. 11; *g87* 11/22 p. 28.

## TRANSPORTATION FOR DISFELLOWSHIPPED OR DISASSOCIATED INDIVIDUALS

**39.** Disfellowshipped and disassociated ones are generally expected to make their own arrangements for transportation to and from congregation meetings. However, in some instances a disfellowshipped or disassociated individual who is making a determined effort to regain a right standing with Jehovah may be in a situation that prevents him from obtaining transportation. It may be that he has no car and that family members or others are not able to help him. Perhaps he cannot afford public transportation or it is not available in his area. It may be that the distance involved, personal safety, or severe weather make it inadvisable to walk. In cases of real need, the elders can determine whether some assistance may be provided. Such assistance would be viewed as similar to public transportation in that there should be no conversing with the disfellowshipped or disassociated person. (2 John 10, 11) The elders should monitor the situation to make sure that any arrangements made are not abused.

# Kingdom Halls

Paragraphs

**Contact Congregation** ......................................................................... 2-3

**Rented Facilities** ................................................................................. 4

**Cleaning** .............................................................................................. 5-7

  Cleaning Coordinator ....................................................................... 7

**Maintenance and Repair** .................................................................. 8-14

  Maintenance Coordinator .............................................................. 14

**Kingdom Hall Operating Committee** ............................................ 15-20

**Expenses** ............................................................................................ 21

**Upgrades and Minor Renovation** .................................................... 22

**Major Renovation and New Construction** ................................. 23-24

**Inspections** ....................................................................................... 25

**Security** .............................................................................................. 26

**Safety** .................................................................................................. 27-29

**Incidents** ............................................................................................ 30-32

**Meeting Times** .................................................................................. 33

**Information Board** ............................................................................ 34

**Phone Answering System** ................................................................ 35

**Internet Service** ................................................................................. 36

**Video Equipment** .............................................................................. 37-38

**Library** ................................................................................................. 39-40

**JW Broadcasting Monthly Programs** ............................................ 41

**Use of Congregation Property** ........................................................ 42

**Kingdom Hall Dedications** ............................................................. 43

**1.** The branch office is responsible for approving and overseeing the construction of new Kingdom Halls and for ensuring that existing Kingdom Halls are being maintained properly and fully utilized. Direction regarding these matters is provided to congregations through the Local Design/Construction Department (LDC). Representatives of the LDC may be used to inspect and gather information on existing and potential meeting places. The local elders set a fine example for all in the congregation when they take the lead in coordinating and being personally involved in the cleaning, maintenance, and security of the Kingdom Hall.

## CONTACT CONGREGATION

**2.** A Kingdom Hall is dedicated to the worship of Jehovah. As many as three or four congregations may be assigned by the branch office to use the same Kingdom Hall auditorium in order to make full use of the facility and to keep expenses to a minimum.

**3.** The branch office will generally correspond with only one of the congregations using the facility regarding legal, property, and related matters. Usually, this contact congregation holds the documents related to the Kingdom Hall and the property on which it is located. This is for practical reasons only and does not provide a basis for the contact congregation to make unilateral decisions related to the use and upkeep of the Kingdom Hall. Regardless of who holds title, no congregation should conclude that it "owns" the Kingdom Hall. It is the responsibility of *all* the congregations using the property to care for it and see that it is used in harmony with Kingdom interests.

## RENTED FACILITIES

**4.** If a congregation needs to rent a facility for long-term use as a Kingdom Hall, the elders should contact the Local Design/

Construction Department. If a congregation needs to rent a facility for one-time use, such as for the Memorial, the elders should follow the instructions provided in *Renting Facilities for Theocratic Events* (TO-19).

# CLEANING

**5.** The Kingdom Hall should be cleaned according to a regular schedule, depending on its use and needs. This usually involves a light cleaning after each meeting, a more thorough cleaning each week, and a major cleaning at least once a year. This should be carried out by volunteers from within the congregations meeting in the Kingdom Hall. All may have a share, including children who are properly supervised.

**6.** A schedule for Kingdom Hall cleaning should be posted on the information board. Some congregations choose to rotate the weekly cleaning arrangements according to field service groups. The thorough and major cleanings should include both the interior and exterior of the buildings, as well as any storage, parking, and landscaped areas. If snow removal or other seasonal maintenance or cleaning is required, this should be well-coordinated. Care should be taken to ensure the safety of all involved in this work.—See 21:27-29.

**7. Cleaning Coordinator:** Each body of elders should assign an elder or ministerial servant to serve as the cleaning coordinator for the congregation. He is not responsible for performing all of the cleaning work himself, nor does he have the authority to make decisions that should be made by the body of elders. He should prepare cleaning schedules and ensure that adequate cleaning supplies and simple written instructions are kept on hand. He should ensure that appropriate safety equipment is on hand and is being used and that publishers have been trained to clean safely. He should monitor the cleanliness of the Kingdom Hall and provide kind reminders as needed.

# MAINTENANCE AND REPAIR

**8.** A preventive maintenance program can lengthen the life of the Kingdom Hall and equipment. Regular maintenance also shows respect for the sanctity of life, since a lack of maintenance can result in unsafe conditions that put those who use the Kingdom Hall at risk. (See 21:27-29.) A meeting place that is well-maintained reflects favorably on Jehovah God. Therefore, each congregation should take seriously the responsibility to care for preventive maintenance and repairs.

**9.** It is expected that the majority of the maintenance and repair work will be done by local volunteers in the congregations using the Kingdom Hall and that the costs for such work will be covered by the congregations. If local volunteers are not available to coordinate or safely carry out the work, the elders should seek the direction of the Local Design/Construction Department (LDC) before any work is started. Any work that will cost more than the average Kingdom Hall operating expenses for three months requires the approval of the LDC.—See Appendix A.

**10.** When it is necessary to hire a contractor to perform a service and the cost is such that the approval of the LDC is not needed, the elders should obtain written estimates and signed written agreements. The details of the estimates or bids should not be shared with others wishing to perform the work. The elders should verify that the contractor has the skill necessary to complete the work and that he has the insurance and other legal protection needed. This should be done whether or not the contractor is a Witness. The congregation should consider requesting a copy of the contractor's certificate of insurance to verify this coverage before the work commences and, if possible, should request that the legal entity holding title to the Kingdom Hall be named as an additional insured on the contractor's insurance policy. If questions arise regarding the contract wording or specific local requirements, the Branch Risk Management Desk in the Accounting Department should be contacted for assistance. In most cases,

it is advisable for a dependable local brother to be on hand to monitor the work of contractors.

**11.** The body of elders should be enthusiastic about and supportive of the maintenance training and the preventive maintenance program provided by the LDC so that all in the congregation are encouraged to take an interest in caring for the Kingdom Hall.

**12.** Immediate action should be taken if moisture-related problems are found. Left unchecked, moisture from water leaks, condensation, infiltration, or flooding can cause extensive damage. All leaks (affecting pipes, roofs, and so forth) must be repaired immediately by someone qualified in this field. If the affected area is not cleaned and dried within 48 hours, further problems may result. In high humidity areas, the HVAC system may have to be set to run for a period each day, even when the hall is unoccupied. This will aid in drying the air and preventing dampness and mold. If a serious moisture problem exists and it is beyond the ability of the elders to repair properly, the LDC should be contacted immediately for assistance.

**13.** If a congregation needs to rent a facility (or parking lot) for a one-time use, the elders should determine the level of repairs necessary to have a safe and suitable place to meet. (See Chapter 21, paragraph 4, for direction on rental of facilities for long-term use.) It is best to have the owner of the property care for such work. However, where this is not a viable option, the elders should seek an equitable arrangement with the owner. The terms of that arrangement should be put in writing prior to the work commencing. Any wording in a contract that indicates that the congregation or the organization is responsible for all liability should be avoided. If there are concerns with the wording in these agreements, the Branch Risk Management Desk should be contacted for assistance.

**14. Maintenance Coordinator:** If the Kingdom Hall is used by only one congregation, the body of elders should assign an elder or

ministerial servant to serve as the maintenance coordinator. (Depending on the circumstances, this may be the same brother who serves as the cleaning coordinator.) He should ensure that the preventive maintenance program provided by the LDC is being followed. This involves verifying that maintenance tasks are being completed on schedule and according to the guidelines provided. In addition to coordinating maintenance activities, he is also responsible to coordinate any necessary repair work. He is not responsible for performing all of the work himself, nor does he have the authority to make decisions that should be made by the body of elders. It is imperative that the brother selected be well-organized and diligent yet submissive to the body of elders. He should also be good at delegating work and training others. The body of elders should allow the brother to show initiative in caring for regular maintenance and repairs. He should ensure that an adequate amount of tools are available and should keep a record of completed maintenance tasks. He should also ensure that adequate safety equipment is on hand and that publishers have been trained to perform tasks safely.—See 21:27-29.

## KINGDOM HALL OPERATING COMMITTEE

**15.** If the Kingdom Hall auditorium is used by more than one congregation or if there are multiple auditoriums on the same property, a Kingdom Hall Operating Committee should be appointed for organizing the cleaning and maintenance of all facilities on the property. These would include all auditoriums, storage buildings, and residences. Additionally, this may include caring for a residence of a special full-time servant located in the same neighborhood. (See *Instructions for Circuit Accounting* [S-331] for direction regarding circuit apartments.) Each body of elders should select one or two elders or qualified ministerial servants to serve on the operating committee. However, the operating committee should consist of no more than five brothers. If there are more than five congregations using the property, then the combined

bodies of elders should select the five brothers who will serve on the operating committee.

**16.** The combined bodies of elders should select the operating committee member who will serve as the operating committee coordinator. He should be an experienced elder who has good organizational ability and the availability for this assignment. He should humbly work in harmony with the other members of the committee and seek direction from the bodies of elders when needed. It is likely that he will often be able to communicate with the other members of the operating committee without organizing meetings. However, the operating committee coordinator should (1) set up periodic meetings for the committee as deemed necessary to carry out their assignment, (2) make sure there is appropriate follow-through on decisions made, and (3) maintain good communication with the bodies of elders. If the bodies of elders agree that a joint meeting of all the bodies of elders is needed to resolve a matter, one of the coordinators of the bodies of elders would normally serve as the chairman of the meeting.

**17.** The operating committee should ensure that adequate safety equipment is on hand and that publishers have been trained to perform tasks safely. During cleaning or maintenance projects shared in by more than one congregation, the operating committee should assign one of their number to serve as the safety coordinator for the project.—See 21:27-29.

**18.** The operating committee should care for regular maintenance and repairs of the Kingdom Hall. They should be willing to show appropriate initiative but should not run ahead of the direction provided by the bodies of elders or the branch office.

**19.** It is not the responsibility of the operating committee to determine when meetings are to be held, whether the building is to be used for weddings or funerals, and so forth.—See 21:33; 27:6.2.

**20.** The bodies of elders of the congregations sharing the Kingdom Hall should record the decisions that have been made regarding

Kingdom Hall matters. Among other things, the agreement should include a description of how the building will be cared for and used, when meetings will be held, any schedule for rotating meeting times, what the financial responsibility of each congregation will be in caring for the operating expenses, the amount of funds to be kept on hand in the operating account, and what the spending limits will be in connection with out-of-the-ordinary expenses. (See *Instructions for Kingdom Hall Operating Committee Accounting* [S-42].) A copy of the agreement signed by the Congregation Service Committees should be retained in each congregation's file. The written agreement should be updated as needed in order to reflect the current decisions of the bodies of elders.

## EXPENSES

**21.** See *Instructions for Congregation Accounting* (S-27) and *Instructions for Kingdom Hall Operating Committee Accounting* (S-42).

## UPGRADES AND MINOR RENOVATION

**22.** Minor renovation projects are typically scheduled by the Local Design/Construction Department (LDC), based on the facility evaluation that is performed every two years. Congregations should not install new elements or upgrade existing elements (whether these items are purchased or donated) or perform minor renovations (work that is beyond routine maintenance and repair) without approval from the LDC. The elders should explain to the LDC the need for the new element, upgrade, or minor renovation and then wait for approval and direction on how to proceed. If a project request is approved, it will then be determined whether the congregation has the means to cover the expense or if funding will be provided by the branch office. Any use of congregation funds to cover such expenses must be approved

by a resolution, even if approval from the LDC has been obtained for the project. The LDC will decide who will coordinate the project based on the scope of the work.—See Appendix A; for direction regarding the funding of the installation of a video system, see Chapter 21, paragraph 37.

## MAJOR RENOVATION AND NEW CONSTRUCTION

**23.** The branch office prepares and maintains a master plan that indicates where Kingdom Halls are needed. This includes new Kingdom Halls needed based on congregation density and growth, existing Kingdom Halls needing major renovations, and Kingdom Halls needing to be replaced. The master plan may show that existing Kingdom Halls can be better utilized by merging congregations or assigning additional congregations to use a Kingdom Hall. The benefits of merging or consolidation may include improved meeting attendance, higher quality meetings, better distribution of experienced brothers, and a reduction in the number of Kingdom Halls needing to be constructed.

**24.** New construction and major renovation projects are prioritized and scheduled by the Local Design/Construction Department (LDC). Inquiries regarding when a Kingdom Hall is scheduled for a major renovation or about a construction project should be referred to the LDC. No congregation should purchase property, accept property as a donation, or undertake major or minor renovation work on an existing Kingdom Hall without the full involvement of the LDC. Design standards and specifications are provided by the branch office, and construction work is overseen by Construction Groups appointed by the branch office. Funding will be provided through the branch office, although the involved congregations will be directed to set up a contribution box for the project. The branch office will handle the sale of Kingdom Hall property whenever this is deemed necessary.

## INSPECTIONS

**25.** The Local Design/Construction Department will arrange for an inspection and evaluation of each Kingdom Hall every two years. While it is not necessary for each elder to be present during the inspection, it is important that the Kingdom Hall Operating Committee or the maintenance coordinator be present. If participation of publishers is needed at the time of the inspection, the elders will be informed of this when the inspection is scheduled. The inspection will help to ensure that the preventive maintenance program is being followed. Each inspection will include a review of any Kingdom Hall ownership and property documents and any regulatory permits related to building systems to ensure that these are in order and to arrange for further assistance if needed. After the inspection, a report will be given to each body of elders. It is expected that the elders will follow through on the recommendations in the report and will promptly address any safety or maintenance issues found.

## SECURITY

**26.** All doors and windows should be secured before leaving the building. Depending on the circumstances, it may be advisable to store expensive equipment in locked cabinets or in the homes of local brothers. Some Kingdom Halls in higher-risk areas may install electronic security systems. If installed, these systems should be kept in good working order. Prior to installing a system, the body of elders should contact the Local Design/Construction Department to determine if it is warranted for their Kingdom Hall.—See 21:22.

## SAFETY

**27.** Each elder should be alert to any hazardous conditions that may exist in the Kingdom Hall or on its grounds and promptly ensure

that they are addressed. Walkways, parking lots, lighting around stairs and areas having changes of level or uneven surfaces, and the condition of mats or carpets at building entrances should receive particular attention. Fire hazards, such as overloaded electrical outlets or the accumulation of combustible material should not be allowed. Storage of hazardous materials on the property should be avoided when possible. Any necessary chemicals used for cleaning or maintenance should be clearly labeled and stored in a secure location inaccessible to young children.

**28.** All elders should be thoroughly familiar with *Working Together Safely—Standards for Theocratic Construction and Maintenance* (DC-82). A printed or an electronic copy of *Working Together Safely* should be provided to each publisher in the congregation who volunteers to assist with a maintenance or construction project or with other tasks that involve a measure of risk, such as working with power tools, using ladders, accessing roofs, or performing electrical work.

**29.** A key aspect of working safely is identifying potential dangers and planning how to avoid them. Those overseeing Kingdom Hall projects are to review each activity planned, determine the potential hazards related to each task, and identify the appropriate safety measures that can be implemented. Ensure that qualified individuals with the health and skill needed to complete the work safely are chosen. The *Congregation Job Hazard Analysis* (DC-85) and *Congregation Job Hazard Analysis Instructions* (DC-85i) forms should be used. These forms are not intended to be used in connection with minor maintenance work and regular cleaning.

## INCIDENTS

**30.** An *Incident Report* (TO-5) should be completed for any incident that occurred at a Kingdom Hall or at a facility rented for a theocratic event if it involved or nearly involved (1) property damage that may result in a request for financial assistance, (2) illness

requiring hospitalization, or (3) personal injury requiring medical treatment beyond minor first aid. *Incident Report Instructions* (TO-5i) should be consulted for every incident or near miss. The completed report should be submitted to the Branch Risk Management Desk in the Accounting Department within 72 hours of the incident. If the incident is catastrophic or there is a threat of legal action, immediately call the Legal Department for assistance.

**31.** When property damage occurs, quick action can go far in preventing further damage. Break-ins, thefts, arson, or other incidents of vandalism should be promptly reported to the local authorities. The Local Design/Construction Department (LDC) may be contacted for direction. For damage that can be easily repaired without assistance from the LDC, please send copies of the written estimate of repair costs (or repair bills, if it was an emergency) along with the *Incident Report* to the Branch Risk Management Desk.

**32.** The Global Assistance Arrangement cares for property damage to Kingdom Halls, such as losses resulting from natural disasters, fire, moisture damage, and vandalism, as well as for expenses related to incidents involving personal injury at Kingdom Halls.

## MEETING TIMES

**33.** Unless there are extreme extenuating circumstances, the Life and Ministry Meeting is to be held during the week and should not be combined with the public talk and *Watchtower* Study, which are to be held on the weekend. If the weekend meeting is overcrowded and there is room in the Kingdom Hall to accommodate another meeting time, consider having two weekend meetings. The publishers can be assigned to attend these meetings by field service groups. Whenever practical, the same speaker can give both public talks and qualified elders can share in conducting the *Watchtower* Studies. When only one congregation meets in a Kingdom Hall, the elders should consider what meeting times

will be most convenient for the majority and should present their recommendations to the congregation for discussion, possible adjustment, and final decision (by majority vote of the baptized publishers). When more than one congregation meets in the hall, the combined bodies of elders should discuss meeting-time preferences before submitting their recommendations to their respective congregations. (1 Cor. 10:24) Some congregations find that rotating the times and/or the days of the meetings each year is desirable. When a rotation is made, it should take place during the first week of January. The Service Department should be notified of changes to congregation meeting times using jw.org or, if that is not possible, by submitting the *Kingdom Hall Information* (S-5) form. Good communication and cooperation contribute to mutual understanding and contentment, preventing the feeling that one congregation has certain advantages all the time. Good cooperation is also needed in connection with adjusting meeting schedules during a circuit overseer's visit to a congregation. A sign with up-to-date meeting times should be displayed in accordance with local codes.

## INFORMATION BOARD

**34.** The coordinator of the body of elders is responsible for approving all items posted on the information board. The information board should be used exclusively to provide information about congregation activities and should be kept neat. No wedding announcements or announcements about social gatherings should be placed on the information board. When more than one congregation shares the auditorium, each congregation should have its own information board or portion thereof.

## PHONE ANSWERING SYSTEM

**35.** An answering machine or voice messaging system should be utilized, if feasible. A recorded announcement, approved by the

Congregation Service Committees using the Kingdom Hall, should provide the Kingdom Hall address, brief directions to the Kingdom Hall (if necessary), and meeting times. During the Memorial season, the day, time, and location of the Memorial observance(s) should also be given. Callers should be directed to jw.org for additional information. The announcement should be provided in the languages of all congregations and groups using the Kingdom Hall.

## INTERNET SERVICE

**36.** If the bodies of elders using the Kingdom Hall determine that having an Internet connection at the Kingdom Hall would benefit the congregations and that the congregations can afford it, the elders should present the publishers with a resolution to obtain such service. Please note the following direction in this regard:

(1) Access to the Internet should be password-protected.

(2) Only publishers in good standing should be permitted access.

(3) The password should not be announced publicly. Instead, it should be given to the approved publishers individually.

(4) If a publisher were to use the Kingdom Hall connection to access inappropriate websites, his connectivity privilege would be revoked.

(5) It is wise to change the password periodically.

(6) If the Kingdom Hall is equipped with a computer that is connected to the Internet, appropriate Internet security practices should be implemented, such as those listed on page 28 of the August 2009 *Awake!* Additionally, Internet browsers provide various built-in

security features, such as automatic pop-up blocking, privacy settings, flexibility in specifying websites that should be blocked, and website certificate validation. Also, most Internet service providers offer some advanced protection that may, for example, block fraudulent websites, prevent phishing attacks, and put in place parental controls. Although there is usually an additional monthly charge for these advanced security features, their benefits generally outweigh such costs.

## VIDEO EQUIPMENT

**37.** With the exception of new construction, major renovations, or sign-language congregations, the installation of video equipment in Kingdom Halls is the financial responsibility of the publishers who attend meetings at that hall. If the bodies of elders recommend the installation of video equipment and determine that the congregations can afford the equipment, they should first contact the Local Design Construction Department for approval and direction.

**38.** Please keep the following guidelines in mind if a video system is installed:

- (1) The system should be configured so that minimal time will be lost when starting a video. For example, it is preferred, but not mandatory, that the primary video display(s) be positioned on one or both sides of the stage, not in the center. Regardless of the configuration, the speaker should be able to remain at the lectern while the video is played.

- (2) The digital yeartext should be displayed before the opening song, after the concluding prayer, and during the meeting when nothing else is being shown on the screens. This may eliminate the need to purchase

signage to display the yeartext. For Kingdom Halls that have a video display in the center of the stage, it may be more practical to continue to display the yeartext with a physical sign. No additional artwork should be combined with the yeartext, not even artwork from our publications.

(3) If the Kingdom Hall has Internet service, it is preferred, but not mandatory, that a wired connection to the provider be used and that the computer or media playback device in the Kingdom Hall be connected with a wired connection.—See 20:21.

(4) Video playback equipment should be installed near the sound equipment. The brother running the system should start the video when directed to do so by the brother on the stage. Generally, the video equipment should not be operated from the stage.

## LIBRARY

**39.** Each Kingdom Hall auditorium should have space for a library. (*od* chap. 7 par. 19) The library should contain publications for each language group using the auditorium. The bodies of elders should determine whether the library will provide publications in printed form, electronic form, or both. Since some publishers and interested persons do not use computers or electronic devices, the elders should give careful consideration to the needs of such individuals when making decisions as to the Kingdom Hall library, especially before deciding to eliminate printed publications. If the publications will be provided in electronic form, such as on a device or on a computer, a printer should be made available. At least one responsible brother should be assigned to keep the library up-to-date and in good order.

**40.** In the event that the bodies of elders decide to eliminate printed publications from the library, care should be taken not to discard

items that have historical significance. The branch office may wish to add such items to its library or to its archive of historical materials.

## JW BROADCASTING MONTHLY PROGRAMS

**41.** To assist publishers who do not have access to the Internet, the bodies of elders in Kingdom Halls already having video equipment could set a time each month for the monthly broadcast to be shown at the Kingdom Hall. If more than one congregation is using the Kingdom Hall, it might be practical to have individuals in those congregations view the program together at a time when the Kingdom Hall is not normally in use. Because such showings are not considered to be congregation meetings, there is no need for opening or closing prayers. Disfellowshipped or disassociated individuals may attend such programs if held at the Kingdom Hall. Those attending should dress as they would for congregation meetings.

## USE OF CONGREGATION PROPERTY

**42.** In lands where it is permissible for congregations to own property, only property necessary for congregation meetings should be purchased. Exceptions may be made for modest dwellings for circuit overseers, special pioneers, or others in special full-time service at the discretion of the branch office. (See *Instructions for Circuit Accounting* [S-331] for direction on circuit apartments.) If questions arise in connection with congregation property, such as regarding housing, use of land by other parties, and gifts of property, the elders should contact the Local Design/Construction Department for direction.

## KINGDOM HALL DEDICATIONS

**43.** See *Kingdom Hall Dedication Guidelines* (S-78).

KINGDOM HALLS

# Correspondence and Records

**Paragraphs**

**JW.ORG E-mail** ......................................................................................... 1-4

**Letters of Introduction** ................................................................... 5-8

**Disfellowshipped or Disassociated Individuals Who Move** ................................................................ 9

**Congregation File** .................................................................... 10-27

Confidentiality and Security ...................................................... 10

Categories ............................................................................................ 11

Field Service Records ............................................................... 12-17

Meeting Attendance Records ................................................... 18

Appointment and Deletion of Elders and Ministerial Servants ............................................. 19

*Report on Circuit Overseer's Visit With Congregation* (S-303) .......................................................... 20

Judicial Files and Other Confidential Reports ........................................................... 21-27

**Use of Online Storage Services** ........................................... 28

**Applications** ............................................................................... 29-31

## JW.ORG E-MAIL

**1.** It is recommended that elders check their jw.org e-mail inbox at least once each week. Confidential information should not be sent using outside e-mail providers. Use of jw.org e-mail is governed by the "Terms of Use" policy available on jw.org.

**2.** When the elders in one congregation need to write to the body of elders of another congregation, it is usually best that they send the correspondence to the congregation's jw.org e-mail address rather than to the address of a specific elder. When correspondence is received, the coordinator of the body of elders and secretary should work together to ensure appropriate follow-through. They should also ensure that all elders have access to correspondence directed to the body of elders.

**3.** When electronic communication is possible, correspondence and forms should be sent to the branch office using jw.org rather than postal mail. Correspondence to the branch office on behalf of the body of elders is usually sent by the secretary. Confidential reports, such as the *Notification of Disfellowshipping or Disassociation* (S-77) form, would usually be sent to the branch office by one of the elders handling the matter.

**4.** Unless instructed otherwise, there is no need to sign correspondence or forms sent using jw.org e-mail. However, the names of the brothers who read and approved the correspondence should appear. Correspondence sent to the branch office as an attachment should be in a commonly used format, such as Microsoft *Word* or PDF. For a routine matter, such as an inquiry on the status of a literature request, the message may be typed directly into the body of the e-mail rather than attaching a separate document.

## LETTERS OF INTRODUCTION

**5.** When a publisher (active or inactive) moves to another congregation, a letter of introduction and the *Congregation's Publisher Records* (S-21) should promptly be sent to the new congregation. The Congregation Service Committee may take the initiative and send these items without waiting for a formal request from the new congregation. If a person who has been accused of child sexual abuse (established or not) moves to another congrega-

tion, see Chapter 14, paragraph 26. If a publisher regularly moves away to live at a second residence, follow the applicable direction in Chapter 8, paragraph 14.

**6.** A letter of introduction should contain the following information:

- (1) The date of the letter.

- (2) The sending congregation's full name.

- (3) The sending congregation's postal address or jw.org e-mail address.

- (4) The receiving congregation's full name.

- (5) The receiving congregation's postal address or jw.org e-mail address.

- (6) The names of the three elders (usually the service committee) who approved the letter.

- (7) The publisher's full name, the names of any immediate family members, and any privileges the publisher or his family members moving with him have enjoyed (such as presenting student assignments on the midweek meeting or serving as an elder or ministerial servant, an auxiliary or regular pioneer, a local design/construction volunteer, or a remote Bethel volunteer or Bethel consultant), and whether the elders recommend that they retain such privileges.—See 8:12.

**7.** Additionally, elders should ask themselves: 'What information would we want to receive if this person moved into our congregation?' (Matt. 7:12) If a person is under judicial restrictions, the elders in the new congregation should be informed of these. If a person was reproved or reinstated in the distant past but is not presently under restrictions, there may be no need to mention past judicial action unless the offense involved entering into an adulterous marriage or some other notorious wrongdoing.—See 12:10-11.

**8.** The publisher's new congregation should retain the letter for no longer than five years unless there is a need to keep it longer. For example, if an individual entered into an adulterous marriage, the letter should be retained for as long as the innocent former mate is alive, is unmarried, and has not been guilty of sexual immorality (*por·nei′a*).—See 12:10-11.

## DISFELLOWSHIPPED OR DISASSOCIATED INDIVIDUALS WHO MOVE

**9.** If the elders learn that a disfellowshipped or disassociated person has moved, they should not send the *Congregation's Publisher Records* (S-21) or the confidential file to the congregation in whose territory he lives or where he attends meetings. The congregation that took the disfellowshipping action or acknowledged the disassociation should retain the records. However, a brief letter should be sent to the body of elders in whose territory he lives to inform them that a disfellowshipped or disassociated person lives in their territory. If possible, they should provide his address. Generally, there would be no need for the letter to include specific information on the details of the case. However, if there is reason for the elders in the new congregation to be especially on guard, this can be explained in the letter.—See Chapter 14, paragraph 26, for direction on when an individual accused of child sexual abuse moves; see Chapter 19, paragraphs 13-16, for direction on communication between committees when an individual requests reinstatement.

## CONGREGATION FILE

**10. Confidentiality and Security:** The congregation file should be kept locked in a place that is safe and secure, preferably at the Kingdom Hall. Any ministerial servants substituting as members of the Congregation Service Committee should not have access

to confidential records, such as correspondence regarding the appointment and deletion of elders and ministerial servants and judicial records. (See 2:2.) Each elder desiring to have a key to the file should be provided one. However, if the Kingdom Hall is particularly vulnerable, then such records may be kept in a locked cabinet in the home of an elder to prevent unauthorized entry. The service committee should plan how to protect and preserve congregation records and confidential files in the event of a disaster.—See 26:4.

**11. Categories:** For items that need to be retained in the congregation file, the following categories should be used. (Additional categories may be used as needed.)

- Accounts
- Applications
- Circuit Overseer's Report on Visit
- Confidential Records (sealed envelopes)
- Elders and Ministerial Servants
- Kingdom Hall
- Letters of Introduction
- Territory

**12. Field Service Records:** The *Congregation's Publisher Records* (S-21) belong to the local congregation. Each branch office provides direction to bodies of elders on whether to retain the records electronically or in printed form. If the records are retained electronically, the body of elders decides whether to use the form provided by the branch office or some other method that displays the same information in the same format. The congregation's field service records should contain at least 13 months of activity but no more than 36 months. (*od* chap. 8 par. 30) The

file is divided into two sections—"Active" and "Inactive." The section for active publishers should be arranged alphabetically, with the records subdivided into sections for (1) regular and special pioneers and field missionaries and (2) all other publishers. The section for all other publishers should be arranged by field service group. Additionally, three separate *Congregation's Publisher Records* should be filled out to reflect the combined monthly totals for (1) all regular and special pioneers and field missionaries, (2) all auxiliary pioneers, and (3) all other publishers.

**13.** The congregation's report should be submitted to the branch office no later than the 20th day of the month. If a publisher turns in his report late, it should be added to the congregation's report for the following month and the "Number Reporting" figure should be adjusted accordingly. Individual reports should be posted on the *Congregation's Publisher Records* for the month shown on the report slip, regardless of when the report is received or when it is included in the congregation's report submitted to the branch office. A publisher is not considered irregular because of a late report.

**14.** If the Congregation Service Committee has granted a publisher with very limiting circumstances permission to report field service in 15-minute increments, the secretary should keep track of these fractions of hours and carry them over to the following month if they total less than an hour. (*od* chap. 8 par. 29) Whenever the sum of these fractions adds up to a full hour, the secretary should include that hour with the congregation's report. Publishers who have questions about what to report should be encouraged to review chapter 8, paragraphs 23-29, of the *Organized* book.

**15.** Regular pioneer reports are handled in the same way as other publisher reports. Hour credits for pioneers should be written in the "Comments" section of their *Field Service Report* (S-4) slips and should not be included with the congregation's report submitted to the branch office. (See Chapter 9, paragraphs 11-13,

for direction on hour credits for pioneers.) Since special pioneers, field missionaries, and other special full-time servants in the field report their field service activity to the branch office directly, their reports are not included with the congregation's report. However, their activity should be posted on the *Congregation's Publisher Record.*

**16.** *Field Service Report* slips should be destroyed after being tabulated and posted on the *Congregation's Publisher Records*. A record of the last 12 months of field service activity of an inactive publisher should be retained. A record of the last 12 months of field service activity of a disfellowshipped or disassociated person should be retained in the sealed envelope.

**17.** While the *Congregation's Publisher Records* may be kept by the secretary, they are to be made available to the other elders as needed.—See 7:2.6.

**18. Meeting Attendance Records:** The body of elders decides whether to retain *Congregation Meeting Attendance Records* (S-88) electronically or in printed form. If the records are retained electronically, the body of elders decides whether to use the form provided by the branch office or some other method that displays the same information in the same format. After the information contained in the *Report of Meeting Attendance* (S-3) slip has been transferred to the *Congregation Meeting Attendance Record*, the slip should be destroyed. The congregation's meeting attendance records should contain at least 13 months of attendance but no more than 36 months.

**19. Appointment and Deletion of Elders and Ministerial Servants:** Records related to the appointment and deletion of elders and ministerial servants should be retained indefinitely. This would include past S-2 forms and S-52 acknowledgment letters from the branch office and letters of appointment and deletion from circuit overseers. In connection with any deletion, a brief explanation of the reason for the brother's deletion should also be kept.

Such background material will be helpful in supplying the circuit overseer with complete details in the event a brother is recommended for reappointment in the future.

20. ***Report on Circuit Overseer's Visit With Congregation* (S-303):** Only the most recent report is retained.

21. **Judicial Files and Other Confidential Reports:** After a judicial committee, an appeal committee, a committee handling a request for disassociation, a reinstatement committee, or one or two elders handling a matter of wrongdoing have met with an individual, a brief summary of the proceedings is prepared and signed by the elders involved. The summary should be prepared regardless of the outcome of the meeting, for example, if the case was dismissed because of lack of evidence. (See 12:41-42.) The summary should include only pertinent facts and the final determination of the person's standing in the congregation; it should not contain personal opinions. Any personal notes should be destroyed. No judicial information should be posted on *Congregation's Publisher Records* (S-21).

22. If the matter involves a *disfellowshipping, disassociation, or reinstatement,* the elders handling the case should ensure that only the following documents are placed in a sealed envelope:

   (1)  Brief summary of the proceedings.

   (2)  *Notification of Disfellowshipping or Disassociation* (S-77) form.

   (3)  *Congregation's Publisher Records* if not reinstated.

   (4)  Any correspondence to or from the branch office regarding the wrongdoer.

   (5)  Any letters requesting reinstatement.

   (6)  Any letter of disassociation.

**23.** If the matter involves *judicial reproof or another matter involving wrongdoing handled by one or two elders,* the elders involved should ensure that the sealed envelope contains only the brief summary and any correspondence to or from the branch office regarding the wrongdoer.

**24.** The following information should be written on the front of the sealed envelope:

    (1)   Name of the individual.

    (2)   Action taken by the congregation, if any, and the date of such.

    (3)   Any judicial restrictions imposed and the date the restrictions are removed.

    (4)   Names of the elders who handled the matter.

    (5)   The words "Do Not Destroy" for matters involving accusations of child sexual abuse (established or not).

**25.** The sealed envelope should be placed in the congregation file by the secretary. If there is a need to open these files in the future, such as in connection with a plea for reinstatement, this should be done only by the elders who are assigned by the body to handle the matter.

**26.** The sealed envelopes containing records on individuals who have not been reinstated should be kept indefinitely. If the person has been reinstated a full five years or has died, usually the file should be destroyed unless the case involved an accusation of child sexual abuse or an adulterous marriage or the committee believes there is some other reason to retain it. The same retention policy applies to records involving judicial reproof and wrongdoing handled by one or two elders. If it is determined that a sealed envelope should be retained after an individual has died, the date of death should be written on the outside of the envelope. If one or more of the elders who handled a specific case are no longer

available, the Congregation Service Committee will assign other elders to determine if the file should be retained.

**27.** If a person entered into an adulterous marriage, the file should be kept for five years after the judicial action and thereafter as long as the innocent former mate is alive, unmarried, and has not been guilty of sexual immorality (*por·nei'a*).—See 12:10-12.

## USE OF ONLINE STORAGE SERVICES

**28.** There is no objection to using online storage services for non-confidential documents, such as those containing information that would be posted on the information board. However, information of a sensitive or confidential nature, including judicial matters, should never be stored online.—See 21:34.

## APPLICATIONS

**29.** The My Profile and My Applications features on jw.org are the primary means for exemplary baptized publishers to submit applications to serve as regular pioneers, to assist with theocratic construction projects and disaster relief, to serve at Bethel, or to attend the School for Kingdom Evangelizers. If a publisher wishes to submit an online application and does not already have access to the My Profile and My Applications features, he should be directed to the congregation secretary. The secretary should consult with the other members of the Congregation Service Committee to determine whether the person is considered exemplary.—See 2:4 and *Instructions for Congregation Use of JW.ORG* (S-135).

**30.** If the service committee determines that the prospective applicant is exemplary but he wishes to submit a printed application, the service committee should provide a copy of the appropriate application as well as any additional documents he needs to review before submitting the application. If he is applying to assist

with theocratic construction projects and disaster relief or for Bethel service, the service committee should arrange for him to view the appropriate videos.

**31.** When a publisher submits an application for any service privilege, the service committee should obtain comments from the appropriate group overseer and then meet promptly to consider the applicant's qualifications. The service committee should use good judgment in determining when it would be wise to confer with the other elders. (Prov. 15:22) Once the service committee has decided whether to provide a favorable recommendation or not, the body of elders should be updated on how the matter was handled. This should be done before the application is submitted. (See Chapter 9, paragraphs 1-3, for direction on processing regular pioneer applications.) If it is decided that the applicant cannot be given a favorable recommendation, two members of the service committee should meet with him and kindly explain the reasons. The two elders should also provide helpful guidance to the publisher so that he knows what he needs to do in order to qualify in the future.

CORRESPONDENCE AND RECORDS

# Field Ministry

Paragraphs

**Congregation Territory Assignment** ....................................................... 1-4

**Witnessing in Public Places** ............................................................. 5-17

Selecting Suitable Locations ....................................................... 5-6

Site Permission and Insurance Coverage ...................................... 7-8

Public Witnessing Equipment ................................................... 9-10

Determining Who May Participate ............................................ 11-12

Providing Practical Training .................................................... 13-14

Displaying Literature .............................................................. 15

Use of Electronic Devices ......................................................... 16

Special Metropolitan Public Witnessing ...................................... 17

**Universities** ................................................................................ 18

**Nursing Homes and Retirement Homes** .................................... 19

**Harbor Witnessing** ...................................................................... 20

**Prison Witnessing** ........................................................................ 21

**Witnessing Difficulties** ............................................................. 22-24

**Showing Consideration for Those Involved in Additional
Theocratic Assignments** ....................................................... 25-26

## CONGREGATION TERRITORY ASSIGNMENT

**1.** The body of elders takes a keen interest in the progress of the preaching and teaching work in the congregation's assigned territory. (Acts 10:42; *od* chap. 9) The service overseer will be helped to care for his assignment effectively if he has the support of his fellow elders.—See Chapter 5.

**2.** The branch office provides a *Congregation Territory Assignment* (S-54) to each congregation. Any requests for adjustments to territory boundaries may be submitted using the *Territory Adjustment Request* (S-6). Local circumstances should be considered when determining the size of individual territories used for house-to-house work. The boundaries of individual territories may be shown on *Territory Map Cards* (S-12). Publishers should carry out all aspects of their personal ministry in harmony with applicable data protection laws.—Rom. 13:1.

**3.** The breakdown of the congregation's territory is commonly shown on a larger map of the entire area, with boundaries and individual territory numbers clearly marked. Use of the *Territory Assignment Record* (S-13) will assist the brother caring for the territory files to identify territories that need to be covered. The congregation should endeavor to cover its entire territory assignment at least once a year.

**4.** The circuit overseer may provide helpful suggestions to assist the congregation to give a thorough witness to everyone in its assigned territory. However, if reasonable efforts have been made and it is not possible for the congregation to cover its territory and sections of it have not been worked for at least two years, the circuit overseer may recommend to the branch office that some portions of the territory be assigned to nearby congregations or listed as unassigned territory.

## WITNESSING IN PUBLIC PLACES

**5. Selecting Suitable Locations:** After consulting with the other elders, the Congregation Service Committee will make the final decision as to specific locations for public witnessing. Primary consideration should be given to areas of high pedestrian traffic that are most visible, taking local regulations into consideration. Possible locations include transportation hubs, public squares, parks, busy streets, shopping malls, university campuses, airports, and

locations of annual events. (*km* 7/13 pp. 4-6) If the elders become aware of an opportunity to set up a literature display at a large event, such as a national or international book fair, they should contact the Service Department for further direction.

**6.** Locations selected for public witnessing must be within the congregation's territory boundaries. Where the territories of different-language congregations overlap, the service overseers should communicate with one another so as to accomplish the most good while not overwhelming pedestrians or impeding access to businesses.

**7. Site Permission and Insurance Coverage:** In some public locations, permission may be needed from a manager or secular authority before setting up a literature display. The service overseer or someone else designated by the body of elders should determine what may be legally required, if anything, in the way of permissions, permits, and insurance coverage. Any application to use a mobile cart or to set up a table or kiosk to display literature must be filled out in the name of an individual publisher, not in the name of the congregation, any corporation used by the organization, or "Jehovah's Witnesses." If a small administrative fee is needed in order to acquire space in a public area, it is to be paid by the individual publisher, not the congregation. Publishers should carefully review any such applications or related documents to see what responsibility they are taking upon themselves with respect to liability. Publishers who apply to distribute literature at these areas are doing so on their own initiative as part of their personal ministry.

**8.** At times, administrators or managers have waived insurance requirements when the voluntary and non-commercial nature of our Bible educational work was explained to them. Any meeting that is held with a location's manager should be informal, such as one between neighbors in a community, and not a discussion of legal rights. If this meeting is unsuccessful or an excessive fee is required, the service committee should identify other public

areas within their congregation's territory where public witnessing could be effective.

**9. Public Witnessing Equipment:** The Congregation Service Committee will determine what equipment (including posters) will be used and where it will be stored. Only artwork approved by the branch office should be displayed. Poster artwork may be rotated periodically so that a variety of topics are featured throughout the month.

**10.** Public witnessing equipment can be requested in the same way that publications are requested. The *Public Witnessing Supplies* (S-80) form contains sample pictures and descriptions for the standard carts, stands, magnetic boards, posters, and so forth. The equipment will remain the property of the congregation. Care should be taken to request only equipment that will be put to good use by publishers who have been trained in its use and that can be financially supported by the congregation. The congregation may be informed that the cost of the public witnessing equipment will be covered by their contributions to the worldwide work.

**11. Determining Who May Participate:** The Congregation Service Committee will select qualified baptized publishers to participate in this feature of the ministry. Those selected should be ones who present themselves in a dignified way. Their appearance and dress should be professional, well-arranged, and modest. They should demonstrate discernment and a willingness to witness in different public settings, enjoy and promote good relations with others, and be willing to cooperate with the body of elders. If a parent is approved to participate in public witnessing, his well-behaved minor child (baptized or not) may accompany him. The service committee should use good judgment in deciding whether a mature baptized minor may be approved to participate in public witnessing.

**12.** If it is possible and practical, the service overseer or someone designated by the body of elders should organize a midweek and

weekend schedule for each selected location. There is an advantage to having the literature displays set up in the same location, on the same days, and at the same times. They serve as a constant feature readily recognized by those in the area.

**13. Providing Practical Training:** The service overseer or someone designated by the body of elders will provide the initial training to field service group overseers, their assistants, and publishers chosen to participate. The training should be based on *Public Witnessing Guidelines* (S-148), and a copy of that document should be provided to those participating. The group overseer and his assistant will monitor and assist publishers, and if additional training is needed, the group overseer and the service overseer will provide reminders.

**14.** Publishers should widely publicize jw.org and should be trained how to highlight its features. For example, those who hesitate to converse with us or accept literature may be more inclined to investigate our website. (*km* 12/12 pp. 5-6) Publishers should know how to help an interested person access material in his language on jw.org, including sign-language videos that would appeal to the deaf and audio recordings that would appeal to the visually impaired.

**15. Displaying Literature:** Taking into account local circumstances and interests, the service overseer will determine the quantity of literature to be displayed. Discernment is needed to ensure that literature will not be wasted or misused. (*km* 12/11 p. 2) The display should be neat and dignified. Experience has shown that a simple, appealing arrangement of literature is best. In many areas, it would be appropriate to feature just a few publications from the Teaching Toolbox that have wide appeal. During the annual campaigns for the Memorial and for the convention, the *You Are Invited* poster may be displayed and invitations distributed. Magazines and other literature in frequently-requested languages may be kept on hand. If more literature is needed than the quantity allowed for request on jw.org, the Shipping Department should

be contacted. While Bibles should not be displayed on public witnessing equipment, they may be kept on hand to offer to individuals who request one or who demonstrate sincere interest in the truth. Additionally, a modest supply of the *Return to Jehovah* brochure should be kept on hand (though not displayed) for the benefit of any inactive ones who are encountered.

**16. Use of Electronic Devices:** If practical, a flat screen monitor connected to a portable electronic device may be used at a literature table or kiosk. The monitor could be used to display approved public witnessing posters, to demonstrate features of jw.org, or to play a short video, such as *Why Study the Bible?*

**17. Special Metropolitan Public Witnessing:** If this separate initiative has been arranged in your area, additional information will be provided to the circuit overseers and congregations so that all may work together in an orderly and organized manner.—*km* 7/13 pp. 4-6.

## UNIVERSITIES

**18.** Before setting up a literature display at a university or other school in which the students are adults, it is usually best to approach the principal, headmaster, or dean of the school. Those making such visits should be forthright in identifying themselves as Jehovah's Witnesses. Schools or organizations for the deaf or the blind may especially appreciate knowing that Jehovah's Witnesses provide literature in formats that may benefit such individuals. The service overseer may train well-qualified publishers approved by the Congregation Service Committee to visit universities and other schools.

## NURSING HOMES AND RETIREMENT HOMES

**19.** Some publishers have had success in reaching elderly persons by approaching the manager or activities director of the facility and

volunteering their time to encourage residents who might enjoy Bible reading and discussion of Bible accounts. It may be explained that volunteers from the congregation would be pleased to read Bible-based material, to conduct a free weekly Bible study, or to show Bible-based videos to anyone who wishes to attend. Oftentimes, the staff, volunteers, family members of patients, and other visitors will join in the study. The service overseer may train well-qualified publishers approved by the Congregation Service Committee to make such visits.—*km* 6/14 pp. 2-4.

## HARBOR WITNESSING

**20.** Harbor witnessing is a specialized ministry that requires specific direction from the branch office. If there is a major harbor within a congregation's territory and the elders have not yet received such direction, they should inform the Service Department of the name, location, and size of the port.

## PRISON WITNESSING

**21.** See Chapter 28.

## WITNESSING DIFFICULTIES

**22.** Individuals have a right to privacy and the right to prohibit anyone, including publishers, from entering their home or property. If a householder insists that no further visits to his home be made by Jehovah's Witnesses, we respect his wishes. (Matt. 7:12; 10: 13) Only the date of the request and the address of the home should be placed in the territory record so that publishers working the territory in the future do not call at that address. The Congregation Service Committee should use good judgment in deciding whether to assign elders to contact such households every two or three years to confirm the person's wishes.

**23.** If a manager insists that no further visits be made by Jehovah's Witnesses to a subdivision or an apartment complex, publishers

should leave immediately. Thereafter, the elders should contact the Legal Department. If a government official seeks to impose some restriction on our ministry, the elders should contact the Legal Department. In such situations, publishers should always respond in a polite and respectful manner.—Rom. 12:18; 1 Pet. 3:15.

**24.** If violent opposition arises, the elders should contact the Legal Department. Elders should be guided by Bible principles and direction from the branch office. (Matt. 5:44; 10:11-23; Rom. 12:17-21) Publishers may need to carry out their ministry very discreetly. (Acts 5:29) The elders should help publishers avoid unnecessary problems.—Prov. 14:15; 17:14.

## SHOWING CONSIDERATION FOR THOSE INVOLVED IN ADDITIONAL THEOCRATIC ASSIGNMENTS

**25.** Some brothers and sisters serve as commuter Bethelites, remote volunteers, or Bethel consultants. Others assist with construction and maintenance of Kingdom Halls, Assembly Halls, and Bethel facilities. Some brothers serve on Hospital Liaison Committees, Patient Visitation Groups, Disaster Relief Committees, or Convention Committees. The field service and congregation activity of those who care for these and other approved assignments in support of the organization may be affected. Even if such ones are not regular pioneers and thus do not receive hour credit for this work, it would be helpful for them to include in the "Comments" section of their *Field Service Report* (S-4) a description of the theocratic responsibilities they cared for during that month. The secretary should make a note of this in the "Remarks" column of the *Congregation's Publisher Record* (S-21). The hours spent working on an approved assignment should not be included with the field service report submitted to the branch office. The figure recorded in the "Hours" column of the *Congregation's*

*Publisher Record* should reflect only the actual hours spent in field service.—See Chapter 9, paragraphs 11-13, regarding how to note hour credits for regular pioneers involved in other theocratic activity.

**26.** Elders can show their appreciation for those who care for extra theocratic assignments by filling in for them when they must be away and not being critical of their reduced field service activity. Consideration along these lines should also be extended when reviewing brothers' qualifications for recommendation as elders and ministerial servants.

# Multilanguage Fields

**Paragraphs**

**Forming Pregroups, Groups, and Congregations** ...................... 2-5

    Pregroups ............................................................................................ 2

    Groups .............................................................................................. 3-4

    Congregations ..................................................................................... 5

**Territory Coverage** .................................................................................. 6-10

**Host Congregation** ................................................................................ 11-12

**Meetings** .................................................................................................. 13-23

    Pregroups ........................................................................................... 13

    Groups ............................................................................................ 14-15

    Location .............................................................................................. 16

    Recordings and Audio/Video Tie-In ............................................. 17-18

    Interpretation ................................................................................... 19

    Recording Attendance .................................................................... 20

    Songs ................................................................................................ 21

    Memorial ........................................................................................... 22

    During the Visit of the Circuit Overseer .......................................... 23

**Assisting Publishers** ............................................................................ 24-26

**Circuit Assemblies and Conventions** ...................................................... 27

**Signs, Yeartext, and Invitations** ............................................................... 28

**1.** Our objective is to reach *everyone* possible with the Kingdom message and to make disciples. (1 Tim. 2:3, 4) Therefore, it is good for bodies of elders to understand and cooperate with arrangements made to support those who speak another language. —*od* chap. 9 pars. 25-44.

# FORMING PREGROUPS, GROUPS, AND CONGREGATIONS

**2. Pregroups:** A pregroup consists of a number of publishers who are preaching in a language other than the language of the congregation, even though a qualified elder or ministerial servant is not available to conduct a weekly meeting in that language. The branch office may recognize a congregation as hosting a pregroup if the following requirements are met:

   (1)   A sizable population in the area speak a language other than the language of the congregation.

   (2)   At least a few publishers know the target language or are willing to learn the language.

   (3)   The body of elders is willing to take the lead in organizing the preaching in that language.

If the body of elders desires to host a pregroup, the elders should consult with the circuit overseer. He may be aware of other congregations attempting to preach to people of that language and may provide valuable information that would help in determining which congregation would be in the best position to host the pregroup. Once that congregation has been determined, the elders should send a letter to the Service Department and request approval to be formally recognized as a congregation hosting a pregroup.

**3. Groups:** The branch office may recognize a congregation as hosting a group if the following requirements are met:

   (1)   There are sufficient interest and potential for growth in a particular language field.

   (2)   At least a small number of publishers speak the language or are learning the language.

   (3)   A qualified elder or ministerial servant is available to take the lead and conduct at least one weekly meeting

—or one portion of a weekly meeting, such as a public talk or a *Watchtower* Study—in that language.—See 24:14-15.

(4) The body of elders is willing to host the group.

When these requirements are met to a reasonable degree, the body of elders should send a letter with complete details to the Service Department requesting formal recognition as a congregation hosting a group. The elder or ministerial servant taking the lead would be considered the "group overseer" or "group servant" responsible for taking care of the group.

**4.** However, the group does not function independently. It works under the oversight of the body of elders. The elders should provide balanced direction and show initiative in caring for the group's needs, including training publishers in the group to take on additional theocratic responsibilities. If the group is ever dissolved, the elders should notify the Service Department.

**5. Congregations:** The circuit overseer helps the elders to prepare the necessary paperwork and to verify that it is correct and complete before he submits it to the Service Department. There should be sufficient population in the target language to allow the publishers to have a meaningful ministry. The publishers involved must be spiritually strong and be able to keep the congregation functioning actively. There is no specific number of elders and ministerial servants needed to form a congregation. However, the appointed brothers must be able to provide the necessary spiritual oversight and to take the lead in the preaching work. Any who are not native speakers should work diligently to become conversant in the language of the congregation.

## TERRITORY COVERAGE

**6.** The elders should be modest in deciding how much territory a pregroup or group should work. The elders should direct the

publishers and pioneers to focus on the areas where there is a high concentration of those who speak the target language. In addition, since new ones will need to be directed to the host congregation in order to progress, areas within a reasonable traveling distance to the Kingdom Hall should receive the greatest attention. Once or twice a year, the elders may arrange to work more distant areas. The elders should direct the coverage of the territory so that the publishers and pioneers use their strength and valuable resources productively.—1 Cor. 9:26.

**7.** Arrangements for covering the territory should comply with applicable data protection laws.—*od* chap. 9.

**8.** A pregroup or group may engage in the preaching work outside the territory of its host congregation. The service overseer of the host congregation would take the lead in contacting the service overseers of nearby congregations that have a large number in their territory who speak the target language. However, the elders should determine the number of congregations he will contact. (See 24:6.) Good communication between the bodies of elders and the circuit overseers involved will ensure that all language groups receive a fine witness.

**9.** When a pregroup or group is ready to begin preaching in another area, the service overseer may contact the body of elders of the congregation there to request help in locating those who speak the target language.

**10.** Congregation territory assignments in multilanguage areas are made according to language. The direction in chapter 9 of the *Organized* book should be followed when working the territory. At times there will be some overlapping of our efforts—for example, when family members of the same household speak different languages. By concentrating our ministry on people who best understand or prefer the language of the congregation we attend, we can accomplish much good.

## HOST CONGREGATION

**11.** The body of elders that hosts a pregroup or group must be willing to take an active interest in developing the target-language field. Generally, the host congregation should be in the proximity of the target-language community. Such a location enables the publishers to make the most of their field service time and makes it easier for interested persons to attend the meetings. Other factors to consider are the location of the publishers, the availability of a suitable Kingdom Hall, and access to public transportation. At times, an adjustment may need to be made as to which congregation serves as the host congregation. If so, the bodies of elders involved should send a joint letter to the Service Department explaining why the change is needed and stating that the bodies of elders are in agreement with the change.

**12.** The body of elders should be reasonable in what they expect of the publishers who are expending themselves in support of the group. For example, it would be a kindness to consider reducing the number of meeting parts that appointed brothers in the group present on the program of the host congregation. Consideration and mutual understanding will help all appointed brothers in the congregation to work together in carrying the load of responsibility.—Gal. 6:2, 5.

## MEETINGS

**13. Pregroups:** Though a pregroup does not hold weekly meetings, the body of elders of the host congregation may arrange for meetings—or a portion of a weekly meeting, such as a public talk and/or a *Watchtower* Study—to be held periodically in the language of the pregroup. This would be helpful in determining the extent of support for meetings and the potential for growth in that language field.

**14. Groups:** In addition to the weekly meeting—or one portion of a weekly meeting—held by a group, the body of elders of the host

congregation may determine whether other portions of congregation meetings should be added and how often the meetings should be held during the month. For example, a group may hold a weekly Life and Ministry Meeting but arrange a public talk once or twice a month.

**15.** A group should follow the meeting schedule as outlined in the target-language edition of the *Life and Ministry Meeting Workbook*. If the *Life and Ministry Meeting Workbook* is not produced in the target language, the elders may request a Congregation Bible Study schedule from the Service Department. The only portion of the Life and Ministry Meeting that a group should not handle on its own is the local needs part when it has been specifically chosen by the body of elders for the host congregation.

**16. Location:** It is preferred that the meetings of pregroups and groups be held in an auxiliary room while the host congregation is conducting its meeting. In this way, those in the pregroup or group will benefit from association with the host congregation. However, if there is an exceptional circumstance and the elders feel that such is not possible, the meeting of the pregroup or group may be held at another time, preferably at the Kingdom Hall. In such cases, all the bodies of elders using the Kingdom Hall must give their approval. (See 21:33.) If the meeting of the pregroup or group must be held at another time, publishers in the pregroup or group are expected to attend the host congregation's regularly scheduled meetings.

**17. Recordings and Audio/Video Tie-In:** It is preferable for congregation meetings to be conducted locally. However, if this is not yet possible, a pregroup, group, or small or isolated congregation may request approval from their circuit overseer to view recorded meetings or portions of meetings in the target language using JW Stream. (In most cases, the meetings available on JW Stream will be recorded on Monday evening and Saturday morning. Thus, pregroups, groups, and small or isolated congregations

desiring to make use of such recordings should hold their meetings at times that will allow them to view the current week's recordings.) The circuit overseer will approve which pregroups, groups, or small or isolated congregations in his circuit will view such recordings and to what extent. (See 24:13-15.) Some congregations may request approval to use the provision occasionally for the public talk. If a small or isolated congregation is approved to view recorded meetings periodically, it should strive to conduct all of its own meetings as soon as possible. Although recordings may be used for the meetings, prayers should be said locally.

**18.** If recordings of congregation meetings are not available on JW Stream, a pregroup, group, or small or isolated congregation may request approval from the circuit overseer to tie in to the meetings or portions of meetings of a congregation holding meetings in the target language. (See 24:13-15.) The circuit overseer will approve which pregroups, groups, or small or isolated congregations in his circuit will make use of this provision and to what extent. With the exception of sign-language congregations or groups, congregations transmitting video should transmit only what transpires on the stage. Footage of the audience or any other areas of the venue should not be transmitted. It is important for the body of elders of a host congregation to maintain good communication with those in the pregroup or group and with the body of elders of the congregation transmitting the meetings in the target language.

**19. Interpretation:** Generally, simultaneous interpretation at the congregation level for languages other than sign language is not recommended. (For direction on sign-language interpretation see Chapter 20, paragraphs 28-35.) Some who are not fluent in the language of the congregation find it helpful to prepare well for the meetings in their mother tongue to the extent possible before listening to the meetings. Others may appreciate help in locating certain Bible texts. Publishers who know the target language

may also share the highlights of the meetings at another appropriate time. However, if the body of elders feels there is merit in having some of the program interpreted simultaneously, good judgment is essential. If the number of qualified interpreters is limited, it may not be possible to interpret each part. The parts to be interpreted and who will interpret them should be assigned well in advance. An auxiliary room should be used so as not to distract others. Interpreters should be exemplary baptized publishers.

**20. Recording Attendance:** The attendance of the meetings of a pregroup or group is included with that of the host congregation in the *Congregation Meeting Attendance Record* (S-88). The only exception to this is if the meetings of the pregroup or group are held at a time *different* from the host congregation's meetings. In such cases, the attendance would not be included with the host congregation's, since it is expected that the pregroup or group would have also attended the host congregation's meeting. Neither would the attendance of a pregroup or group that tied in to another congregation's meeting be included with the transmitting congregation's attendance. In any case, a separate record of the attendance of a pregroup or group may be kept so that the elders can review its progress.

**21. Songs:** In rare instances when the song being sung in the main auditorium is not available in the language of the pregroup or group, it may be possible to turn off the sound from the main auditorium and an alternate song may be selected and sung in the auxiliary room, provided it does not cause disturbance for those singing in the main auditorium.

**22. Memorial:** If a qualified speaker is available, the body of elders of the host congregation may make an arrangement to present the Memorial talk in the language of the pregroup or group.—See Chapter 20, paragraph 10, for direction on use of recordings of the Memorial talk if a qualified speaker is not available.

**23. During the Visit of the Circuit Overseer:** A group may hold its meetings even when the circuit overseer is visiting the host congregation. However, the group will rejoin the host congregation for all of the service talks and the public talk that the circuit overseer presents. Consideration could also be given to simultaneous interpretation of the talks for the benefit of the group.

## ASSISTING PUBLISHERS

**24.** A publisher desiring to learn another language to expand his ministry should be commended and encouraged to count the cost. (Luke 14:28) This may involve adapting to a new culture and traveling farther from home in order to support preaching arrangements and meetings in the target language. Therefore, elders should encourage publishers to do research in our publications and evaluate matters carefully and prayerfully. For example, family heads must evaluate their children's needs realistically, putting their children's spiritual well-being ahead of personal preferences. (1 Cor. 10:24; *w17.05* pp. 8-12; *w16.10* pp. 13-17) Discussions about what it takes to be successful should be positive and realistic. If publishers decide to learn another language, a copy of *Suggestions for Publishers Learning Another Language* (S-394) should be provided to them.

**25.** It may require considerable time for a publisher to become conversant in a new language. Many progress when they become fully absorbed in congregation activities. They should be encouraged to participate in the meetings as soon as possible, including making themselves available to present student assignments on the Life and Ministry Meeting. The elders may organize a special reading class. (*be* p. 285) If appropriate and practical, arrange for qualified publishers who are conversant in the language to work in the ministry with those who are learning the language. Use a simple vocabulary and speak clearly and correctly in your conversations with them. Commend them for their efforts to progress in the language.

**26.** A publisher who has moved to a different-language congregation may need personal assistance if his struggle with the language is impeding his spiritual progress. Is the publisher beginning to comprehend the congregation meetings? Does he participate at the meetings, making brief comments? Does he give understandable presentations in the ministry? Is he staying spiritually strong, cultivating the fruitage of the spirit, and working for the peace of the congregation? The answers to such questions will guide the elders in determining what may need to be recommended to the publisher so that he maintains strong spirituality. In some cases, they may recommend that the publisher consider returning to a congregation in his native tongue.

## CIRCUIT ASSEMBLIES AND CONVENTIONS

**27.** Publishers in a pregroup or group are encouraged to attend assemblies and conventions held in the language of the pregroup or group, if they are able to do so, even if those events fall on the same weekends as the assemblies and conventions to which their host congregation has been assigned. When the assembly or convention of the host congregation is on a different weekend, some publishers may choose to attend both events, but they should not feel compelled to do so. Questions regarding the interpretation of circuit assemblies and conventions or tying in to or making use of recordings of circuit assemblies and conventions in another language should be forwarded to the circuit overseer. If approval is given for pregroups or groups to view recordings of assemblies or conventions in the target language, it is preferred that these recordings be viewed at the same time and in the same location that their host congregation attends the event, perhaps in an auxiliary room. If this is not possible, the pregroup or group should attend the event with their host congregation and then tie in to or watch a recording of the event in the target language at another time and location.

## SIGNS, YEARTEXT, AND INVITATIONS

**28.** Arrangements can be made for a Kingdom Hall sign to be posted in the language of the group if it is determined that the group is well-established and that it will continue to hold at least one weekly meeting or portion of a meeting at the Kingdom Hall. (*km* 1/90 p. 8) If possible, the sign listing the schedule for the meeting times of the congregations should also include the meeting schedule of the group. Consideration can be given to displaying the yeartext in that language. (See 21:38.2.) The host congregation may request invitations from the branch office in the language of the group to advertise its weekly meeting(s). The group should not make its own posters or flyers for advertising its meetings.

# Shepherding

Paragraphs

**Shepherding Calls** ............................................................................... 3

**Training Ministerial Servants** .......................................................... 4-6

**Recognizing Spiritual Weakness** ..................................................... 7-8

**Giving Effective Counsel** .................................................................... 9

**Assisting Those With Marital Problems** ....................................... 10-11

**Assisting Sisters** .................................................................................. 12

**Assisting Inactive Ones** ..................................................................... 13-18

**Assisting Victims of Abuse** ............................................................... 19

**Disfellowshipped or Disassociated Ones** ...................................... 20

**1.** In imitation of Jehovah God and Jesus Christ, elders "shepherd the flock of God" under their care. (1 Pet. 5:2, 3) This includes protecting the congregation so that no one is lost through neglect or because of the influence of Satan, the world, or apostates. (Acts 20:29, 30) It involves taking a loving and active interest in the spiritual, emotional, and physical needs of others. (Jas. 1:27; 2:15, 16) The objective of shepherding is to impart a spiritual gift that is faith-strengthening and to provide needed commendation and encouragement. (Rom. 1:11, 12) This requires that elders maintain regular contact with each family in the congregation. (Prov. 27:23) While group overseers should arrange to shepherd periodically all in the groups, there is no need for the body of elders to keep records of shepherding calls. Nor is it necessary for the body of elders to assign one elder to make general shepherding call assignments. Whether serving as group

overseers or not, all elders should sense their personal responsibility to shepherd the congregation.—Eph. 4:15, 16.

**2.** One way elders shepherd the flock is by giving well-prepared Scriptural talks. Another is by engaging individuals in positive, encouraging conversations before and after the meetings and while sharing in the ministry. Still another means is by making shepherding calls. Effective shepherding calls may be made at the homes of the publishers, at the Kingdom Hall, or at other appropriate locations. Shepherding may also be provided by telephone or by letter.—John 21:15-17.

## SHEPHERDING CALLS

**3.** Elders and qualified ministerial servants who join the elders in making shepherding calls should keep the following points in mind:

    (1) **Prepare:** Pray for Jehovah's guidance as you consider the needs and circumstances of the individual or family to be visited. Although the visit should not be scripted, it is appropriate to give advance thought to Scriptural encouragement or counsel that will be most beneficial. Do research in the publications of the faithful slave. (Matt. 24:45; Heb. 12:12, 13) When making the visit, be willing to be flexible, since the need may not be what you had anticipated.

    (2) **Determine Whom to Take Along:** It is usually best for two elders or an elder and a qualified ministerial servant to make a visit together. (See 25:12.) If you expect to discuss a confidential or serious matter, two elders should make the visit. Otherwise, a qualified ministerial servant may join an elder, with the elder taking the lead.—See 25:4-6.

(3) **Make an Appointment:** It is usually best to make an appointment. If there is a serious problem to be discussed, use good judgment in deciding whether the publisher should be informed of this before the visit.

(4) **Be Encouraging:** Maintain a relaxed and positive atmosphere. Express genuine concern and be quick to listen.—Jas. 1:19; 5:11.

(5) **Use the Bible:** The Bible should be the primary source of direction and encouragement. Skillful use of God's Word allows Jehovah's thoughts to reach the heart of the publisher.—Isa. 30:21; Heb. 4:12.

(6) **Duration of the Call:** Keep to the agreed time. If necessary, another visit can be arranged.—Eccl. 3:1; Matt. 5:37.

(7) **Pray:** In your prayer, mention the person or family by name and any adversity or trial they may be dealing with.—Phil. 4:6, 7; Col. 4:12.

(8) **Respect Privacy and Maintain Confidentiality:** Do not meddle in personal matters. (1 Thess. 4:11) Spiritual shepherds promote a loving, familylike spirit in the congregation by being trustworthy friends who are known to maintain confidentiality.—Prov. 10:19; 20:19; 25:9.

## TRAINING MINISTERIAL SERVANTS

**4.** Timothy learned by serving alongside the apostle Paul. (2 Tim. 2: 1, 2) Elders imitate Paul's example by taking qualified ministerial servants along on shepherding calls when appropriate. This provides an opportunity for these ministerial servants to observe firsthand the teaching, faith, patience, and love required of Christian overseers.—1 Tim. 3:1.

**5.** Prior to making a shepherding call with a ministerial servant, the elder should discuss with him how he hopes to handle the shepherding call. The ministerial servant could be asked to prepare an encouraging Scriptural point or a faith-strengthening experience that would fit the needs of the individual or family to be visited. The ministerial servant could also be asked to conclude the visit with prayer. After the visit, the elder should review with him how the visit went, providing commendation and suggestions as needed.

**6.** Under the direction of the elders, a group servant along with another ministerial servant may make spiritually encouraging visits on those in the group. (See 7:1.) The group servant should keep the elders updated after each such visit. If a confidential or serious matter comes up during the visit, the group servant should tactfully inform the publisher that it would be best for the matter to be handled by the elders.

## RECOGNIZING SPIRITUAL WEAKNESS

**7.** Symptoms of spiritual weakness may include loss of enthusiasm for the truth, neglecting daily Bible reading and personal study or attendance at congregation meetings, missing entire months of field service activity, undue emphasis on the pursuit of pleasure or material things, or criticizing the elders and the organization.

**8.** When shepherds detect signs of spiritual weakness, they use the Scriptures to remind the publisher of the importance of praying for holy spirit; reading the Bible daily; studying Christian publications; meditating on Scriptural matters; regularly attending meetings, assemblies, and conventions; regularly participating in field service; and being willing to accept spiritual help from those taking the lead.—Ps. 1:1, 2; 77:12; Luke 11:13; Acts 20:20, 21; Heb. 10:23-25; 13:17.

## GIVING EFFECTIVE COUNSEL

**9.** Elders are alert to give Scriptural counsel before bad trends become ingrained. (Prov. 27:5, 6) Prayerful advance thought to the content of the counsel and how you will present it will increase its effectiveness. (Gal. 6:1) The following points will be helpful:

(1) Take sufficient time to listen and get all the facts. —Prov. 18:13; Jas. 1:19.

(2) The tone of the conversation should be warm and loving. The publishers are Jehovah's sheep and should be treated with tenderness. (Ps. 100:3) Exhortation should be prefaced by specific, sincere commendation.

(3) Elders should base their expressions on the Bible and Bible-based publications, not their opinion.

(4) On sensitive matters, such as dress and grooming and entertainment, it is wise to seek the observations of another elder before providing counsel.—Eccl. 7:16.

## ASSISTING THOSE WITH MARITAL PROBLEMS

**10.** If a Christian experiences marital difficulties resulting in one or both parties approaching the elders to seek help, the elders should provide loving counsel based on the Scriptures and Christian publications. If both mates are Christians, it is usually best to have both present. However, if only one mate is present, the elders will discuss what that one can do to improve the situation. Because elders cannot know everything that occurs in a marriage, they should avoid taking sides.—Prov. 18:13.

**11.** If a Christian is contemplating separation, the elders should direct his attention to the Scriptures and Christian publications. (1 Cor. 7:10, 11; *lvs* pp. 250-251) If the Christian is contemplating divorce, the elders should explain that a legal divorce of itself

does not free an individual to remarry. (Matt. 19:9) Elders should not encourage separation or divorce; neither should they forbid such. These are personal matters, and each Christian will have to accept the consequences of his decision. (Gal. 6:7) However, the elders may determine that a publisher's decisions in this area disqualify the individual from receiving special privileges normally given to those viewed as exemplary.—See 2:4; 8:9.

## ASSISTING SISTERS

**12.** An elder or ministerial servant must never meet alone with or become the sole confidant of a sister who is not closely related to him. (Prov. 22:3; Jer. 17:9) If possible, the body of elders should arrange for different pairs of elders to shepherd a sister who needs ongoing assistance. It is appropriate for an elder to speak with a sister while in full view of others at her home, at congregation meetings, or in the field ministry.

## ASSISTING INACTIVE ONES

**13.** Jehovah never forgets his worshippers who stray from the fold. (Ezek. 34:11) Elders have the responsibility to search diligently for sheep who have strayed. (Matt. 18:12-14; 1 Thess. 5:14; *rj* pp. 4-5) Helping a fellow Christian who has become inactive calls for prayerful reliance on God, the guidance of his spirit, and skillful use of his Word. Elders may read scriptures, review an article, discuss meeting highlights, pray with the inactive one, and so forth. (2 Cor. 1:3-7; Jas. 5:13-15) A visit, a telephone call, or a letter can accomplish much good.—*w08* 11/15 pp. 8-16*; rj* pp. 12-15; *cl* pp. 240-249.

**14.** To ensure that inactive ones are not overlooked, the Congregation Service Committee should assign each one of such to a field service group. Though the names of inactive ones should not appear on any list that is posted on the information board, the

group overseer and his assistant should be made aware of the person's circumstances and contact information.

**15.** Each year prior to the special talk and Memorial, a special effort should be made to contact all inactive ones living in the congregation's territory. If group overseers and their assistants need help, the service committee may ask other elders and qualified ministerial servants to work along with the group overseers. The brothers making such visits should be warm and upbuilding. In addition to extending an invitation to the special talk and the Memorial, ensure that the inactive publisher is provided a copy of the *Return to Jehovah* brochure. If circumstances permit, Scriptural encouragement tailored to the individual's needs may be shared.

**16.** If the inactive one expresses a desire to resume activity with the congregation, a Bible study may be offered. If the study is accepted, the service committee will then determine who will conduct the study and for how long, as well as what publication should be studied.

**17.** If a person has been inactive for only a short time, encouragement and practical assistance from an experienced publisher may be all that is needed to reactivate the individual. On the other hand, before inviting a longtime inactive one to share in the ministry, two elders should meet with him to see if he meets the basic requirements. This is similar to the procedure for approving new publishers as outlined in chapter 8 of *Organized to Do Jehovah's Will.*

**18.** An inactive one who has been involved in serious wrongdoing and desires to return to the congregation may feel that if he confesses his wrongdoing to the elders, he will be disfellowshipped. But he will not be expelled from the congregation if he has discontinued the unscriptural practice and is genuinely repentant.—Isa. 1:18; 55:7; 2 Cor. 7:10, 11; Jas. 5:13-16; *w08* 11/15 pp. 14-15 pars. 12-13; *rj* pp. 10-14.

## ASSISTING VICTIMS OF ABUSE

**19.** See 14:12-17.

## DISFELLOWSHIPPED OR DISASSOCIATED ONES

**20.** There is no formal arrangement to visit disfellowshipped or disassociated individuals each year. Rather, elders should use good judgment in determining whether and how to make brief contact with such ones. For example, if a disfellowshipped individual gives some evidence of changing his ways, an elder could provide him with a copy of the *Return to Jehovah* brochure and remind him of the steps he can take toward being reinstated. (Isa. 1:18; *rj* pp. 10-14) Such brief contact could be made while an elder engages in the house-to-house ministry. While shopping, an elder may see a disfellowshipped person who has not been contacted in years and choose to approach him. An elder may visit a disfellowshipped person at any time that is appropriate or even make contact by telephone. Elders should keep the coordinator of the body of elders updated when such contact is made. Of course, contact should not be made with active apostates, with those who are trying to lead others into sin, or with those who have made it known that they want nothing to do with the Christian congregation.

# Disasters and Emergencies

**Paragraphs**

**Preparedness** ............................................................................... 1-6

    Confirm Contact Information ............................................... 2

    Make Arrangements for Those With Special Needs ................... 3

    Secure Congregation Records ............................................ 4

    Review Arrangements With the Body of Elders ............................. 5

    Annual Part on Midweek Meeting .............................................. 6

**When a Disaster Occurs in the Local Area** ...................................... 7-12

    Contact All Publishers ................................................................ 7

    Update the Coordinator of the Body of Elders ............................. 8

    Update the Circuit Overseer .................................................. 9

    Be Safety Conscious ................................................................ 10

    Shepherd the Publishers ...................................................... 11

    Provide Ongoing Practical Support ......................................... 12

**When a Disaster Occurs in Another Area** ........................................... 13

## PREPAREDNESS

**1.** If advance warning of a disaster is given, elders should ensure that all publishers are in a safe location and, if time permits, should obtain and distribute any supplies that may be needed. The following steps should be taken in preparation for disasters and various types of emergencies, even if it seems that such are not likely in your area:

**2. Confirm Contact Information:** The secretary should maintain a list containing the contact information and emergency contact information for all publishers, including inactive ones. This list should also include the circuit overseer's contact information. Whenever there is an update to this list, the secretary should promptly provide a copy to all elders. Each elder should ensure that he has ready access to this information. Keep in mind that following a disaster, electronic files may not be accessible if power or Internet service is disrupted.

**3. Make Arrangements for Those With Special Needs:** The Congregation Service Committee together with the field service group overseers should develop a plan to assist those with special needs, such as the elderly.

**4. Secure Congregation Records:** Congregation records and confidential files should be secure and safely stored at all times. In addition, the Congregation Service Committee should develop a plan to protect the records in the event of an impending disaster.—See 22:10.

**5. Review Arrangements With the Body of Elders:** Annually, during an elders' meeting, the local preparations should be reviewed.

**6. Annual Part on Midweek Meeting:** Once a year a part about disaster preparedness will be included in the midweek meeting. In that part, time is alloted for reminders from the branch office and the body of elders, if necessary. If your congregation will be attending a circuit assembly or a convention the week that the part is scheduled, you should schedule the part sometime in the weeks that follow.

## WHEN A DISASTER OCCURS IN THE LOCAL AREA

**7. Contact All Publishers:** When the congregation is affected by a disaster, elders should quickly make an assessment of the immediate needs of the publishers. Group overseers should take the

lead in locating each family in their field service group, including inactive ones, and should inquire of their well-being.

   (1) Determine and address immediate needs, such as medical care, food, water, shelter, clothing, and other basic items.

   (2) Determine the condition of the brothers. Are any displaced, missing, injured, or deceased?

   (3) Determine the basic condition of their homes. Are there power or utility outages? Are any homes damaged or destroyed?

**8. Update the Coordinator of the Body of Elders:** As soon as possible (usually within one day), group overseers should communicate their findings to the coordinator of the body of elders, *even if the information is incomplete or no one has been affected.* Continue to provide daily updates until all of the publishers have been accounted for.

**9. Update the Circuit Overseer:** Once this information is gathered, the coordinator of the body of elders should immediately inform the circuit overseer of any damage and the health condition of those in the congregation. He should also inform the circuit overseer if the Kingdom Hall was damaged or destroyed. Continue to provide daily updates until all of the publishers have been accounted for. When the circuit overseer has received the report from the elders, he will promptly contact the branch office. The branch office will determine whether there is a need for further assistance.

**10. Be Safety Conscious:** Before volunteers assigned by those coordinating the relief effort arrive, it is expected that those in the affected and surrounding areas will reach out to try to assist with the immediate needs of those in their congregations. However, when providing assistance, it is vital that all remember to use modesty in what they are qualified to do. It may be that the situation is hazardous or that buildings could be susceptible to

collapse. No one should endanger himself for material posses-
sions.

**11. Shepherd the Publishers:** Give spiritual and emotional support
to the congregation, and resume congregation meetings as quick-
ly as possible.—*od* chap. 17 pars. 15-16.

**12. Provide Ongoing Practical Support:** If the damage was exten-
sive or the relief effort will continue for weeks or months, elders
should be alert to do the following:

(1) Identify congregation publishers who could offer
temporary accommodations for those who are
displaced or for construction volunteers.

(2) Ensure that relief supplies are distributed adequately
and equitably to families in need.—Acts 6:1.

(3) Accompany Local Design/Construction Department
(LDC) field personnel when visiting publishers to survey
property damage.

(4) Help publishers determine if they qualify to apply for
government aid. Before they submit an application for
such, ensure that publishers understand what would be
required of them after they receive the help. These are
personal matters for publishers to consider before
entering into an agreement.

(5) Help the LDC to determine which publishers qualify
for reconstruction assistance from the organization,
based on direction from the branch office.—*od* chap. 12
pars. 12-15.

## WHEN A DISASTER OCCURS IN ANOTHER AREA

**13.** If a disaster occurs in another area, elders can remind the pub-
lishers of the following points:

(1) We should remember our brothers and sisters in our prayers.—2 Cor. 1:8-11.

(2) Those desiring to provide monetary assistance may donate to the worldwide work. In this way, the organization can help to care for the needs of any in the worldwide brotherhood.

(3) Materials or supplies should not be sent to the disaster area unless specifically requested by the brothers in charge. This will ensure an orderly relief effort and the proper distribution of goods.

(4) The branch office should not be called merely for information, as this can tie up phone lines that are needed to handle incoming calls from the disaster area.

(5) Publishers should not travel to the affected area to help unless they have been invited to do so by those coordinating the relief effort. Volunteers should have an approved *Local Design/Construction Volunteer Application* (DC-50) or *Application for Volunteer Program* (A-19) on file.

# Weddings

|                           | Paragraphs |
| ------------------------- | ---------- |
| **Presiding at Weddings** | 2-5        |
| **Use of the Kingdom Hall** | 6        |

**1.** Weddings that are organized in harmony with Bible principles honor Jehovah. This is especially true with regard to weddings that are held at the Kingdom Hall.

## PRESIDING AT WEDDINGS

**2.** If available, an elder should be used to preside at a Christian wedding. A couple may request a specific elder to give their wedding talk. Otherwise, the body of elders may select an elder to do so. In many lands, the government authorizes ministers of Jehovah's Witnesses to administer the marriage vows.—*w06* 10/15 pp. 18-23.

**3.** An elder may preside at a wedding of two Christians or of two unbaptized publishers who are progressing toward baptism. (1 Cor. 7:39; 2 Cor. 6:14; *w04* 7/1 pp. 30-31) Before agreeing to do so, he should consider the following:

   (1)  Confirm that the prospective bride and groom are Scripturally and legally free to marry, and confirm their standing in their respective congregations. (See 2:4.) Meet with the couple to make tactful but straightforward inquiries about their conduct during courtship.

   (2)  If either the prospective bride or groom was married before, he or she should have provided convincing

evidence to the elders that establishes his or her Scriptural freedom to remarry. (Heb. 13:4; see 12:71-76.) The elder presiding at the wedding should confirm this is the case and should review a copy of the divorce decree or other similar legal document to confirm that the divorce was finalized. If there is any question about the matter of Scriptural freedom to remarry, the body of elders should write to the Service Department to clarify matters before the wedding.

(3) An elder who decides to give a wedding talk must confirm that he is permitted by law to administer the vows in the town or community where the wedding will take place. (Rom. 13:1) The local authorities may require that a minister who performs weddings register and provide proof of his ordination. In some lands, the authorities may accept a letter signed by the body of elders confirming the brother's appointment as an elder in the local congregation. If this does not suffice, the elder should determine the exact requirements and then, if necessary, write to the Service Department for assistance. If the elder is not permitted by law to administer the vows, another elder who meets such legal requirements may administer the vows immediately after the wedding talk. The elder who administers the vows would complete the necessary documents.

**4.** Those who are engaged to be married are in particular need of shepherding by loving elders. Scriptural encouragement can help them make a success of their wedding and their future marriage. They should be encouraged to do research in the Bible and Christian publications. Such prayerful study will strengthen them to remain chaste during courtship and will help them to plan their wedding in a way that will honor Jehovah and leave them with a

clean conscience. (1 Cor. 10:31, 32) For example, if they are planning a wedding reception, they should be reminded to review the latest material published by the faithful slave.—*w06* 10/15 pp. 18-31; *w00* 5/1 pp. 19-22; *w97* 4/15 pp. 23-26; *lvs* pp. 180-181, 251-252.

**5.** The wedding talk is based on the outline "Honorable Marriage in God's Sight" (S-41). The talk should highlight the God-given responsibilities that married couples must assume and carry out in harmony with the Scriptures. The talk should be delivered with love, warmth, dignity, honor, and seriousness. The speaker should resist the temptation to make funny remarks just for the sake of making the audience laugh, since this could betray a lack of respect for the audience and for God. During a wedding talk, the speaker should not project any moving video footage on screens or monitors. However, a few appropriate still images during such a talk are acceptable as visual aids. (See 20:20.) If any video footage is used before or after a wedding talk, it should be in good taste. The aforementioned direction regarding video footage also applies in connection with a funeral talk.

## USE OF THE KINGDOM HALL

**6.** A prospective bride and groom who wish to use a Kingdom Hall for their wedding should submit a written request to the elders well in advance of the wedding date indicating the specific day and time they desire to use the hall. (*od* chap. 11 pars. 10-11; *km* 11/08 p. 3) The Congregation Service Committee should meet promptly to consider the following:

(1) Confirm that the prospective bride and groom are Scripturally and legally free to marry and that they are in good standing in their respective congregations. (See 2:4.) If this is true of two unbaptized publishers who are progressing toward baptism, they may be approved to use the Kingdom Hall. An undocumented

alien may use the Kingdom Hall for his wedding if he meets the civil marriage requirements and he is otherwise qualified as outlined above.—See 29:3-7.

(2) The time of the wedding and any rehearsal should not interfere with scheduled meetings or other scheduled programs at the Kingdom Hall. If other congregations share the hall, the service committee should confirm the hall's availability with the other service committees.

(3) The service committee decides whether there is a need to make a brief announcement to the congregation about the use of the Kingdom Hall for a wedding.

(4) The service committee should be kept up-to-date on the couple's plans regarding the use of the Kingdom Hall. For example, any decoration of the Kingdom Hall or rearrangement of the chairs must be approved by the service committee. Only music from *"Sing Out Joyfully" to Jehovah* should be used. The wedding party should not include any disfellowshipped person or anyone whose lifestyle grossly conflicts with Bible principles; baptism is not a requirement. Anyone assigned to take photographs or to record the ceremony should do nothing that would cause a distraction during the talk or that in other ways would detract from the seriousness and dignity of the occasion.

(5) If it is learned that the couple has engaged in serious wrongdoing that will require handling by a judicial committee, the couple may not use the Kingdom Hall. If neither is disfellowshipped, it is left to the discretion of the elder as to whether he will preside at the wedding at another location.

# Prisons

|  | Paragraphs |
|---|---|
| **Contact Congregation** | 2-4 |
| **Correspondence With the Branch Office** | 5-7 |
| **Communication With Prison Officials** | 8 |
| **Referrals and Contact With Prisoners** | 9 |
| **Ministry** | 10-16 |
| Literature | 10-12 |
| Reporting Activity | 13-14 |
| Reporting Baptisms | 15 |
| Publishers Who Transfer to Another Facility | 16 |
| **Conducting Meetings** | 17-20 |
| Memorial | 19 |
| Extended Meetings | 20 |
| **Inmates Serving in an Appointed Capacity** | 21 |
| **Conducting Judicial Hearings With Inmates** | 22 |

**1.** One or more prisons may be located within the congregation's assigned territory. Though visits to prisoners are often restricted, it may be possible for publishers to receive permission from prison authorities to visit individuals who have requested spiritual help. (Matt. 5:3) The guidelines in this chapter may apply to other facilities where access to the general public is not allowed.

## CONTACT CONGREGATION

**2.** The branch office will assign one or more congregations to serve as contact congregations to take the lead in following up initial

interest and in caring for the long-term spiritual needs of prisoners who study the Bible and become Jehovah's Witnesses.

**3.** The Congregation Service Committee of the contact congregation selects qualified, baptized, adult publishers to participate in this feature of the ministry. (Matt. 10:16) The service overseer takes the lead in coordinating their work. If needed, qualified publishers from nearby congregations may be included if approved by their service committees. Appropriate portions of this chapter should be shared orally with publishers approved to participate in this aspect of the ministry.

**4.** If a congregation is unable to continue to serve as the contact congregation, the service committee should send a letter to the Service Department providing the reason. If the brothers know of another congregation that is willing to serve in their place, the letter should be approved by both service committees. The branch office will indicate in writing whether or not the recommendation is approved.

## CORRESPONDENCE WITH THE BRANCH OFFICE

**5.** The congregation secretary is responsible for sending correspondence to the Preaching Needs Desk in the Service Department regarding the work at the facility. The complete name and address of the prison should always be included in the correspondence. If there is a need to communicate about the spiritual needs of a specific prisoner, include his name and identification number, if known.

**6.** The *Prison Information* (S-68) form is used to submit updated information to the Service Department regarding facilities. If several different yards or units are in the facility, a separate form for each unit should be submitted.

**7.** For direction regarding an inmate who has been accused of child abuse and who is now associating with a congregation, see Chapter 14, paragraphs 9 and 27.

## COMMUNICATION WITH PRISON OFFICIALS

**8.** A pleasant, persistent approach is often successful. Elders should keep appointments with inmates and officials and adhere to the regulations of the institution. When proof of ordination as a minister is required, the elders should write an official letter using the congregation's letterhead. The letter should clearly identify the individual as an ordained minister of the congregation, state the date of his or her ordination (baptism), and be signed by the Congregation Service Committee. If the letter is not accepted by a facility, the elders may write to the Service Department for further direction, including a copy of the letter that was rejected.

## REFERRALS AND CONTACT WITH PRISONERS

**9.** When the contact congregation receives a referral from the branch office, the service overseer should follow up promptly. He may be able to provide literature and assign qualified publishers to visit regularly and, if possible, conduct one-on-one or group studies at the facility. If personal contact is not possible, perhaps a qualified publisher approved by the Congregation Service Committee could be assigned to correspond with a prisoner. Sisters should correspond only with female prisoners and brothers should correspond with male prisoners. The return address of the Kingdom Hall or another appropriate address may be used instead of the publisher's home address in order to protect the privacy of the publisher. However, the return address of the branch office should not be used.

## MINISTRY

**10. Literature:** It is preferred that a prisoner initiate requests for visits or literature through publishers approved to visit the facility or by making a request directly to the branch office. This allows the individual to give evidence of his genuine interest and may assist publishers in being granted access to the facility. If needed, the secretary of the contact congregation may contact the Preaching Needs Desk in the Service Department on behalf of the inmate. For example, some facilities do not allow visitors to bring literature to inmates but do permit the branch office to mail literature to the person. Disfellowshipped inmates may obtain literature (including special-request items) upon request. Basic publications may also be provided for the library at such facilities.

**11.** When a facility permits publishers to deliver literature to inmates, the congregation should request it as part of the regular congregation literature request.

**12.** Only literature from the Teaching Toolbox and publications needed for congregation meetings should be provided, depending on the needs of Bible students. Special-request items should generally be provided only for baptized publishers, unbaptized publishers, and those who are progressing well in their studies. (See 28:10.) In such cases, the elders of the contact congregation will request these items. Special consideration can be given to those who suffer from impaired vision or when there are other extenuating circumstances.

**13. Reporting Activity:** Placements, video showings, and Bible studies conducted in a prison should be reported by publishers in the usual manner. Even if many attend a Bible study being held in a prison, one study is counted for the month and one return visit is counted each time the study is conducted. While field service time is not counted for conducting or participating in congregation meetings held in prison, pioneers may report hour credit for

such activity. (See 9:11-13.) Non-pioneers should be shown extra consideration for their participation in this form of service.—See 23:25-26.

**14.** Unbaptized or baptized publishers who are inmates should be counted as publishers in the contact congregation, and their field service reports should be included in the congregation report.

**15. Reporting Baptisms:** The contact congregation should inform the circuit overseer of baptisms performed in a prison.

**16. Publishers Who Transfer to Another Facility:** When an inmate is transferred to another facility, the *Congregation's Publisher Record* (S-21) and a letter of introduction should be sent to the contact congregation caring for that facility.

## CONDUCTING MEETINGS

**17.** Extensions of regular congregation meetings can be established when at least one baptized or unbaptized publisher will attend regularly. The attendance should be included with the contact congregation's meeting attendance. The manner in which meetings are conducted in prisons must, as closely as possible, mirror the manner in which meetings are conducted at the Kingdom Hall. Disfellowshipped individuals should be treated the same as they would be at the meetings at the Kingdom Hall.

**18.** Only qualified elders and ministerial servants should conduct meetings in prison. These brothers could be selected from the contact congregation or from a neighboring congregation. (See 28:21.) If appointed brothers are not available, the inmates could meet as a group to view a recording of the meeting or to consider the material together. If an inmate who has been accused of child abuse attends meetings in prison or otherwise associates with a congregation, see Chapter 14, paragraphs 9 and 27.

**19. Memorial:** Every effort should be made to arrange for a qualified elder or a ministerial servant to conduct the Memorial. If this is

not possible, the inmates may be able to view a recording of the talk or they could discuss the Bible account at Matthew 26:17-30; Luke 22:7-23, 28-30; and 1 Corinthians 11:20-31. (*w93* 2/1 p. 31) Memorial attendance figures should be added to the total congregation count.

**20. Extended Meetings:** Some facilities allow for an annual or semi-annual meeting at which the inmates are able to meet together for a longer period of time than is usual. This could be a fine opportunity for baptisms, reviews of assembly and convention programs, and so forth. Such extended meetings should not include arrangements in which congregation publishers, especially members of the opposite sex, are able to mingle freely with the prisoners. It may be that inmates are allowed to invite family members to attend an event. However, experience has shown that it is best for those of the opposite sex, even though related to prisoners, not to be invited to such meetings. Rather, invitations should be extended only to those who will share in the program; volunteers who participate regularly in witnessing at the prison; and possibly a few responsible, experienced ones who would be able to encourage and shepherd the inmates so that an excellent witness is given. Elders in the circuit or from nearby congregations who have presented assembly or convention parts could be invited to present this information along with the parts presented by the local elders. The invitation process should be closely monitored by the elders responsible for caring for the prison witnessing.

# INMATES SERVING
# IN AN APPOINTED CAPACITY

**21.** While inmates who make spiritual progress may qualify to be baptized, they do not qualify to serve as ministerial servants or elders while in prison. (1 Tim. 3:2, 7, 10; Titus 1:6, 7) They also do not qualify to serve as auxiliary or regular pioneers. Of course, if

an appointed person in the congregation is imprisoned for maintaining his Christian integrity, the body of elders may determine that he can continue serving in an appointed capacity even while imprisoned.

## CONDUCTING JUDICIAL HEARINGS WITH INMATES

**22.** When a judicial committee endeavors to meet with an incarcerated accused wrongdoer, the secular authorities may not allow all three members to meet with him at the same time. If so, a judicial committee should not handle the case over the telephone by means of a conference call or a videoconference. The elders should endeavor to arrange for two members of the committee to meet with him in person in a confidential setting. Others should not be present when the accused person is interviewed. Afterward, the two brothers would discuss the case with the third member of the committee, and the judicial committee may then render a decision. Two members of the judicial committee should inform him of the decision. If he is disfellowshipped, the elders should inform him of his option to appeal, and so forth. If the authorities allow only one elder at a time to speak with him, the judicial committee should decide in advance what questions to ask. Then two on the judicial committee should talk with him separately and ask the same questions. Thereafter, the judicial committee should convene to make a decision. In unusual cases, contact the Service Department.

# Legal Matters

Paragraphs

**Personal Legal Advice** ......................................................................... 2

**Undocumented Aliens** ................................................................. 3-7

**Social Events** ................................................................................. 8

**Child Custody** ................................................................................ 9

**Charitable Donation Programs** ......................................................... 10

    Matching Donation Programs ............................................... 10.1

    Volunteer Service Donation Programs ........................................ 10.2

    Fund-Raising Programs ............................................................. 10.3

**1.** In harmony with Matthew 22:21, 37, Romans 13:1-7, Philippians
1:7, and 1 Timothy 2:1-2, the congregation respects the relative
authority of secular governments. To ensure compliance with ap-
plicable laws, two elders, if possible, should call the Legal De-
partment immediately in the following situations:

    (1)   The elders receive a request or an order to disclose
confidential information, such as a request from an
individual, the authorities, an attorney, or the media.

    (2)   The elders learn of an accusation of child abuse,
abuse of the elderly, or abuse of the disabled.—See
Chapter 14.

    (3)   The elders learn of threatened or actual legal action
against the organization, the local congregation, or an
elder in connection with a congregation matter.

    (4)   A manager insists that no further visits be made by
Jehovah's Witnesses to a subdivision or an apartment

complex, a government official seeks to impose some restriction on our ministry, or violent opposition to our ministry arises.—See 23:22-24.

(5) A publisher while in the ministry or in any other theocratic activity was involved in an incident resulting in serious bodily injury or death. (See 21:30.) If an elder is contacted by anyone who requests a statement, he should not discuss the incident or publishers involved, nor should he answer any questions. Rather, the caller's name, telephone number, title, and the office he represents should be obtained, and he should be told that the elders will contact an attorney before responding to any questions.

## PERSONAL LEGAL ADVICE

**2.** As spiritual shepherds, elders do not involve themselves in the legal matters of individual Christians. (Gal. 6:5) In their role as elders, they should not offer legal advice or encourage publishers to contact the Legal Department for legal advice on personal legal questions. For example, if a publisher asks about a restraining order or an order of protection, the elders should politely tell him that this is a personal legal matter that does not involve the congregation. Elders should not try to enforce such orders between private parties.

## UNDOCUMENTED ALIENS

**3.** Elders take a keen interest in the spiritual, emotional, and physical needs of fellow believers who are "foreign residents." (Ps. 146:9; 1 John 3:17, 18; *w17.05* pp. 3-7) An individual who asks about meeting the legal requirements for residency should be encouraged to consult Scriptural references such as Romans 13:1-7,

Titus 3:1, and 1 Peter 2:13-17 and to do research in our publications.

**4.** A foreigner may wish to obtain qualified legal assistance for such personal legal matters. It is not the responsibility of congregation elders to research and enforce secular laws involving undocumented aliens.—Philem. 8-22; *w77* pp. 191-192.

**5.** All Christians are obligated to obey the laws of the land in which they live and thus give "the superior authorities" their relative subjection. (Rom. 13:1) For this reason, an undocumented alien would not qualify for appointment as an elder, a ministerial servant, or a regular or auxiliary pioneer until he has obtained legal residency or taken genuine steps to procure such. (1 Tim. 3:7, 10) He may not be assigned to oversee any congregation responsibility. Additionally, although he may assist with the cleaning and construction of his own Kingdom Hall and with the cleaning of his own Assembly Hall, he may not work with construction or maintenance on other Kingdom Halls or Assembly Halls. However, he may comment at congregation meetings and present student parts in the midweek meeting. If he is exemplary in every other way, he may be granted certain additional privileges, just as Paul used Onesimus to a certain extent. (Col. 4:7-9; Philem. 13) For example, he may be allowed to pass microphones and help with literature. He may also be granted use of the Kingdom Hall for a wedding if he meets the Scriptural and civil marriage requirements.—See 27:6.

**6.** When an undocumented alien requests in good faith or obtains permission from the proper governmental authority to reside in the country, his situation changes because he is thereby demonstrating more fully his subjection to "the superior authorities." (Rom. 13:1) Once the publisher has sought permission to be in the country, he is no longer viewed as a fugitive and thereafter may enjoy privileges of service even if Caesar takes an extended period of time to process the application. Thus, if he is otherwise

spiritually qualified and, if employed, is working without resorting to fraudulent means, he may serve as an elder, a ministerial servant, or a regular or auxiliary pioneer. When recommendations are submitted for such ones to be appointed to serve as elders or ministerial servants, their situation should be fully explained to the circuit overseer.—See *Addendum to "Shepherd the Flock of God"—1 Peter 5:2* for any additional direction that may apply locally.

**7.** If a publisher makes a request for residency but is later denied and remains in the country illegally, he would no longer qualify to serve as an elder, a ministerial servant, or a regular or auxiliary pioneer. It is also not honest for a publisher to use falsified documents of any kind or to submit what he knows to be inaccurate information when applying to a government agency for a certain status or privilege. If the government becomes aware of this, the individual may face some sort of sanction on a charge of fraud and the congregation could come into disrepute. In such cases, further action on the part of the congregation may be necessary. Before proceeding, elders should send a letter to the Service Department for direction. However, if one applied for or obtained legal status through such means before coming to an accurate knowledge of Scriptural principles, the elders would not make this an issue.—1 Cor. 6:11.

## SOCIAL EVENTS

**8.** The congregation does not organize or sponsor social events. Individuals who host social events bear personal responsibility for what occurs at the event. Such individuals should not state or imply that they are acting on behalf of the congregation. They should not use terms such as "congregation picnic" or "congregation gathering." (*od* chap. 13 par. 19) Thus, invitations should not be posted on the information board, nor should announcements regarding social events be made from the platform.

# CHILD CUSTODY

**9.** If publishers become involved in a lawsuit over child custody and visitation matters, two elders should contact the Legal Department if the answers to all of the following questions are yes:

(1) Is it evident that the publisher's religious beliefs will be at issue?

(2) Has someone been served with papers to appear in court?

(3) Is the litigation between two biological parents?

(4) Is the other party to the litigation not one of Jehovah's Witnesses?

(5) Is the publisher in good standing in the congregation? —See 2:4.

# CHARITABLE DONATION PROGRAMS

**10.** Some charitable donation programs may be acceptable to a Christian. The following are brief descriptions and comments about their use:

(1) **Matching Donation Programs:** In these programs, a company agrees to increase or match an individual's donation to a charitable organization. The company is simply making an additional voluntary contribution. Since the donation does not require the congregation's active participation, designating a charitable organization in a matching donation program is a personal decision. Publishers should not initiate such an arrangement with the company but may take advantage of an established program.

(2) **Volunteer Service Donation Programs:** In these programs, a donor agrees to make a donation to a

charitable organization for which an individual performs a required amount of volunteer service. Publishers should not designate the branch office or a congregation to receive donations as a charitable organization for which they do "volunteer service," and congregations should not participate in such programs. All publishers perform their ministry motivated by their dedication to Jehovah and their personal obedience to Jesus Christ's command, not in behalf of the congregation or any other organization. This is the case whether the publisher expends time working on construction projects, in relief work, or any other activity that advances Kingdom interests.

(3) **Fund-Raising Programs:** In these programs a donor offers to donate to a designated charitable organization based upon an individual's commercial activity with the donor. For example, a grocery store may agree to donate a percentage of an individual's purchases from that store. Frequently, these programs require the designated charitable organization to participate actively, such as by encouraging individuals to do business with the donor. The congregation, however, should not promote any type of commercial activity or solicit funds. Thus, publishers should not designate the branch office or a congregation to receive donations from a fund-raising program, and congregations should not participate in this type of program.

APPENDIX A

# Work Performed at Kingdom Halls

(For additional direction on work performed at Kingdom Halls, see Chapter 21.)

| Type of Work | Definition | Should the congregation contact the LDC for approval? | Who provides the funding? | Who coordinates the work? |
|---|---|---|---|---|
| **Scheduled Maintenance** | Work that includes such tasks as performing scheduled inspections; adjusting, servicing, or cleaning existing building elements and/or equipment; checking proper operation of equipment or fixtures; or replacing consumable parts at regular intervals.<br><br>Examples: Replacing air conditioning filters, cleaning ventilation grilles, replacing light bulbs, checking plumbing fixtures, checking and adjusting door hardware, checking exit lights, changing engine oil on lawn mower, touch-up painting. | **No** | **Congregation** | **Congregation** |
| **Repair** | Work that is required to restore an existing building element or piece of equipment to an acceptable condition. This may involve replacement of various components, but it is not a complete replacement of a system, unless it is a simple replacement of small items that have reached their end of life.<br><br>Examples: Repairing or replacing light fixtures or similar elements; repairing leaking toilet cisterns, roof leaks, water heater element failures, or loose floor tiles. | **Only if the work will cost more than three months' worth of average Kingdom Hall operating expenses** | **Congregation** | **Congregation** |
| **Minor Renovations, Upgrades, and New Installations** | Work that involves making any alterations to the design of the building, performing end-of-life replacement of a building element or of building finishes, or installing new minor equipment.<br><br>Examples: Replacing or installing carpeting, roofing (shingles, tiles, membrane), chairs/benches, air conditioning systems, building finishes, fences, parking lot surfaces, video systems. | **Yes** | **Congregation** | **LDC or Congregation** |
| **Major Renovations, Upgrades, and New Installations** | Work that is required to convert a facility that is not currently considered suitable into one that is suitable. It may include end-of-life replacements for multiple building elements and any work that involves changing, expanding, or modifying the purpose, use, or design intent of the facility.<br><br>Examples: Replacement of all or most of the building's finishes or the entire roof structure (trusses) or moving interior or exterior walls. | **Yes** | **Branch Office** | **LDC** |
| **New Construction** | Work that involves construction of a new facility or significant expansion of an existing building. | **Yes** | **Branch Office** | **LDC** |

# Index

## A

**Accounts**
audits:   3:3.20
expenses
approval of:   3:3.20
circuit overseer:   10:6-8
hospitality and travel for visiting
speakers:   20:5
Kingdom Hall:   21:20-22
Kingdom Hall Operating Committee:
21:20
oversight:   4:2.8
proper use of congregation funds:   10:9
selection of accounts servant:   1:2.7

**Adultery**
adulterous marriage:   12:10-12
judicial files:   22:26-27
letters of introduction:   22:7-8
announced reproof:   16:20.1
bearing on recommendation as elder or
ministerial servant:   8:8
confession to mate:   15:14; 16:10.5
Scriptural freedom to remarry:   12:71-76

**Anger:   12:36-37**

**Announcements**
approval:   20:13
deletion
elder or ministerial servant:   8:38
pioneer:   9:4
disassociation:   18:5
disfellowshipping:   16:29-30
Memorial:   20:12
reinstatement:   19:12
reproof:   16:20-21
special public talk:   20:12
unbaptized publisher:   12:49, 51, 54
wedding:   27:6.3

**Apostasy:   12:39**

**Appeals**
deletion:   8:39
disassociation:   18:6
disfellowshipping:   17
discovery of new grounds for disfel-
lowshipping:   17:8
if appeal committee agrees with judi-
cial committee:   17:9-10
if appeal committee disagrees with ju-
dicial committee:   17:11-15
informing of right to appeal:   16:26.2
unbaptized publishers:   12:53

***Application for Regular Pioneer Service***
**(S-205):   9:1-3, 9**

**Applications:   22:29-31**

**Appointments**
elder and ministerial servant:   8
cautions before recommending certain
brothers:   8:6-11
baptized for many years but only
now being recommended:   8:11
guilty of adultery in past:   8:8
previously reproved, disfellow-
shipped, or disassociated:   8:7
separated or unscripturally di-
vorced:   8:9
served in an appointed position in
past:   8:10; 13:8
congregation file:   22:19
considering Scriptural qualifications:
8:1-5
prisoners:   28:21
recommendations between circuit
overseer's regular visits to congrega-
tion:   8:21
recommendations during circuit over-
seer's regular visit to congregation:
8:15-20
when appointed brother moves into
congregation:   8:13-14
pioneer:   9:1-3

**"Are You Ready to Face a Faith-Challenging Medical Situation?" (*kmi11/90*): 11:1**
**Assemblies: 20:16**
   JW Stream: 20:27
   multilanguage fields: 24:27
   prisons: 28:20
   rooming: 2:3.5
**Assistance for needy publishers**
   role of elders in determining: 1:2.20, 6.3
   rooming for assemblies and conventions: 2:3.5
**Association with disfellowshipped or disassociated individuals: 12:17.1**
**Attendants**
   approval: 1:2.8
   disruptive individuals: 20:37-38
   oversight: 3:3.18
**Audits: 3:3.20**

### B

**Bankruptcy: 8:29**
**Baptism**
   communicable diseases: 11:16-17
   materials provided by secretary: 11:1
   meeting one year after
      reminder: 4:2.7
      scheduling: 3:3.6
   prisons: 28:15
   review of questions with candidates: 3:3.3
   validity: 12:60-62
**Bethelites, wrongdoing by: 12:43**
**Blind: 5:2.4**
**Blood**
   (See Medical matters)
**Body of elders**
   elders' meetings: 1:1, 3-11
   pursue peace: 1:12-13
   responsibilities: 1:2
**Boxing: 12:37**
**Brazen conduct: 12:16-17**
   dating though not Scripturally free to remarry: 12:17.2

   pornography: 13:4
   sexting: 14:30
   unnecessary association with disfellowshipped or disassociated individuals: 12:17.1
**Brideprice: 12:34**
**Broadcasting systems: 20:24**

### C

**Causing divisions: 12:39.4, 70**
**Charitable donation programs: 29:10**
   fund-raising programs: 29:10.3
   matching donation programs: 29:10.1
   volunteer service donation programs: 29:10.2
**Child abuse: 14**
   child pornography: 14:3, 10
   congregation considerations: 14:11
   filing: 14:25
   investigating allegations: 14:18
   judicial committee: 14:19; 16:11
   legal considerations: 14:4, 6-10
      prison inmates: 14:9, 27
   moving to another congregation: 14:26-27
   notification by secular authorities: 14:28
   providing spiritual assistance: 14:12-17
   questions asked of newly appointed brothers: 8:17
   reinstatement committee: 14:20-21; 19:3
   reporting: 14:4, 6-10
   restrictions: 14:22-24
   sexting: 14:3, 10, 30
   sexual misconduct involving only minors: 14:29-30
**Child custody: 29:9**
**Circuit overseer**
   accommodations and meals: 10:2-5
   expenses during week of visit: 10:6-8
   meeting with elders during visit: 1:4
   meetings of pregroup or group during visit: 24:23

recommendations for appointment
    during visit: 8:15-20
    between visits: 8:21
recommendations for deletion
    during visit: 8:34
    between visits: 8:35
*Report on Circuit Overseer's Visit With Congregation* (S-303): 1:6.1; 22:20
**Circumstantial evidence: 12:7-9**
**Cleaning: 21:5-7**
    coordinator: 21:7
    Kingdom Hall Operating Committee: 21:15, 17
    safety: 21:27-29
**Confession**
    establishing wrongdoing: 12:40.1
    to innocent mate: 15:14; 16:10.5
**Congregation Bible Study**
    approval of conductors and readers: 1:2.8
    conducting: 20:19
**Congregation file**
    (See Correspondence and records)
***Congregation Job Hazard Analysis* (DC-85): 21:29**
***Congregation Job Hazard Analysis Instructions* (DC-85i): 21:29**
***Congregation Meeting Attendance Record* (S-88): 22:18**
**Congregation Service Committee: 2**
    ministerial servants substituting as members of: 2:2; 8:15
    responsibilities: 2:1, 3
***Congregation Territory Assignment* (S-54): 23:2**
***Congregation's Publisher Record* (S-21): 22:12-17**
    hour credit: 9:13-14
    infirm regular pioneers: 9:19
    judicial information: 22:21-22
    letter of introduction: 22:5
    publishers who regularly move to second residence: 8:14; 22:5

those involved in additional theocratic assignments: 23:25
**Construction servant, wrongdoing by: 12:43**
**Contact congregation: 21:2-3**
**Conventions: 20:17**
    JW Stream: 20:27
    multilanguage fields: 24:27
    prisons: 28:20
    role of secretary: 4:2.8
    rooming: 2:3.5
**Coordinator of the body of elders: 3**
    appointment: 3:1
    qualifications: 3:2
    responsibilities: 3:3
**Correspondence and records: 22**
    congregation file: 22:10-27
        *Application for Regular Pioneer Service* (S-205): 9:2
        appointment and deletion of elders and ministerial servants: 22:19
        categories: 22:11
        child sexual abuse: 14:25
        confidentiality: 22:10
        *Congregation Meeting Attendance Record* (S-88): 22:18
        disaster preparedness: 26:4
        field service reports: 22:12-17
        judicial file and other confidential reports: 22:21-27
        *Report on Circuit Overseer's Visit With Congregation* (S-303): 22:20
        security: 22:10
    disfellowshipped or disassociated individuals who die: 19:10
    disfellowshipped or disassociated individuals who move: 22:9
    JW.ORG e-mail: 22:1-4
    letters of introduction: 22:5-8
    online storage services: 22:28
    role of Congregation Service Committee: 2:3.6-7
    role of coordinator of the body of elders and secretary: 3:3.1

visit of service overseer to field service group: 5:2.5

**Counsel: 25:9**

# D

**Dating**
unbeliever
marking: 12:77-80
support by elder or ministerial servant: 8:24
when not Scripturally free to remarry: 12:17.2

**Deaf: 5:2.4**
(See also Sign language)

**Death**
disfellowshipped or disassociated person: 19:10
elder or ministerial servant: 8:37

**Deletions**
elders and ministerial servants: 8
announcements: 8:38
appealing: 8:39
congregation file: 22:19
for judicial reasons or death: 8:37
pornography: 13:5-6
recommendations between circuit overseer's regular visits to congregation: 8:35
recommendations during circuit overseer's regular visit to congregation: 8:34
resignations: 8:36
reviewing qualifications: 8:31-33
*Shepherd* book: Intro:3
when appointed brother moves out of congregation: 8:12
pioneers: 9:4-5, 11-19; 13:5-6

**Disassociations: 18**

**Disasters and emergencies: 26**
preparedness: 26:1-6
annual part on midweek meeting: 26:6
congregation records: 26:4
contact information: 26:2

review of arrangements with body of elders: 26:5
special needs: 26:3
response
local area: 26:7-12
contacting publishers: 26:7
practical support: 26:12
safety: 26:10
shepherding: 26:11
updating circuit overseer: 26:9
updating coordinator of the body of elders: 26:8
other area: 26:13

**Disfellowshipped or disassociated individuals**
appointed brother allows to live in home: 8:23
association with: 12:17.1
contact by elders: 25:20
death: 19:10
monthly JW Broadcasting programs: 21:41
moving: 22:9
prisoners: 28:17
transportation to meetings: 20:39

**Disfellowshipping: 16:26-31**

**Disruptive individuals: 20:37-38**

**Divorce**
assistance to those contemplating: 25:11
bearing on recommendation as elder or ministerial servant: 8:9; 25:11
Scriptural freedom to remarry: 12:71-76
judicial hearings: 15:14
weddings: 27:3.1-2, 6.1

**"Do-not-calls"**
child abuser: 14:27-28
request by householder: 23:22
request by manager: 23:23

**Domestic violence: 12:36-37**

**Drugs: 12:15.4**

**Drunkenness: 12:18-19**

**Durable power of attorney (DPA)**
admission to hospital: 11:4

elderly: 11:3
Hospital Liaison Committee: 11:8.4;
  20:15
newly baptized publishers: 11:1

### E

**Emergencies**
(See Disasters and emergencies)
**Employment**
false religion: 12:39.5
gambling: 12:32
neutrality: 18:3.4
**Engagements: 27:4**
**Evidence establishing wrongdoing:
 12:40-42**
**"Exemplary": 2:4**
**Expenses**
approval of: 3:3.20
circuit overseer: 10:6-8
Kingdom Hall: 21:20-22; A
**Extortion: 12:31-34**
**Eyewitnesses**
appeal hearing: 17:6
establishing wrongdoing: 12:40.2
judicial hearing: 16:2-3

### F

**False teachings: 12:39.3**
**Field ministry: 23**
Bible study with child of Christian parent:
  2:3.3
congregation territory assignment:
  23:1-4
"do-not-calls"
  child abuser: 14:27-28
  request by householder: 23:22
  request by manager: 23:23
harbor witnessing: 23:20
inactive: 25:17
incidents resulting in injury or death
  while engaging in: 29:1.5
literature
  oversight: 5:2.4
  selection of servant: 1:2.7

meetings for field service
  conductors
    approval: 1:2.8
    groups: 7:2.2
    scheduling: 5:2.2
  locations and meeting times: 2:3.1
multilanguage fields: 24:1-10
nursing homes: 23:19
prisons: 28:10-16
  literature: 28:10-12
  publishers who transfer to another
    facility: 28:16
  reporting activity: 28:13-14
  reporting baptisms: 28:15
public witnessing: 23:5-17
  displaying literature: 23:15
  electronic devices: 23:16
  equipment: 23:9-10
  participants: 23:11-12
  selecting suitable locations: 23:5-6
  site permission and insurance cover-
    age: 23:7-8
  special metropolitan: 23:17
  training: 23:13-14
reports and records: 22:12-17
  collecting: 7:2.9
  pioneers: 9:10-17
  prisons: 28:13-14
  publishers who regularly move to sec-
    ond residence: 8:14; 22:5
retirement homes: 23:19
review of activity
  field service group: 7:2.6
  pioneers: 9:14-17
  showing consideration for those in-
    volved in additional theocratic as-
    signments: 23:25-26
universities: 23:18
witnessing difficulties: 23:22-24
**Field missionaries: 22:15**
**Field service groups**
assigning publishers: 2:3.1
assistant: 7:1

number:   1:2.2
overseer:   7
  qualifications:   7:1
  responsibilities:   7:2
review of activity:   7:2.6
visit of service overseer:   5:2.5
**Fits of anger:   12:36-37**
**Foreign-language field (See Multilanguage fields)**
**Forms:   5:2.6**
*Application for Regular Pioneer Service* (S-205):   9:1-3, 9
"Are You Ready to Face a Faith-Challenging Medical Situation?" (*kmi11/90*):   11:1
*Congregation Job Hazard Analysis* (DC-85):   21:29
*Congregation Job Hazard Analysis Instructions* (DC-85i):   21:29
*Congregation Meeting Attendance Record* (S-88):   22:18
*Congregation Territory Assignment* (S-54):   23:2
*Congregation's Publisher Record* (S-21)
  hour credit:   9:13-14
  infirm regular pioneers:   9:19
  judicial information:   22:21-22
  letters of introduction:   22:5
  publishers who regularly move to second residence:   8:14; 22:5
durable power of attorney (DPA)
  admission to hospital:   11:4
  elderly:   11:3
  Hospital Liaison Committee:   11:8.4; 20:15
  newly baptized publishers:   11:1
*Field Service Report* (S-4)
  collecting:   7:2.9
  pioneers:   9:10-17
  publishers who regularly move to second residence:   8:14; 22:5
"Honorable Marriage in God's Sight" (S-41):   27:5

"How Do I View Blood Fractions and Medical Procedures Involving My Own Blood?" (*kmi11/06*):   11:1
*How Parents Can Protect Their Children From Misuse of Blood* (S-55):   11:2
*Identity Card* (ic):   11:8.4
*Incident Report* (TO-5):   21:30-31
*Incident Report Instructions* (TO-5i):   21:30-31
*Information for Expectant Mothers* (S-401):   11:2
*Kingdom Hall Information* (S-5):   21:33
*Notification of Disfellowshipping or Disassociation* (S-77):   22:22
pioneer appointment letter (S-202):   9:9
pioneer welcome letter (S-236):   9:3
*Prison Information* (S-68):   28:6
*Public Witnessing Guidelines* (S-148):   23:13
*Public Witnessing Supplies* (S-80):   23:10
*Recommendations for Appointment of Elders and Ministerial Servants* (S-62):   8:15, 21
*Reminders for Those Assigned Public Talks* (S-141):   20:1
*Renting Facilities for Theocratic Events* (TO-19):   21:4
*Report of Meeting Attendance* (S-3):   22:18
*Report on Circuit Overseer's Visit With Congregation* (S-303):   1:6.1; 22:20
*Special Medical Needs Room Request* (*hlc*-20):   11:10-15
*Suggestions for Publishers Learning Another Language* (S-394):   24:24
*Territory Adjustment Request* (S-6):   23:2
*Territory Assignment Record* (S-13):   23:3
*Territory Map Card* (S-12):   23:2
*Working Together Safely—Standards for Theocratic Construction and Maintenance* (DC-82):   21:28

**Fraud:** 12:24-28
**Funerals:** 2:3.11; 21:19; 27:5

### G

**Gambling:** 12:31-33
**Gluttony:** 12:20
**Greed:** 12:31-34
**Gross uncleanness, uncleanness with greediness:** 12:14-15
  pornography: 13:3
  sexting: 14:30

### H

**Harbor witnessing:** 23:20
**Higher education:** 8:30
**Holidays:** 12:39.1
**Homebound publishers:** 20:24, 26-27
**"Honorable Marriage in God's Sight" (S-41):** 27:5
**Hospital Liaison Committees:** 11:2, 6-15; 20:15
**Hour credit:** 9:11-14
**"How Do I View Blood Fractions and Medical Procedures Involving My Own Blood?" (*kmi11/06*):** 11:1
*How Parents Can Protect Their Children From Misuse of Blood* **(S-55):** 11:2

### I

*Identity Card* **(ic):** 11:8.4
**Idolatry:** 12:39.7
**"In good standing":** 2:4
**Inactive**
  field service records: 22:12, 16
  Memorial and special talk: 25:15
  repentant wrongdoer: 25:18
  shepherding: 25:13-18
  wrongdoing by: 12:44-46
*Incident Report* **(TO-5):** 21:30-31
*Incident Report Instructions* **(TO-5i):** 21:30-31
**Infirm regular pioneers:** 9:18-19
**Information board:** 21:34
  inactive ones: 25:14
  social events: 29:8

*Information for Expectant Mothers* **(S-401):** 11:2
**Interfaith:** 12:39.2
**Internet service**
  circuit overseer: 10:8
  Kingdom Hall: 21:36, 38.3
**Interpretation**
  sign-language: 20:28-35
    attire: 20:32-34
    seating area: 20:28-29
    songs: 20:35
    use of natural sign language: 20:30-31
  simultaneous: 24:19, 23
**Irregular publishers:** 7:2.9

### J

**Joining another religion:** 18:3.2
**Judicial committee**
  appeals
    (See Appeals)
  determining which congregation should handle the matter: 12:63-65
  disassociations
    (See Disassociations)
  disfellowshipping: 16:26-31
  evidence establishing wrongdoing: 12:40-42
    confession: 12:40.1
    eyewitnesses: 12:40.2
      appeal hearing: 17:6
      judicial hearing: 16:2-3
  files: 22:21-27
  inactive: 25:18
  inviting accused to hearing: 15:7-11
  legal action: 15:18-20
  marking: 12:77-80
  meeting with baptized minors and young adults: 15:15
  meeting with incarcerated ones: 28:22
  meeting with marriage mates: 15:12-14
  mental or emotional problems: 16:12
  news media: 15:19

offenses requiring review by elders:
12:2-39
   adulterous marriage:   12:10-12
   apostasy:   12:39
      causing divisions, promoting sects:
         12:39.4
      deliberately spreading teachings
         contrary to Bible truth:   12:39.3
      employment:   12:39.5
      holidays:   12:39.1
      idolatry:   12:39.7
      interfaith:   12:39.2
      spiritism:   12:39.6
   brazen conduct:   12:16-17
      dating though not Scripturally free
         to remarry:   12:17.2
      pornography:   13:4
      sexting:   14:30
      unnecessary association with disfel-
         lowshipped or disassociated indi-
         viduals:   12:17.1
   child abuse:   14:19; 16:2
   drunkenness:   12:18-19
   extortion:   12:34
   fits of anger:   12:36-37
   fraud:   12:24-28
   gambling:   12:31-33
   gluttony:   12:20
   greed:   12:31-34
   gross uncleanness, uncleanness with
      greediness:   12:14-15
      extreme physical uncleanness:
         12:15.5
      immoral conversations over tele-
         phone or Internet:   12:15.2; 14:30
      misuse of tobacco or marijuana and
         abuse of medical, illicit, or addic-
         tive drugs:   12:15.4
      momentary touching of intimate
         body parts or caressing of
         breasts:   12:15.1
      viewing abhorrent forms of pornog-
         raphy:   13:3
   lying:   12:22-23
   manslaughter:   12:38
   obscene speech:   12:15.2, 30
   pornography:   13:2-4
   refusal to provide for family:   12:35
   reviling:   12:29
   sexual immorality (por·nei'a):   12:3-6
   slander:   12:24-28
   stealing:   12:21
   strong circumstantial evidence of sex-
      ual immorality (por·nei'a):   12:7-9
   violence:   12:36-37
permitting individuals to commit sexual
   immorality in home:   12:67-70
preparing mind and heart to judge:
   15:4-6
recordings:   16:1
reinstatements
   (See Reinstatements)
repentance:   16:6-17
reproof:   16:18-25
restrictions
   letter of introduction:   22:7
   reinstatement:   19:11-12, 14
   reproof:   16:19, 22
Scriptural freedom to remarry:   12:10-12,
   71-76
selecting committee and chairman:
   15:1-3
serious wrongdoing that occurred years
   in past:   12:57-59
suicide
   attempt:   12:81
   threat:   15:17
those having certain privileges of service:
   12:43
those who have not associated for many
   years:   12:44-46
unbaptized publishers:   12:47-56
validity of wrongdoer's baptism:
   12:60-62
wrongdoing involving individuals from
   different congregations:   12:66
**JW Broadcasting:   21:41**
*JW Library:*   **20:21**

**JW.ORG**
applications:  22:29
assigning roles:  2:3.12
e-mail:  22:1-4
local domain administrators:  3:3.15;
  4:2.12
**JW Stream:  20:25-27**
Memorial and special talk:  20:10
multilanguage fields:  24:17

## K

**Kingdom Hall and Assembly Hall construc-
  tion worldwide:  1:2.15**
*Kingdom Hall Information* (S-5):  **21:33**
**Kingdom Halls**
cleaning:  21:5-7
  coordinator:  21:7
  Kingdom Hall Operating Committee:
    21:15, 17
construction:  21:23-24; A
contact congregation:  21:2-3
dedications:  21:43
expenses:  21:20-22; A
funerals:  2:3.11; 21:19; 27:5
incidents:  21:30-32
information board:  21:34
  inactive ones:  25:14
  social events:  29:8
inspections:  21:25
Internet service:  21:36, 38.3
JW Broadcasting monthly programs:
  21:41
Kingdom Hall Operating Committee:
  21:15-20
  monthly contribution:  1:2.16
library:  21:39-40
maintenance and repair:  21:8-14; A
  coordinator:  21:14
  Kingdom Hall Operating Committee:
    21:15, 17-18
meeting times:  21:19-20, 33
merging congregations:  21:23
moisture-related problems:  21:12

ownership:  21:3
phone answering system:  21:35
property:  21:42
renovation:  21:22-24; A
rented facilities:  21:4, 13
safety:  21:27-29
  cleaning:  21:6-7, 17
  maintenance:  21:8-9, 14, 17
security:  21:26
signs
  meeting times:  21:33
  multilanguage fields:  24:28
  yeartext:  21:38.2; 24:28
upgrades:  21:22; A
video equipment:  21:37-38; A
weddings:  27:6
written agreement:  21:20
yeartext:  21:38.2; 24:28
**Kingdom Ministry School:  8:13**

## L

**Legal matters:  29**
charitable donation programs:  29:10
  fund-raising programs:  29:10.3
  matching donation programs:  29:10.1
  volunteer service donation programs:
    29:10.2
child abuse:  14:6-10
  child pornography:  14:10
  prison inmates:  14:9, 27
  sexting:  14:3, 10, 30
child custody:  29:9
incidents resulting in injury or death
  while engaging in theocratic activities:
  21:30; 29:1.5
news media:  15:19
personal legal advice:  29:2
presiding at weddings:  27:2-5
public witnessing:  23:7-8
social events:  29:8
threats of legal action:  15:18-20
undocumented aliens:  29:3-7
witnessing difficulties:  23:22-24

**Letters of introduction: 22:5-8**
   child abusers: 14:26-27
   elders and ministerial servants: 8:12-14
   pioneers: 9:6-7
**Library: 21:39-40**
**Life and Ministry Meeting**
   assignments: 1:2.8; 3:3.17
   auxiliary counselor: 1:2.5
   chairman: 1:2.8
   conducting: 20:19
   Congregation Bible Study
      approval of conductors and readers:
         1:2.8
      conducting: 20:19
   counselors for auxiliary classes: 1:2.5
   overseer: 1:2.4
**Literature**
   disfellowshipped individuals: 16:26.3
   oversight: 5:2.4
   prisons: 28:10-12
   public witnessing: 23:15
   selection of literature servant: 1:2.7
**Local Design/Construction Department**
   disasters: 26:12
   inspections: 21:25
   maintenance and repair: 21:8-14; A
   major renovation and new construction:
      21:23-24; A
   rented facilities: 21:4
   security system: 21:26
   upgrades and minor renovation:
      21:22; A
   use of congregation property: 21:42
   video equipment: 21:37; A
**Local needs parts: 20:14-15**
   assemblies: 20:16
   conventions: 20:17
**Lying: 12:22-23**

**M**

**Maintenance and repair: 21:8-14; A**
   coordinator: 21:14

   Kingdom Hall Operating Committee:
      21:15, 17-18
   safety: 21:27-29
**Manslaughter: 12:38**
**Marijuana: 12:15.4**
**Marking: 12:77-80**
**Marriage**
   adulterous: 12:10-12
      judicial files: 22:26-27
      letters of introduction: 22:7-8
   Scriptural freedom: 12:71-76
      confirmation before wedding:
         27:3.1-2, 6.1
      dating: 12:17.2
      resuming relations: 15:14
   shepherding: 25:10-11
   support of uneven yoking: 8:24
**Masturbation: 12:4**
**Medical matters: 11**
   accepting blood: 18:3.3
   admission to hospital: 11:4
   baptism of individual with communicable
      disease: 11:16-17
   communication with medical personnel:
      11:5
   elderly: 11:3
   Hospital Liaison Committee: 11:6-9
      local needs parts: 20:15
   newly baptized publishers: 11:1
   parents and pregnant sisters: 11:2
   Patient Visitation Group: 11:6
   traveling to care for medical needs:
      11:10-15
**Meetings: 20**
   attendance records: 22:18
      pregroups and groups: 24:20
      prison: 28:17
   attendants
      approval: 1:2.8
      disruptive individuals: 20:37-38
      oversight: 3:3.18
   baptism
      candidates: 3:3.3

one year after
    reminder:   4:2.7
    scheduling:   3:3.6
broadcasting systems:   20:24
disruptive individuals:   20:37-38
elders':   1:1, 3-11
    arranging for:   3:3.4
    compiling and distributing
     agenda:   1:7
    during meeting:   1:8-11
    length:   1:3
    reviewing qualifications:   8:31-33
    what to discuss:   1:5-6
    when to hold:   1:4
field service
    conductors
        approval:   1:2.8
        group overseer:   7:2.2
        scheduling:   5:2.2
    locations and meeting times:   2:3.1
informing of appointment:   8:17-19
informing of deletion:   8:34-35
*JW Library:*   20:21
JW Stream:   20:25-27
    Memorial and special talk:   20:10
    multilanguage fields:   24:17
Kingdom Hall Operating Committee:
 21:16
meeting times:   21:19-20, 33
Memorial:   20:6-12
    chairman and announcements:   20:12
    inactive:   25:15
    JW Stream:   20:10
    meeting times:   20:8
    other meetings week of:   20:9
    prayers:   20:7
    pregroups and groups:   24:22
    prisons:   28:19
    speaker:   20:6
midweek (Life and Ministry Meeting)
    announcements:   20:13
    annual part on disaster preparedness:
     26:6
    assignments:   1:2.8; 3:3.17

auxiliary counselor:   1:2.5
chairman:   1:2.8
Congregation Bible Study
    approval of conductors and read-
     ers:   1:2.8
    conducting:   20:19
    counselors for auxiliary classes:   1:2.5
    local needs parts:   20:14-15
        assemblies:   20:16
        conventions:   20:17
    overseer:   1:2.4
multilanguage fields:   24:13-23
    audio/video tie-in:   24:17-18
    during visit of circuit overseer:   24:23
    groups:   24:14-15
    interpretation:   24:19, 23
        (See also Sign language)
    locations:   24:16
    Memorial:   24:22
    pregroups:   24:13
    recording attendance:   24:20
    recordings:   24:17-18
    songs:   24:21
passing microphones:   1:2.8
pioneer
    review of application:   9:1
    review of field service activity:
     9:15-17
    with elders in December/January:
     1:2.12
pornography:   13:1
prayer:   1:2.8
prisons:   28:17-20
    extended meetings:   28:20
    Memorial:   28:19
recordings
    Memorial:   20:10; 28:19
    special public talk:   20:10
resignations:   8:36
sign-language:   20:28-36
    audio during videos:   20:36
    interpretation:   20:28-35
        attire:   20:32-34

seating area:  20:28-29
   songs:  20:35
   use of natural sign language:
      20:30-31
  visual aids:  20:20
songs:  20:21-23
  pregroups and groups:  24:21
  sign-language:  20:35
sound
  approval of those working with:  1:2.8
  oversight:  3:3.18
  sign-language videos:  20:36
stage
  approval of those working with:  1:2.8
  oversight:  3:3.18
transportation for disfellowshipped:
  20:39
unbaptized publishers
  desirous of becoming:  3:3.5
  with parents of minors involved in
    wrongdoing:  12:55
video:  20:21
  approval of those working with:  1:2.8
  oversight:  3:3.18
  sign-language:  20:36
visual aids:  20:20
weekend
  public talk
    chairman
      approval:  1:2.8
      Memorial and special talk:
        20:12
      scheduling:  3:3.19
    coordinator
      oversight:  3:3.18
      selection:  1:2.7
    overcrowding:  21:33
    speakers:  20:1-5
      assignments:  20:2-3
      hospitality and travel expenses:
        20:5
      qualifications:  20:1
      symposiums:  20:4

   special
      chairman and announcements:
        20:12
      inactive:  25:15
      JW Stream:  20:10
      speaker:  1:2.13
  *Watchtower* Study
    conductor:  6
      conducting study:  6:2-9
      qualifications:  6:1
    overcrowding:  21:33
    paragraph readers
      approval:  6:9
      recordings:  6:9
      scheduling:  3:3.19
**Memorial:  20:6-12**
  chairman and announcements:  20:12
  inactive:  25:15
  JW Stream:  20:10
  meeting times:  20:8
  other meetings week of:  20:9
  prayers:  20:7
  pregroups and groups:  24:22
  prisons:  28:19
  speaker:  20:6
**Merging congregations:  21:23**
**Microphones, passing:  1:2.8**
**Moisture-related problems:  21:12**
**Moving**
  child abusers:  14:26-27
  disfellowshipped or disassociated individ-
    uals:  22:9
  elders and ministerial servants:  8:12-14
  letters of introduction:  22:5-8
  pioneers:  9:6-7
  prisoners:  28:16
  wrongdoers:  12:64; 19:13-16
**Multilanguage fields:  24**
  assemblies:  24:27
  assisting publishers:  24:24-26
  conventions:  24:27
  forming pregroups, groups, and congre-
    gations:  24:2-5

host congregation:   24:11-12
invitations:   24:28
meetings:   24:13-23
    audio/video tie-in:   24:17-18
    during visit of circuit overseer:   24:23
    groups:   24:14-15
    interpretation:   24:19, 23
        (See also Sign language)
    locations:   24:16
    Memorial:   24:22
    pregroups:   24:13
    recording attendance:   24:20
    recordings:   24:17-18
    songs:   24:21
signs:   24:28
territory coverage:   24:6-10
yeartext:   24:28
**Murder:   12:38**

## N

**Neutrality:   18:3.4**
**News media:   15:19**
***Notification of Disfellowshipping or Disas-
    sociation* (S-77):   22:22**
**Nursing homes:   23:19**

## O

**Obscene speech:   12:15.2, 30**
**Online storage services:   22:28**

## P

**Patient Visitation Groups:   11:6**
**Permitting individuals to commit sexual
    immorality in home:   12:67-70**
**Phone answering system:   21:35**
**Pioneers:   9**
    appointment letter (S-202):   9:9
    appointments:   9:1-3
    changes to information:   9:8
    congregation changes:   9:6-7
    deletions:   9:4-5
    *Field Service Reports* (S-4):   9:10
    hour credit:   9:11-14
    infirm:   9:18-19

meeting with elders in December/
    January:   1:2.12
prisoners:   28:21
review of activity:   9:15-17
special consideration:   9:14
special pioneer
    field service report:   22:15
    wrongdoing by:   12:43
welcome letter (S-236):   9:3
**Plea bargain:   12:40.1**
***Por·nei′a:*   12:3-9**
**Pornography:   13**
    child pornography:   14:3, 10
    determining whether a judicial hearing is
        required:   13:2-4
    reappointment of elders and ministerial
        servants:   13:8
    reviewing qualifications of appointed per-
        sons:   13:5-6
    shepherding:   13:7
**Prayer**
    elders' meetings:   1:1
    public:   1:2.8
**Pregroups**
    (See Multilanguage fields)
**Prisons:   28**
    child abuse:   14:9, 27
    communication with prison officials:
        28:8
    contact congregation:   28:2-4
    correspondence with branch office:
        28:5-7
    inmates serving in appointed capacity:
        28:21
    judicial hearings:   28:22
    meetings:   28:17-20
        extended:   28:20
        Memorial:   28:19
    ministry:   28:10-16
        literature:   28:10-12
        proof of ordination:   28:8
        publishers who transfer to another
            facility:   28:16
        reporting activity:   28:13-14
        reporting baptisms:   28:15

referrals and contact with prisoners: 28:9
**Public talk**
  chairman
    approval:  1:2.8
    scheduling:  3:3.19
  coordinator
    oversight:  3:3.18
    selection:  1:2.7
  speakers:  20:1-5
    assignments:  20:2-3
    hospitality and travel expenses:  20:5
    qualifications:  20:1
    symposiums:  20:4
  special
    inactive:  25:15
    speaker:  1:2.13
**Public witnessing:  23:5-17**
  displaying literature:  23:15
  electronic devices:  23:16
  equipment:  23:9-10
  participants:  23:11-12
  selecting suitable locations:  23:5-6
  site permission and insurance coverage: 23:7-8
  special metropolitan:  23:17
  training:  23:13-14

### R

**Rape:  12:5, 41; 16:2**
**Reappointment of elders and ministerial servants:  13:8**
**Recommendations**
  (See Appointments)
*Recommendations for Appointment of Elders and Ministerial Servants* **(S-62): 8:15, 21**
**Recordings**
  assemblies and conventions:  24:27
  judicial hearings:  16:1
  Memorial:  20:10; 28:19
  multilanguage fields:  24:17-18
  paragraph reading:  6:9
  special public talk:  20:10

**Records**
  (See Correspondence and records)
**Reinstatements:  19**
  child abuse:  14:20-21
  communication between committees: 19:13-16
  hearings:  19:5-8
  if the decision is not to reinstate:  19:9
  if the decision is to reinstate:  19:10-12
  requests for:  19:1-4
**Refusal to provide for family:  12:35**
*Reminders for Those Assigned Public Talks* **(S-141):  20:1**
**Renovation:  21:22-24; A**
*Renting Facilities for Theocratic Events* **(TO-19):  21:4**
**Repentance**
  judicial hearings:  16:6-17
  reinstatement hearings:  19:5-8
*Report of Meeting Attendance* **(S-3): 22:18**
*Report on Circuit Overseer's Visit With Congregation* **(S-303):  1:6.1; 22:20**
**Reproof:  16:18-25**
**Resignations:  8:36**
**Restrictions**
  branch-imposed:  14:22-24
  judicial
    letter of introduction:  22:7
    reinstatement:  19:11-12, 14
    reproof:  16:19, 22
**Retirement homes:  23:19**
**Reviewing qualifications of elder or ministerial servant:  8:31-33**
  bankruptcy:  8:29
  disfellowshipped or disassociated family member in home:  8:23
  higher education:  8:30
  member of household involved in serious wrongdoing:  8:22
  past disfellowshipping offense never addressed:  8:25-27
  permitting individuals to commit sexual immorality in home:  12:69

supports marriage of a baptized Christian to an unbaptized person: 8:24
viewed pornography: 13:5-6
**Reviling: 12:29**

# S

**S-202 letter: 9:9**
**S-236 letter: 9:3**
**Safety**
disasters: 26:10
Kingdom Hall: 21:27-29
cleaning: 21:6-7, 17
maintenance: 21:8-9, 14, 17
**Scriptural freedom to remarry: 12:71-76**
adulterous marriage: 12:10-12
confirmation before wedding: 27:3.1-2, 6.1
dating: 12:17.2
resuming relations: 15:14
**Secretary: 4**
qualifications: 4:1
responsibilities: 4:2
**Sects: 12:39.4**
**Security: 21:26; 22:10**
**Separation**
assistance to those contemplating: 25:11
bearing on privileges: 8:9; 25:11
refusal to provide for family: 12:35
**Service overseer: 5**
qualifications: 5:1
responsibilities: 5:2
**Serving where need is greater: 2:3.7**
**Sexting: 12:15.2, 30**
minors: 14:3, 10, 30
**Sexual immorality (*por·nei′a*)**
judicial offense: 12:3-9
permitting in one's home: 12:67-70
*Shepherd Addendum:* **Intro:2**
**Shepherding: 25**
calls: 25:3
child abuse: 14:12-17
counsel: 25:9
disasters: 26:11

disfellowshipped or disassociated ones: 25:20
engaged individuals: 27:4
inactive: 25:13-18
marital problems: 25:10-11
pornography: 13:7
publishers learning another language: 24:24-26
recognizing spiritual weakness: 25:7-8
sisters: 25:12
training ministerial servants: 25:4-6
**Sign language: 20:28-36**
audio: 20:36
interpretation: 20:28-35
attire: 20:32-34
seating area: 20:28-29
songs: 20:35
use of natural sign language: 20:30-31
visual aids: 20:20
**Signs**
groups: 24:28
meeting times: 21:33
yeartext: 21:38.2; 24:28
**Slander: 12:24-28**
**Smoking: 12:15.4**
**Songs: 20:21-23**
pregroups and groups: 24:21
sign-language: 20:35
**Sound**
approval of those working with: 1:2.8
oversight: 3:3.18
sign-language videos: 20:36
*Special Medical Needs Room Request* (*hlc-20*)**: 11:10-15**
**Special metropolitan public witnessing: 23:17**
**Special pioneer**
field service report: 22:15
wrongdoing by: 12:43
**Special public talk**
chairman and announcements: 20:12
inactive: 25:15
JW Stream: 20:10
speaker: 1:2.13

**Spiritism:** **12:39.6**
**Stage:** **3:3.18**
   approval of those working with:   1:2.8
   oversight:   3:3.18
**Stealing:** **12:21**
*Suggestions for Publishers Learning Another Language* **(S-394):** **24:24**
**Suicide**
   attempt:   12:81
   threat:   15:17
**Symposiums:** **20:4**

## T

**Territory**
   congregation assignment:   23:1-4
   multilanguage fields:   24:6-10
   oversight:   5:2.1
   selection of territory servant:   1:2.7
*Territory Adjustment Request* **(S-6):** **23:2**
*Territory Assignment Record* **(S-13):** **23:3**
*Territory Map Card* **(S-12):** **23:2**
**Tobacco:** **12:15.4**
**Training:** **1:6.4-5**
   body of elders:   1:6.4-5
   group overseer:   7:2.8
   public witnessing:   23:13-14
   shepherding:   25:4-6

## U

**Unbaptized publishers**
   dating:   12:79
   durable power of attorney (DPA) and *Identity Card* (ic):   11:8.4
   handling wrongdoing by:   12:47-56
   meeting with those desirous of becoming:   3:3.5
   weddings:   27:3, 6.1
**Uncleanness:** **12:14-15**
**Undocumented aliens:** **27:6.1; 29:3-7**

## V

**Video:** **20:21**
   approval of those working with:   1:2.8

   equipment:   21:37-38
   footage at funerals and weddings:   27:5
   multilanguage fields:   24:17-18
   oversight:   3:3.18
   sign-language:   20:35-36
**Violence:** **12:36-37**
**Visual aids:** **20:20; 27:5**
**Voyeurism:** **14:3**

## W

**Warning talk:** **12:77-80**
   determining need and assigning speaker:   1:2.11
   permitting sexual immorality in one's home:   12:70
   reproof:   16:23
   unbaptized publisher:   12:50
*Watchtower* **Study**
   conductor:   6
      conducting the study:   6:2-9
      qualifications:   6:1
   paragraph readers
      approval:   6:9
      recordings:   6:9
      scheduling:   3:3.19
**Weddings:** **27**
   information board:   21:34
   presiding at:   27:2-5
   proof of ordination:   27:3.3
   receptions:   27:4
   Scriptural freedom:   27:3.1-2, 6.1
   support of uneven yoking:   8:24
   unbaptized publishers:   27:3, 6.1
   undocumented aliens:   27:6.1
   use of Kingdom Hall:   27:6
**Witnessing difficulties:** **23:22-24**
*Working Together Safely—Standards for Theocratic Construction and Maintenance* **(DC-82):** **21:28**
**Written agreement:** **21:20**

## Y

**Yeartext:** **21:38.2; 24:28**